ⒸCOPY

1 | SPILLANE WEINGARTEN LLP
Jay M. Spillane (Bar No. 126364)
2 | jspillane@spillaneweingarten.com
3 | Raphael Cung (Bar No. 201829)
rcung@spillaneweingarten.com
4 | 1880 Century Park East, Suite 1004
Los Angeles, CA 90067-2627
5 | Telephone: (310) 229-9300
Fax: (310) 229-9380
6 |

7 | Attorneys for Plaintiff CWIE, LLC

8 |

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | SANTA ANA DIVISION

12 |

13 | CWIE, LLC,

14 |      Plaintiff,

15 |    vs.

16 |

17 | BANDWIDTH CONSULTING, INC.,
a California corporation; ARI
18 | BENOWITZ, an individual; MIKE
FLATIN, an individual; SCOT ROSS,
19 | an individual; and DOES 1-10,

20 |      Defendants.

Case No. **SACV08-01423 DOC (RNBx)**

**COMPLAINT FOR:**

(1) BREACH OF CONTRACT;
(2) ENFORCEMENT OF DUTIES
OF INSPECTION (CORP. CODE
§ 1600 ET SEQ.); AND
(3) BREACH OF FIDUCIARY
DUTIES;

JURY TRIAL DEMANDED

BY FAX

FILED
2008 DEC 18 AM 10:48

Plaintiff CWIE, LLC ("CWIE"), avers:

## Jurisdiction and Venue

1.      Jurisdiction is proper in this court under 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000, and the action is between citizens of different states.

2.      Venue is proper in the United States District Court for the Central District of California, Santa Ana Division, under 28 U.S.C. § 1391(a).  The defendants' principal place of business is located in Costa Mesa, California.  The defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## Nature of Action

3.      CWIE is an Internet hosting company located in Tempe, Arizona.  The defendants have unlawfully frozen out CWIE, a ten percent shareholder in defendant Bandwidth Consulting, Inc. ("BandCon"), an Internet hosting company in Costa Mesa, California.  CWIE provided the means by which BandCon could launch its business.  Now that BandCon has parlayed CWIE's invaluable initial investments into a successful company, BandCon regrets, and has brazenly repudiated, its obligations to CWIE.

4.      In 2002 BandCon was a startup company without substantial assets or operations.  BandCon wanted to get into the web hosting business.  At BandCon's request, CWIE provided the means by which BandCon could start its business.  CWIE provided servers and other equipment to BandCon.  CWIE permitted BandCon to purchase bandwidth through CWIE's contract with backbone provider Level 3, terms that BandCon could not obtain on its own.  CWIE technical personnel provided heavy support to BandCon until BandCon could become more technically self-sufficient.

5.      In consideration for those valuable investments, opportunities and services, BandCon and CWIE entered into a Subscription Agreement by which CWIE was granted a guaranteed 10% of the shares of BandCon.  BandCon also promised to pay to CWIE, on a monthly basis, 10% of BandCon's net income.

1    6.    For years BandCon sent monthly checks to CWIE that purported to reflect

2    the agreed-upon 10% of net income.  Those monthly payments were made by

3    BandCon for the monthly periods commencing August 2003 and continuing through

4    December 2006.

5    7.    CWIE's initial investment allowed BandCon to develop into a flourishing

6    business.  Commencing in 2007, with Bandcom's income growing, its directors and

7    officers, including defendants Ari Benowitz ("Benowitz"), Mike Flatin ("Flatin") and

8    Scot Ross ("Ross"), on information and belief regretted having to perform their

9    promises to CWIE.  They knew that CWIE's net income payments were going to grow

10   as BandCon grew.  Rather than honor their promise to continue to make net income

11   payments to CWIE, on information and belief defendants decided to simply freeze

12   CWIE out.

13   8.    Defendants initially fended off CWIE's inquiries about the status of

14   payments by BandCon to CWIE with claims that BandCon was changing its

15   accounting method and that information would be forthcoming.  In early 2008

16   BandCon claimed that it had been through a period of growth, and that it paid nothing

17   until it "knew how much the growth would cost."

18   9.    By late April 2008, defendants' true intentions emerged.  In a meeting

19   with CWIE, defendants declared that "CWIE has received a significant return on its

20   investment in BandCon and the time has come for CWIE to either step up with

21   additional financing . . . for the company or walk away and compete fairly for business

22   in the market."  Of course, CWIE has no obligation whatsoever to provide additional

23   financing or walk away.  Defendants have no right whatsoever to simply decide that

24   CWIE has earned enough on its investment and to refuse to honor their obligations to

25   CWIE.

26   10.   BandCon recently boasted in a news release that "it had its best

27   performing quarter in the company's history," "a total revenue increase of 52% or $5.3

28   million of revenue for the 3rd quarter ending September 30, 2008."  BandCon has also

1  announced that the Orange County Business Journal has recently ranked BandCon as
2  the 8th fastest growing private company in Orange County.

3      11.    Despite this growing success, BandCon has refused to pay one red cent to
4  CWIE since December 2006.  The defendants have blatantly conspired to deprive
5  CWIE of its rights as a 10% shareholder of BandCon, and to CWIE's right to receive
6  monthly payments of 10% of BandCon's net income.  The defendants are liable for
7  breach of contract, breach of their corporate duties under the California Corporations
8  Code and breach of fiduciary duties.  CWIE is entitled to an award of actual damages
9  in an amount to be proven at trial, in no event less than $1,000,000, plus punitive
10 damages for defendants' willful and fraudulent conduct.  CWIE is also entitled to a
11 number of ancillary remedies, including appointment of an auditor or receiver for
12 BandCon.

13                              **The Parties**

14     12.    CWIE is a limited liability company with offices at 2353 W. University
15 Drive, Tempe, AZ 85281.  CWIE is 100% owned by CWIE Holding Company, Inc.,
16 an Arizona corporation located in Arizona.

17     13.    On information and belief, BandCon is a California corporation with its
18 principal office located at 151 Kalmus Drive, Suite M-2, Costa Mesa, CA 92626.

19     14.    On information and belief, Benowitz is an individual residing in Orange
20 County, California.  On information and belief, Benowitz is an officer, director and a
21 large shareholder of BandCon.

22     15.    On information and belief, Flatin is an individual residing in Orange
23 County, California.  On information and belief, Flatin is an officer, director and a large
24 shareholder of BandCon.

25     16.    On information and belief, Ross is an individual residing in Orange
26 County, California.  On information and belief, Ross is an officer of BandCon.

27     17.    CWIE has no knowledge of the true names and capacities of the parties
28 sued as Doe Defendants 1-10, inclusive, and therefore sues them using fictitious

1   names.  CWIE will amend this Complaint to identify these Doe Defendants

2   specifically if and when their true names and capacities are ascertained.

3         18.    On information and belief, through their acts or omissions, Does 1-10 are

4   responsible, along with the other specifically-named defendants, for the injuries

5   alleged, and therefore are liable to them.  On information and belief, at all times, the

6   specifically-named defendants and Does 1-10 were principals, agents, and

7   representatives of each other, or acting in concert with one another, such that the acts

8   or omissions of any of them can be ascribed to the others.

9                              **The Subscription Agreement**

10        19.    CWIE is a successful Internet hosting company.  CWIE's principal is Ron

11  Cadwell.  In 2002 BandCon was a startup company without substantial assets or

12  operations.  BandCon wanted to get into the web hosting business.  At BandCon's

13  request, CWIE provided the means by which BandCon could start its business.  CWIE

14  provided servers and other equipment to BandCon.  BandCon also wanted to take

15  advantage of CWIE's valuable relationship with companies such as Level 3, a

16  backbone Internet connection provider.  If BandCon directly approached Level 3 for

17  bandwidth, BandCon would have had to qualify for credit on its own, and BandCon

18  would not have received favorable pricing from Level 3.  On the other hand, if

19  BandCon purchased bandwidth through CWIE's contract with Level 3, BandCon

20  could avoid having to qualify for credit with Level 3 and would receive a more

21  favorable rate than BandCon could receive on its own.  In addition,  CWIE technical

22  personnel provided heavy support to BandCon until BandCon could become more

23  technically self-sufficient.

24        20.    BandCon agreed that if CWIE would provide these valuable investments,

25  connections and service, CWIE would have a guaranteed 10% of the shares in

26  BandCon, and BandCon would make monthly payments to CWIE of 10% of its net

27  income.

28

21.     In March 2002 the parties entered into a Subscription Agreement, a true and correct copy of which is attached hereto as Exhibit "A."  In the Subscription Agreement CWIE subscribed to receive 300 shares of voting common stock of BandCon (on information and belief then called "Big Blue Coyote, Inc."), which was to constitute 10% of the "equity interest" in BandCon, in consideration of investment by CWIE of from $25,000 to $50,000 in equipment or cash.  The Subscription Agreement provides that BandCon would issue enough shares to CWIE to ensure that CWIE always owned 10% of the shares of BandCon, and that CWIE would not be required to invest additional capital for these shares.  BandCon agreed to purchase bandwidth from CWIE, which CWIE agreed to pass through to BandCon at cost.  At ¶ 7.C. of the Subscription Agreement, BandCon agreed that it would make "a distribution to CWIE within 30 days after the close of each successive calendar month in an amount equal to 10% of its 'Net Profit,'" which term was defined in ¶ 7.C.

22.     Some months later, Benowitz sent a September 9, 2003 letter to CWIE, a true and correct copy of which is attached hereto as Exhibit "B," in which he explained that BandCon's accountant thought that the net profits payment "looks too much like a dividend," as a result of which BandCon would "'clarify' that we are not paying a 'dividend' but rather a payment on services from CWIE."  BandCon followed that letter up with an Amendment to the Subscription Agreement, pursuant to which the original ¶ 7.C. was replaced with a clause stating that CWIE would perform and submit invoices for monthly consulting services.  A true and correct copy of the Amendment to the Subscription Agreement is attached hereto as Exhibit "C."  While CWIE signed the amendment, CWIE does not know whether BandCon ever signed the agreement.  On information and belief, the Amendment was never approved at any noticed meeting of BandCon's shareholders or directors.

### The Monthly Payments to CWIE

23.     BandCon started delivering checks to CWIE that purported to satisfy BandCon's agreement to pay 10% of its net profits to CWIE.  These checks

commenced with a check dated November 14, 2003, containing a payment for the
month August 2003. BandCon continued sending checks in this fashion for the
months August 2003 through April 2006. After a gap of some months in 2006,
BandCon sent a large catch up check to CWIE in December 2006.

24. Although the Amendment to the Purchase Agreement purported to call for
payment against invoices for consulting services, at no time during the years that
BandCon sent these monthly payments to CWIE did BandCon treat the payments as
compensation for consulting services, nor did BandCon ever require delivery of an
invoice for consulting services against which to make the payment. Some of the
checks were sent with memos such as "10% consulting fee," indicating that the
calculation of the check reflected 10% of net profits. Other checks had memos such as
"CWIE Jan Consulting BandCon," even though, on information and belief, BandCon
neither asked for nor received consulting services in the month referenced, nor did
BandCon ask for or receive an invoice for actually rendered consulting services as a
condition of sending the check.

25. Communications by BandCon also reflected that they treated the monthly
payments as net profit payments, albeit pursuant to calculations that BandCon changed
over time. On February 24, 2006, CWIE sent an email asking for a reconciliation of
"investment income amounts that have been paid in 2005 to CWIE from BandCon for
the 10% equity ownership." Flatin responded that BandCon was still working on its
books for 2005, but that they had a way to calculate "Ron's 10% commission" that
was "easier" than auditing 2005. Flatin stated:

"Beginning when BandCon was split up (April 1, 2005) we changed the way
that the partners took out payment/commissions/etc. We moved away from
figuring out what the 'net' was each month and transitioned to a system where
we all take out our current percentage based on that the other partners take out.
What I mean by that is if Ari and Mike (45% and 45%) took $100k in

salary/draw commissions in a year, we'd pay Ron (now called consulting-RC on our checks) 10% of that number."

26.    The payments to CWIE grew over the years.  In 2003, the payments totaled about $3,000.00.  In 2004 the payments totaled about $15,000, in 2005 the payments totaled about $42,000 and in 2006 the total payments came to $104,000.

**Defendants' Decision to Freeze out CWIE**

27.    The large yearend payment made in December 2006 was the last payment BandCon made to CWIE.

28.    In a January 8, 2008 email Level 3 contacted CWIE, saying that they were "in the process of qualifying BandCon . . . for a sizable credit limit," and that the documents Level 3 received from BandCon showed that "BandCon is 10% owned by CWIE."  That email precipitated an inquiry by CWIE to BandCon concerning the status of CWIE's payments for 2007, none of which were made.  Although Flatin previously said that BandCon was relying on the "easier" system of paying to CWIE 10% of monies paid to Benowitz and Flatin, in responding to CWIE's 2008 inquiries, BandCon reverted to the position that CWIE's payments would require calculation of net profits.  Benowitz replied in a January 9, 2008 email that "We move from cash to accurl [sic] so we are working on it.  Should have the number in a month or so."  In an email later that day Benowitz equivocated that "This year with all the growth we did not pay out anything until we knew how much the growth would cost."

29.    For the first four months of 2008, BandCon continued to deflect CWIE's inquiries by claiming that BandCon was still trying to complete its financial statements for 2007.  In emails of February 29, 2008 and March 2, 2008 Ross wrote that BandCon was anticipating "pre audit internal numbers" in March and that outside accounting review started in April.

30.    Finally the parties met at CWIE's offices on or about April 24, 2008.  At that meeting the defendants abandoned their prior statements to the effect that they intended to pay subject to completing their accounting, but simply stated that they

1   would refuse to make any more payments to CWIE.  On information and belief, the

2   defendants realized that an honest accounting to CWIE – an accounting consistent with

3   the parties' agreements and past practices – would result in substantial payments due

4   to CWIE, and that such payments would continue to increase as BandCon grew in

5   profitability.  On information and belief, the defendants determined to avoid making

6   these payments by brazenly freezing CWIE out from its rights as a 10% owner of

7   BandCon.

8        31.     Ross sent a May 2, 2008 email to CWIE recapping the April 24, 2008

9   meeting from BandCon's standpoint.  In Ross's own words, BandCon stated that

10   CWIE had simply been paid enough already and that BandCon would refuse to honor

11   its agreement with CWIE.  Ross brazenly wrote that "CWIE has received a significant

12   return on it's [sic] investment in Bandcon and the time has come for CWIE to either

13   step up with additional financing and funding for the company or walk away and

14   compete fairly for business in the market."  Of course, CWIE has no obligation

15   whatsoever to provide additional financing or walk away.  Defendants have no right

16   whatsoever to simply decide that CWIE has earned enough on its investment and to

17   refuse to continue their obligations to CWIE.

18        32.     BandCon recently boasted in a news release that "it had its best

19   performing quarter in the company's history," "a total revenue increase of 52% or $5.3

20   million of revenue for the 3rd quarter ending September 30, 2008."  BandCon has also

21   announced that the Orange County Business Journal has recently ranked BandCon as

22   the 8th fastest growing private company in Orange County.

23        33.     Despite this success, BandCon has refused to pay CWIE one red cent

24   since December 2006.

25        34.     CWIE has repeatedly demanded production of financial information from

26   BandCon that would enable CWIE to determine how much BandCon owes to CWIE.

27   BandCon has refused to provide such information, except on the meritless grounds that

28

1    CWIE should enter into an onerous and unreasonable nondisclosure agreement in

2    order to see basic information to which it is entitled as a shareholder.

3          35.     BandCon has further refused to make payment of any money to CWIE in

4    satisfaction of its obligations to CWIE under the Subscription Agreement.

5                              **First Cause of Action**

6              **Against BandCon – Breach of Contract**

7          36.     CWIE refer to Paragraphs 1 through 35 above, which it incorporates by

8    reference into this cause of action.

9          37.     CWIE has substantially performed all of its duties under the Subscription

10    Agreement, except to the extent those duties have been excused by the material

11    breaches of defendants.

12          38.     All conditions to performance of the Subscription Agreement by

13    BandCon have occurred.

14          39.     CWIE has made repeated demands that BandCon perform its duties under

15    the Subscription Agreement.  BandCon has failed and refused to perform these duties.

16          40.     CWIE has been damaged by defendants' breaches, in an amount to be

17    proven at trial, in no event less than $1,000,000.

18          41.     CWIE is entitled to an award of attorneys' fees incurred in protecting its

19    rights under the Subscription Agreement.

20          42.     In addition, CWIE is entitled to injunctive relief and a decree of specific

21    performance requiring BandCon to produce its books and records for inspection,

22    copying and audit.

23                           **Second Cause of Action**

24        **Enforcement of Rights of Inspection – Against BandCon**

25          43.     CWIE refer to Paragraphs 1 through 42 above, which it incorporates by

26    reference into this cause of action.

27          44.     On November 24, 2008 and again on December 10, 2008, CWIE formally

28    demanded in writing that BandCon honor its duties to CWIE to permit inspection and

9

1 | copying of BandCon's accounting records and shareholder rolls. BandCon has refused
2 | to comply with any of these demands.

3 |     45.    CWIE is entitled, pursuant to California Corporations Code §§ 1600-
4 | 1605, to an order requiring BandCon to open its books and records for inspection and
5 | copying. The court may also enter an order appointing one or more inspectors or
6 | accountants to audit the books and records of BandCon.

7 |     46.    In connection with any such inspections, CWIE is entitled to an order
8 | requiring that BandCon bear the expense of any inspection or audit, and requiring
9 | BandCon to pay to CWIE its reasonable expenses, including attorneys' fees.

10 | **Third Cause of Action**

11 | **Breach of Fiduciary Duties – Against Benowitz, Flatin, Ross & Does 1-10**

12 |     47.    CWIE refer to Paragraphs 1 through 46 above, which they incorporate by
13 | reference into this cause of action.

14 |     48.    Defendants Benowitz and Flatin, as directors, officers and major
15 | shareholders of BandCon, owe fiduciary duties of due care and loyalty to CWIE as a
16 | minority shareholder in BandCon. Defendants Ross and Does 1-10, as directors and/or
17 | officers of BandCon, owe fiduciary duties of due care and loyalty to CWIE as a
18 | minority shareholder in BandCon.

19 |     49.    Defendants have breached these duties by engaging in bad faith conduct
20 | and self dealing. Defendants have repudiated and are attempting to deprive CWIE of
21 | all of its rights of CWIE as a shareholder of BandCon. Defendants have refused to
22 | provide information to CWIE to which it is entitled, and have refused to pay any of the
23 | monies due and owing to CWIE as shareholder of BandCon.

24 |     50.    CWIE is entitled to an award of actual damages arising from defendants'
25 | breaches of their fiduciary duties, in an amount to be proven at trial, in no even less
26 | than $1,000,000.

27 |     51.    Defendants have undertaken these actions maliciously and fraudulently,
28 | entitling CWIE to an award of punitive damages.

52.    Defendants' brazen breaches of their fiduciary duties to CWIE, and their acts of mismanagement and self dealing, justify appointment by the Court of a receiver over BandCon.

### PRAYER FOR RELIEF

WHEREFORE, CWIE prays for the following relief:

A.    An award of damages against defendants in an amount to be proven at trial, in no event less than $1,000,000.

B.    An award of punitive damages.

C.    Injunctive relief and a decree of specific performance requiring defendants to perform their obligations to permit inspection and copying of BandCon's accounting books and shareholder rolls.

D.    An order appointing one or more inspectors or auditors to audit the books of BandCon.

E.    An award in favor of CWIE of its reasonable costs in enforcing its inspection rights.

F.    An order appointing a receiver over BandCon.

G.    An award of CWIE's reasonable attorneys' fees.

H.    Such other and further relief as may be warranted by the evidence and which this Court may deem just and proper.


DATED: December 17, 2008        SPILLANE WEINGARTEN LLP


By: _____
           Jay M. Spillane
Attorneys for Plaintiff CWIE, LLC

11

1

## JURY DEMAND

2    CWIE requests trial of this action before a jury.

3

4    DATED:  December 17, 2008          SPILLANE WEINGARTEN LLP

5

6                                       By: _____
7                                           Jay M. Spillane
                                        Attorneys for Plaintiff CWIE, LLC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

## SUBSCRIPTION AGREEMENT

## BIG BLUE COYOTE, INC.,

## A CALIFORNIA CORPORATION

1. <u>SUBSCRIPTION</u>: The undersigned Cave Creek Wholesale Internet Exchange, an Arizona Limited Liability Company, the "Subscriber" ("CWIE") here irrevocably subscribes $50,000.00 for 300 shares (the "Shares") of voting Common Stock of Big Blue Coyote, Inc. a California corporation (the "Company"), which subscription, when and if accepted by the Company, will constitute the payment by the Subscriber of the purchase price of the Shares.

2. <u>REPRESENTATION, WARRANTIES AND AGREEMENTS BY SUBSCRIBER</u>: The Subscriber hereby represents, warrants and agrees as follows:

(a) The Shares are being purchased by the Subscriber and not by any other person, with the Subscriber's own funds and not with the funds any other person, and for the account of the Subscriber, not as a nominee or agent and not for the account of any other person. On acceptance of this Subscription Agreement by the Company, no other person will have any interest, beneficial or otherwise, in the Shares. The Subscriber is not obligated to transfer Shares to any other person nor does the Subscriber have any agreement or understanding to do so. The Subscriber is purchasing the Share for investment for an indefinite period not with a view to the sale or distribution of any part or all thereof by public or private sale or other disposition. The Subscriber has no intention of selling, granting any participation in or otherwise distributing or disposing of any Shares. The Subscriber does not intend to subdivide the Subscriber's purchase of Shares with any person.

(b) The Subscriber has been advised that the Shares have not been registered under the Securities Act of 1933, as amended (the "Act"), or qualified under the California Corporation Securities Law of 1968, as amended (the "Law"), on the ground, among others, that no distribution or public offering of the Shares is to be effected and does not involve any public offering within the meaning of section 4(2) of the Act or section 25102 (f) of the Law, under the respective rules and regulation of the Securities and Exchange Commission and the California Commissioner of Corporations thereunder. The Subscriber understands that the Company is relying in part on the Subscriber's representations as set forth herein for purposes of claiming such exemptions and that the basis for such exemption may not be presented if, notwithstanding the Subscriber's representation, the Subscriber has in mind merely acquiring Shares for resale on the occurrence or nonoccurrence of some predetermine event. The Subscriber has no such intention.

(c) (i) The Subscriber has a preexisting personal or business relationship with one or more of the founding shareholders and directors of the Company who control the Company, consisting of personal or business contacts of a nature and duration sufficient to enable the Subscriber, as a reasonably prudent investor, to be aware of the character, business acumen and general business and financial circumstances of the persons with whom such relationships exists; or

(ii) By reason of the Subscriber's business and financial experience or the business or financial experience of the Subscriber's professional advisers who are unaffiliated with and who are not compensated by the Company or any affiliate or selling agent of the

Company, directly or indirectly, the Subscriber has the capacity to protect the Subscriber's own interests in connection with the Subscriber's purchase of Shares; or

(d) If the Subscriber is an individual, the Subscriber is a citizen of the United States over 21 years of age; and if the Subscriber is an unincorporated association, all of its members are such citizens of such age. If the Subscriber is a corporation, partnership, trust or other entity, the Subscriber was not formed for the purpose of investing in Shares and has or will have other substantial business or investments.

(e) The Subscriber, if not an individual, is empowered and duly authorized to enter into this Subscription Agreement under any governing document, partnership agreement, trust instrument, pension plan, charter, certificate of incorporation, bylaw provision or the like; this Subscription Agreement constitutes a valid and binding agreement of the Subscriber enforceable against the Subscriber in accordance with its terms; and the person signing this Subscription Agreement on behalf of the Subscriber is empowered and duly authorized to do so by the governing document or trust instrument, pension plan, charter, certificate of incorporation, bylaw provision, board of directors or stockholders resolution, or the like.

3. AGREEMENT TO REFRAIN FROM RESALES: Without in any way limiting the representation and warranties herein, the Subscriber further agrees that the Subscriber shall in no event pledge, hypothecate, sell, transfer, assign or otherwise dispose of any Shares, nor shall the Subscriber receive any consideration for Shares from any person, unless and until prior to any proposed pledge, hypothecation, sale, transfer, assignment or other disposition:

(a) (i) The Subscriber shall have furnished the Company with a detailed explanation of the proposed disposition; "Notice"),

(ii) The Subscriber shall have furnished the Company with an opinion of the Subscriber's counsel in form and substance and substance satisfactory to the Company to the effect that such disposition will not require registration of such Shares under the Act or qualification of such Shares under the Law or any other securities law,

(iii) Counsel for the Company shall have concurred in such opinion and the Company shall have advised the Subscriber of such concurrence and

(b) For forty-five (45) days following the Notice to the Company, it shall have the option to purchase the shares, or such part of the shares as it may lawfully repurchase, at a price and on the terms stated in the Notice. The Company's right to exercise its option and to purchase the shares is subject to the restrictions imposed on a corporation's repurchase of its own shares imposed by California Corporation's Code Section 500-503 and any other applicable governmental restrictions as are now, or hereafter may become effective.

4. CERTIFICATES REPRESENTING SHARES TO BE LEGENDED: The Subscriber understands and agrees that any certificate representing Shares or relating to Shares may bear such legends as the Company may consider necessary or advisable to facilitate compliance with the Act, the Law and any other securities law, including without limitation legends stating that

2

the Shares have not been registered under the Act or qualified under the Law and setting forth the limitations on disposition imposed hereby.

5. COMPANY MAY REFUSE TO TRANSFER: Notwithstanding the foregoing, if, in the opinion of counsel for the Company, the Subscriber has acted in a manner inconsistent with the representation and warranties in this Subscription Agreement, the Company may refuse to transfer the Subscriber's Shares until such time as counsel for the Company is of the opinion that such transfer will not require registration of Shares under the Act or qualification of Shares under the Law or any other securities law. The Subscriber understands and agrees that the Company may refuse to acknowledge or permit any disposition of Shares that is not in all respects in compliance with the Subscription Agreement and that the Company intends to make an appropriate notion in its records to that effect.

6. INDEMNIFICATION: The Subscriber hereby agrees to indemnify and defend the Company and its directors and officers and hold them harmless from and against any and all liability, damage, cost or expense incurred on account of or arising out of:

(a) Any breach of or inaccuracy in the Subscriber's representations, warranties or agreement herein:

(b) Any disposition of any Shares contrary to any of the Subscriber's representations, warranties, or agreements herein;

(c) Any action, suit or proceeding based on (i) a claim that any of said representation, warranties or agreements were inaccurate or misleading or otherwise cause for obtaining damages or redress form the Company or any director or officer of the Company under the Act, or (ii) any disposition of any Shares.

7. OTHER:

(a) CWIE will receive a 10% equity interest in the form of the Company's voting common stock in exchange for a capital investment of $50,000.00. The capital investment may include cash and equipment with a fair market value of the equipment applied to the $50,000.00 investment. In the event that at any time the Company issues additional shares of stock to investors other than CWIE, the Company will issue enough additional shares to CWIE to allow CWIE to maintain its 10% interest. CWIE will not be required to invest additional capital or otherwise pay for these additional shares.

(b) As of the date of this Agreement, CWIE has contributed equipment with a fair market value of $25,000.00. If the Company achieves or exceeds the 12 month Total Revenue projection of $1,848,950.00 (as depicted on attached Exhibit "A"), CWIE must tender within 30 days of its receiving the Company's year end unaudited financial statements prepared by an independent Certified Public Accountant, the balance of the initial $50,000.00 ($25,000.00) in (a) cash, (b) equipment with a fair market value of $25,000.00 or (c) any combination thereof in order to retain its 10% equity interest in the Company. In the event that the Company does not achieve or exceed the 12 month total revenue projection of $1,848,950.00 (as depicted in Exhibit "A"), CWIE will not be obligated to tender the remaining $25,000.00 towards its 10% equity interest in the Company. In the event that CWIE fails to comply with the terms of this

3

Agreement, CWIE will: (1) forfeit its entire equity interest in the Company; (2) shall be required to return its stock certificate to the Company and (3) CWIE shall not be entitled to receive any reimbursement, credit or consideration for any cash or equipment contributed to the Company.

(c) The Company shall make a distribution to CWIE within 30 days after the close of each successive calendar month in an amount equal to 10% of it's "Net Profit." For purposes of this Agreement, Net Profit is defined as "Gross Revenue less all Operating and Administrative Expenses" paid or incurred during any given calendar month **BEFORE** any salaries, wages, commissions and/ or bonuses are paid to or incurred on behalf of Ariz Benowitz, Nathan Alexander and Dean Wirtz

(d) CWIE will not participate in the day to day operations of Big Blue Coyote, Inc. ("Company") nor will CWIE have any authority to act on behalf of the Company.

(e) The Company agrees that so long as CWIE retains its equity interest in the Company, the Company must purchase the first 500 Mbs/month of bandwith from CWIE and enter into CWIE's standard Service Agreement for that bandwith. CWIE agrees to sell bandwith to the Company at CWIE's cost from its suppliers. At any time with, and only with CWIE's agreement, the Company may purchase bandwith from suppliers other than CWIE even though the Company has not met the 500 Mbps/month requirement above.

8. SUCCESSORS: The representations, warranties and agreements contained in this Subscription Agreement shall be binding on the Subscriber's successors, assigns, heirs and legal representatives and shall inure to the benefit of the respective successors and assigns of the Company and its directors and officers.

9. GOVERNING LAW: This Agreement shall be governed by and construed in accordance with the internal laws of the State of California.

10. ATTORNEYS' FEES: In the event a dispute arises between Buyer and Seller under this Agreement which results in a final, unappealable judgment as to the merits through arbitration, mediation or court proceedings, the prevailing party shall be entitled to recover court costs incurred and reasonable attorneys' fees and costs from the non-prevailing party.

12. NOTICES: All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given or within 72 hours after mailing, if mailed to the party to whom notice is to be given, by first-class mail; registered or certified mail, postage prepaid and properly addressed to the party at his address set forth on the signature page of this Agreement or any other address that any party may designate by written notice to the others.

13. ENTIRE AGREEMENT: This Agreement contains the entire agreement of the PARTIES hereto with the respect to CWIE's acquisition of a 10% equity interest in the Company and no representations, inducements, promises or agreements, oral or otherwise, between the PARTIES no embodied herein or incorporated herein by reference shall be of any

4

force or effect.

Number of Shares Subscribed: **300; VOTING COMMON STOCK**

TYPE OF OWNERSHIP (Check One)

_____ INDIVIDUAL OWNERSHIP
       (One signature required)

_____ PARTNERSHIP
       (Please include a copy of the
Statement of Partnership or Partnership
Agreement authorizing signature)

_____ COMMUNITY PROPERTY
       (One signature required)

_____ CORPORATION
       (Please include Articles of
Incorporation, Certified Corporate Resolution
authorizing signature and Incumbency
Certificate of signing Officer)

_____ TENANTS-IN-COMMON
       (Both PARTIES must sign

_____ TRUST
       (Please include name of trust, name of
trustee, and date trust was formed and include
copy of the Trust Agreement or other
authorization)

X  LIMITED LIABILITY
       COMPANY (Please provide
a copy of the Operating
Agreement)

Dated: March 25th, 2002

By: Ron Cadwell, Operating Manager of CWIE
    1501 W. 17th Street
    Tempe, Arizona 85281

Accepted By:

Ari Benowitz, Director
Dated: March 26 ,2002

Dean Wirtz, Director
Dated: March 25 ,2002

Nathan R. Alexander, Director
Dated: March    ,2002

5

EXHIBIT B

LAW OFFICE OF RICHARD A. LENSE
222 N. SEPULVEDA BLVD. #2000
EL SEGUNDO, CA. 90245
Tel. (310) 662-4750
Fax (310) 662-4751

## FAX COVER SHEET

To:        Ari Benowitz
Fax No.: (310) 943-2574
From:     Richard A. Lense
Date:      June 25th, 2003
Subject:  Amended Subscription Agreement

Number of Pages: 2 (Including cover sheet)



# BandCon
### Comprehensive e~Business Solutions

*5155 West Rosecrans*
*ste 213*
*Hawthorn, CA 90250*

Fax Cover Page:

*Mark S. Janssen*
*Chief Financial Officer*
*CWIE Holding Company, Inc.*
*Email: marks@ccbill.com*
*Phone: 480-449-7767*
*Fax: 480-449-7758*

September 9, 2003

Mark,

Dean asked me to fax this to you.  Please let me know if there is anything else you need. The paragraph we are further clarifying is number "7C."

The accountant seems to think that looks too much like a dividend and therefore
1) needs to be taxed before paid out at corporate tax level and
2) Every shareholder needs the same dividend.

Our answer was easy, "clarify" that we are not paying a "dividend" but rather a payment on services from CWIE......

Sincerely,

Ari Benowitz
Bandwidth Consulting, Inc.
Office: 310.491.3485
Ari@Bandcon.com

# EXHIBIT C

## AMENDMENT TO THE SUBSCRIPTION AGREEMENT
### BETWEEN BANDWIDTH CONSULTING, INC. (FORMERLY BIG BLUE COYOTE, INC. CAVE CREEK WHOLESALE INTERNET EXCHANGE, LLC ("CWIE")

On March 25th, 2002, a stock subscription agreement ("Agreement") was executed by and between the principals of Big Blue Coyote, Inc. and CWIE. The principals have elected to amend the Agreement as follows:

Paragraph 7 of the Agreement ("OTHER"), subsection (c) is deleted in full. The principals elect to adopt (and hereby incorporate by reference to the Agreement) the following:

"CWIE will perform monthly consulting services for Bandwidth Consulting consistent with the business needs of Bandwidth Consulting. Further, CWIE will send to Bandwidth Consulting a detailed (monthly) invoice which depicts the services provided and the consulting fees charged."

By: _____
Ron Cadwell, Operating Manger of CWIE

Date: June _30_,2003

Accepted By:


_____
Ari Benowitz, Director of Bandwidth Consulting

Date: June _____,2003


_____
Dean Wirtz, Director of Bandwidth Consulting

Date: June _____,2003



**BY FAX**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| CWIE, LLC, | BANDWIDTH CONSULTING, INC., a California corporation; ARI BENOWITZ, an individual; MIKE FLATIN, an individual; SCOT ROSS, an individual; and DOES 1-10, |

| (b) County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases): Maricopa, Arizona | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only): Orange, California |
|---|---|

| (c) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Jay M. Spillane (SBN 126364)    Tel: (310) 229-9300<br>SPILLANE WEINGARTEN LLP    Fax: (310) 229-9380<br>1880 Century Park East, Suite 1004<br>Los Angeles CA, 90067 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff     ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant     ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☑ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No     ☑ MONEY DEMANDED IN COMPLAINT: $ 1,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 USC§ 1332 - Breach of Contract, Enforcement of Duties of Inspection (CORP. CODE § 1600 ET SEQ.), and Breach of Fiduciary Duties.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☑ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☑ No  ☐ Yes

If yes, list case number(s):

| FOR OFFICE USE ONLY: | Case Number:  **SACV08-01423 DOC (RNBx)** |
|---|---|

CV-71 (07/05)                      CIVIL COVER SHEET                      Page 1 of 2

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET
AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

VIII(b).  RELATED CASES: Have any cases been previously filed that are related to the present case? ☑No   ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                            ☐ B.  Call for determination of the same or substantially similar questions of law and fact; or
                            ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                            ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.
    Arizona

List the California County, or State if other than California, in which EACH named defendant resides. (Use an additional sheet if necessary.)
☐ Check here if the U.S. government, its agencies or employees is a named defendant.
    Orange, California

List the California County, or State if other than California, in which EACH claim arose. (Use an additional sheet if necessary.)
Note: In land condemnation cases, use the location of the tract of land involved.
    Orange, California

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____    Date ___December 17, 2008___

   Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
   or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not
   filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions
   sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
| --- | --- | --- |
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## 8:CV08- 1423 DOC (RNBx)

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CWIE, LLC<br><br>PLAINTIFF(S)<br><br>v.<br><br>BANDWIDTH CONSULTING, INC., a California corporation; ARI BENOWITZ, an individual; MIKE FLATIN, an individual; SCOT ROSS, an individual; and DOES 1-10,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV08-01423 DOC (RNBx)**<br><br><br>**SUMMONS** |

TO:    THE ABOVE-NAMED DEFENDANT(S):

YOU ARE HEREBY SUMMONED and required to file with this court and serve upon plaintiff's attorney
Jay M. Spillane _____, whose address is:

SPILLANE WEINGARTEN LLP
1880 Century Park East, Suite 1004
Los Angeles, CA 90067

an answer to the ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim
which is herewith served upon you within __20__ days after service of this Summons upon you, exclusive
of the day of service. If you fail to do so, judgement by default will be taken against you for the relief
demanded in the complaint.

Clerk, U.S. District Court

Dated: _DEC 1 8 2008_____

By: _____
         Deputy Clerk

(Seal of the Court)          1144