SPILLANE WEINGARTEN LLP
Jay M. Spillane (Bar No. 126364)
jspillane@spillaneweingarten.com
Raphael Cung (Bar No. 201829)
rcung@spillaneweingarten.com
1880 Century Park East, Suite 1004
Los Angeles, CA 90067-2627
Telephone: (310) 229-9300
Fax: (310) 229-9380

Attorneys for Plaintiff CWIE, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| CWIE, LLC,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>BANDWIDTH CONSULTING, INC., a California corporation; ARI BENOWITZ, an individual; MIKE FLATIN, an individual; SCOT ROSS, an individual; and DOES 1-10,<br><br>　　　　Defendants. | Case No. SA CV 01423 DOC (RNBx)<br><br>**CADWELL DECLARATION IN SUPPORT OF MOTION OF PLAINTIFF AND SHAREHOLDER CWIE, LLC TO ENJOIN ISSUANCE OF PREFERRED SHARES BY DEFENDANT BANDWIDTH CONSULTING, INC.**<br><br>Date: February 23, 2009<br>Time: 8:30 a.m.<br>Crtrm: 9D (Carter)<br><br>Filed concurrently herewith: Notice of Motion, Memorandum of Points and Authorities, Declarations of Thomas A. Fisher, Mark Janssen, Brian Lenzen, Ian McClarty and Jay M. Spillane |

1    I, Ronald Cadwell, declare:

2        1.      I am the CEO of CWIE, LLC ("CWIE"), the plaintiff in this action.  The

3    following facts are stated on my personal knowledge.

4    **CWIE Launched BandCon**

5        2.      I am one of the founders of CWIE.  CWIE operates a wholesale Internet

6    access and website hosting business popularly known as "Cavecreek Web Hosting."

7    CWIE began this business in 1996, which was when wholesale website hosting

8    businesses were just emerging.  CWIE serves Internet businesses with large bandwidth

9    and hosting requirements who want to outsource their Internet access, hosting and

10   customer service functions to a provider such as CWIE.  CWIE offers its clients

11   dedicated, shared and colocated web hosting services, wholesale Internet bandwidth, a

12   variety of business solutions and 24/7 technical and customer support.  CWIE

13   maintains twenty-eight data centers throughout the United States.  CWIE has enjoyed a

14   long and valuable business relationship with Level 3, a "Tier 1" or "backbone"

15   Internet access provider.  In its twelve years of business CWIE has grown its customer

16   base because of the depth and strength of CWIE's network and technical prowess, its

17   financial strength and its excellent reputation for customer service.

18       3.      In about early 2002 I was approached by an acquaintance, Dean Wirtz,

19   who introduced me to his colleague, Ari Benowitz.  Mr. Wirtz and Mr. Benowitz had

20   lost their jobs at Aperian, an Internet data center that had recently gone out of business.

21   Mr. Wirtz told me that he and Mr. Benowitz were unemployed, and he wanted to know

22   whether I would help him and Mr. Benowitz start their own Internet hosting business.

23   At the time Messrs. Wirtz and Benowitz called their new company Big Blue Coyote,

24   Inc.  That company was later named Bandwidth Consulting, Inc., or "BandCon."

25       4.      CWIE essentially provided BandCon with the equipment, training and

26   bandwidth access without which BandCon would never have launched.  CWIE

27   provided BandCon with a high end router and an investment of cash.  CWIE gave

28   BandCon the engineering and technical assistance it needed to get the business

1

1 | launched.  CWIE provided its own customer call center to BandCon.  CWIE provided
2 | such assistance for years, often at its own expense, until such time as BandCon could
3 | provide its own engineering, technical and customer services through its own
4 | personnel.

5 |      5.     One of the most vital things CWIE provided to permit BandCon to start
6 | its business was access to "Tier 1" bandwidth at discounted wholesale costs.  CWIE
7 | has a longstanding business relationship with Level 3, one of the few "backbone" or
8 | "Tier 1" Internet providers.  One cannot purchase bandwidth from Level 3 without
9 | applying for and receiving approval for substantial credit from Level 3.  BandCon, a
10 | raw startup business, would have been hard pressed to receive credit approval to open
11 | an account with Level 3.  Without CWIE's help, BandCon would only have been able
12 | to purchase bandwidth, if at all, at higher prices than CWIE was charged by Level 3.
13 | In order to help BandCon deal with this problem, CWIE agreed that BandCon could
14 | purchase bandwidth through CWIE's contract with Level 3, and that CWIE would pass
15 | its wholesale cost through to BandCon.  Not only did CWIE provide BandCon with
16 | bandwidth prices it could not obtain on its own, but for a significant period of time
17 | CWIE provided substantial credit to BandCon until its cash flow improved.  Often
18 | CWIE would timely pay Level 3 for all bandwidth ordered, including that ordered by
19 | BandCon, while BandCon would be late in repaying CWIE its share of the orders to
20 | Level 3.

21 |      6.     In exchange for agreeing to provide Messrs. Benowitz and Wirtz with the
22 | means to launch their own business, we agreed that CWIE would own 10% of
23 | BandCon.  Messrs. Benowitz and Wirtz readily agreed to this term.  At no time did
24 | Mr. Benowitz or Mr. Wirtz disclose any intention that CWIE would enjoy this 10%
25 | ownership position only while BandCon needed CWIE to start its business, and that
26 | after that point BandCon would seek to dilute CWIE or cut it out of the company.

27
28

**CWIE and BandCon Executed a Subscription Agreement**

7.    BandCon and its attorney drafted a Subscription Agreement between BandCon and CWIE.  In house CWIE staff negotiated that Agreement with BandCon. A true and correct copy of the executed Subscription Agreement is attached hereto as Exhibit A.

8.    CWIE has more than performed its obligations under the Subscription Agreement.

9.    The Subscription Agreement was two features that are particularly important to CWIE, features that CWIE more than earned.  One, BandCon promised that CWIE would always be a 10% shareholder, and that if necessary BandCon would issue additional stock to CWIE to maintain CWIE's 10% interest without additional investment or payment.  [Subscription Agreement ¶ 7.(a).]  Additionally, BandCon promised that CWIE would receive monthly payment of 10% of BandCon's "net profit."  [Subscription Agreement ¶ 7.(c).]  BandCon has broken both of those promises.

**BandCon's Promise not to Dilute CWIE**

10.    BandCon assured me at the time we helped them start their company that CWIE would be a 10% owner of BandCon.  The Subscription Agreement says that CWIE subscribed for 300 shares of BandCon.  I am not aware that CWIE ever received any share certificates from BandCon.

11.    At some point after BandCon was formed I was elected a director of BandCon.  BandCon almost never asked me to participate in meetings of the directors of BandCon.  The rare occasions on which BandCon did ask me to vote as director was when they wanted me to approve a transaction BandCon had already fully staffed for approval.  On these rare occasions BandCon would email me the materials they wanted me to approve, rather than send me a formal notice of a director's meeting. Other than these occasions, I do not recall receiving any notice of meetings of the

1   BandCon board of directors prior to December 2008, nor do I remember ever

2   participating in a noticed director's meeting via conference call.

3          12.     On one occasion in 2005 BandCon emailed me some documents they

4   wanted me to sign off on in connection with the redemption of stock from Dean Wirtz,

5   who had left BandCon, and the purchase of such stock by Mike Flatin.

6          13.     The second occasion on which I was asked to take action as a director of

7   BanCon was on June 26, 2007, when I received an email from Mike Flatin, BandCon's

8   Chief Operating Officer, attaching legal documents for purchase of a company called

9   AM6, an optical network communications business.  A true and correct copy of that

10  email, together with the attachments, is attached hereto as Exhibit B.  In that email,

11  Mr. Flatin says "Ari and I will be calling you shortly to go over these documents as we

12  need to have the board approve this transaction."  The minute that accompanied this

13  email said nothing about any potential dilution of CWIE's 10% share holding as a

14  result of the AM6 transaction.

15         14.     As the email stated, Mr. Benowitz and Mr. Flatin called me that day.  I

16  really did not have time to study the attachment or consult counsel about the

17  documents they emailed to me.  Mr. Benowitz and Mr. Flatin told me that the AM6

18  purchase was a great opportunity for BandCon, and that I should vote to approve the

19  transaction.  Based upon their recommendation, I did.  No one ever told me that the

20  AM6 purchase, including any issuance of BandCon shares to Am6, would result in a

21  dilution in CWIE's 10% ownership position.  No one ever told me that even if

22  issuance of shares to AM6 did dilute CWIE's interest, that BandCon would fail to

23  issue additional shares to CWIE to maintain CWIE's holding at 10%.

24         15.     Just recently BandCon has produced to my attorneys a purported copy of

25  the Minutes of the June 26, 2007 meeting which are different than the draft minute that

26  is attached as Exhibit B.  The recently-produced Minute has a clause that I have never

27  seen before, reciting that I supposedly agreed on behalf of CWIE to waive CWIE's

28  anti-dilution protections in ¶ 7.(a) of the Subscription Agreement.  This Minute is

1  utterly false.  The idea that the issuance of stock to AM6 would result in a dilution of

2  CWIE's shares in BandCon was never disclosed to me, and if it had been I would

3  never have waived CWIE's rights.  In all of the emails that have passed back and forth

4  between CWIE and BandCon over CWIE's ownership of BandCon, I have never seen

5  any emails in which BandCon says that I supposedly waived CWIE's anti-dilution

6  rights in a directors meeting.

7      16.    I did not learn until the last several months that CWIE in fact has less than

8  10% of the shares in BandCon.  Apparently CWIE has been diluted to about 7-8%.

9  This was done without my knowledge or consent.

10      17.    The only other time I can recall being asked to participate in a meeting of

11  directors or shareholders of BandCon was in the last month, when BandCon mailed

12  notice of a meeting to remove me as director.  At the very end of 2008 I received a

13  notice of a meeting of shareholders of BandCon, a true and correct copy of which is

14  attached hereto as Exhibit C.  One of the agenda items on the notice was approval of

15  issuance to unspecified investors of 1,000,000 preferred shares of BandCon.  To my

16  knowledge BandCon has never authorized issuance of preferred shares to any party.  I

17  never agreed that CWIE's ownership of BandCon could be further diluted through

18  issuance of preferred shares.  I executed a proxy for my attorney, Jay Spillane, to

19  attend the meeting for CWIE.  Although CWIE asked for full disclosure concerning

20  the new preferred shares, to this date I have absolutely no information about the terms

21  of the new shares, nor the date or circumstances under which the new shares could be

22  issued.  CWIE objects to any further dilution of what is supposed to be CWIE's 10%

23  ownership of BandCon through issuance of preferred shares.

24  **The 10% Net Profits Payments**

25      18.    In September 2003 Mr. Benowitz sent Mark Janssen, CWIE's Chief

26  Financial Officer, a letter saying that BandCon's accountant "seems to think that [¶

27  7.(c)] looks too much like a dividend," and that CWIE and BandCon would therefore

28  "'clarify' that we are not paying a 'dividend' but rather a payment on services from

1   CWIE …"  A true and correct copy of this letter is attached hereto as Exhibit D.

2   BandCon presented me with an Amendment to the Subscription Agreement.  A true

3   and correct copy of the Amendment executed by me is attached hereto as Exhibit E.

4         19.   After execution of the Amendment, from about late 2003 through 2006,

5   BandCon sent checks to CWIE that appeared to reflect the 10% payments called for by

6   ¶ 7.(c) of the Subscription Agreement.  BandCon never required an invoice from

7   CWIE before it would send these payments, nor did it ever require rendition of any

8   particular or monthly consulting services from CWIE as a condition to making the

9   payment.  Certainly the years of free support CWIE provided to BandCon more than

10   justified these payments, but BandCon never related the 10% monthly payments that it

11   remitted to CWIE to the provision or cost of any particular services.  To the extent that

12   CWIE's technical, engineering or customer service staff billed BandCon for services

13   rendered, those charges were separately invoiced and separately paid by BandCon.

14   BandCon was simply sending us checks for 10% of monthly net profits as ¶ 7.(c)

15   requires.

16         20.   BandCon referred to the 10% monthly payments as CWIE's

17   "commission."  Attached hereto as Exhibit F is a true and correct copy of a January 2,

18   2007 email from Mike Flatin in which he says "[y]our commission for 2006 is

19   $111,990.69."  He attached a spreadsheet that "shows what Ari and I have taken and

20   your associated 10%."

21         21.   Attached hereto as Exhibit G is a true and correct copy of an April 30,

22   2007 email from me to Mike Flatin asking about the status of the commission checks.

23         22.   As far as I knew at the time, the only other owners of BandCon beside

24   CWIE were Ari Benowitz and Mike Flatin.  Mr. Flatin came to BandCon as an

25   investor and officer after Dean Wirtz left the company.  Neither Mr. Benowitz nor Mr.

26   Flatin told me at any time that they had any objection to the monthly 10% payments to

27   CWIE, nor that there was any impediment to CWIE continuing to receive these 10%

28   payments.  At no time did they tell me that the "commission checks" were conditioned

1    on any particular or new consulting services, nor that they were calculated by the value

2    of such services.  At no time did they tell me that I has supposedly participated in a

3    meeting where I supposedly waived CWIE's rights to these "commission checks."

4         23.    BandCon ceased paying CWIE its 10% payments after 2006.  CWIE staff

5    asked BandCon about the status of these payments.  BandCon deflected these inquiries

6    by saying that they were still working on their books.  At no time did BandCon tell me

7    that CWIE failed to render services to earn the 10% payment or that CWIE had waived

8    the 10% payment.  At no time did BandCon raise the Amendment as having anything

9    to do with the 10% payments.  At no time did BandCon ever say that I supposedly

10    participated in a meeting of BandCon's directors or shareholders and agreed that

11    CWIE would no longer receive these payments.  Instead, BandCon bought time with

12    assurances that they would eventually provide an accounting.

13         24.    Eventually we had a meeting with BandCon at our offices on April 24,

14    2008.  BandCon did not, as I expected, provide the accounting they had promised.

15    Instead, BandCon's representatives took a contentious tone, saying that CWIE was a

16    competitor of BandCon, that CWIE had "earned enough already" from its arrangement

17    with BandCon and that CWIE should either invest more money in BandCon or back

18    out of the company.  We said that the Subscription Agreement did not require CWIE

19    to provide further investment to maintain its interest, nor was CWIE required to give

20    up its interest.  At no time during that meeting did anyone tell me that I had

21    supposedly waived these payments on behalf of CWIE at a meeting of the directors or

22    shareholders of BandCon.

23         25.    BandCon contended in the April 2008 meeting that CWIE had earned a

24    substantial benefit from the arrangement by which BandCon purchased its bandwidth

25    through CWIE's contract with Level 3.  While it is true Level 3's prices generally

26    scale according to volume, and that the combined orders from CWIE and BandCon

27    resulted in lower prices for both companies, at no time did CWIE agree that any side

28    benefit to CWIE would offset or eliminate BandCon's obligations to CWIE.

1  BandCon's agreement to purchase bandwidth through CWIE was a separate feature of

2  the Subscription Agreement [Subscription Agreement ¶ 7.(e)], one that was unrelated

3  to BandCon's separate obligations to maintain CWIE's 10% ownership and to pay to

4  CWIE 10% of its net profits.

5      26.   In the last few days BandCon has produced to my attorneys purported

6  minutes of meetings of BandCon's Directors in which CWIE supposedly confirmed

7  that the payments under ¶ 7.(c) were in consideration of monthly consulting services,

8  and later that CWIE supposedly stopped providing such services, such that BandCon

9  no longer needed to make the payments. These minutes are utterly false. I

10 participated in no such meetings and never made any such statements. I have no

11 reason to, nor did I ever, say any such things.

12     27.   At this point BandCon has simply refused to make any further 10% net

13 profit payments to CWIE.

14     28.   I am concerned that the issuance of new preferred shares will be used as

15 an additional device to justify BandCon's refusal to continue to make these 10%

16 monthly payments.

17

18     This declaration was executed on January 22, 2009 at MARICOPA, ARIZONA .

19 I declare under penalty of perjury under the laws of the United States and of California

20 that the foregoing is true and correct.

21

22

23  _____

24                Ronald Cadwell

25

26

27

28

8

# EXHIBIT A

SUBSCRIPTION AGREEMENT

BIG BLUE COYOTE, INC.,

A CALIFORNIA CORPORATION

1.  SUBSCRIPTION: The undersigned Cave Creek Wholesale Internet Exchange, an Arizona Limited Liability Company, the "Subscriber" ("CWIE") here irrevocably subscribes $50,000.00 for 300 shares (the "Shares") of voting Common Stock of Big Blue Coyote, Inc. a California corporation (the "Company"), which subscription, when and if accepted by the Company, will constitute the payment by the Subscriber of the purchase price of the Shares.

2.  REPRESENTATION, WARRANTIES AND AGREEMENTS BY SUBSCRIBER: The Subscriber hereby represents, warrants and agrees as follows:

(a) The Shares are being purchased by the Subscriber and not by any other person, with the Subscriber's own funds and not with the funds any other person, and for the account of the Subscriber, not as a nominee or agent and not for the account of any other person.  On acceptance of this Subscription Agreement by the Company, no other person will have any interest, beneficial or otherwise, in the Shares.  The Subscriber is not obligated to transfer Shares to any other person nor does the Subscriber have any agreement or understanding to do so.  The Subscriber is purchasing the Share for investment for an indefinite period not with a view to the sale or distribution of any part or all thereof by public or private sale or other disposition.  The Subscriber has no intention of selling, granting any participation in or otherwise distributing or disposing of any Shares.  The Subscriber does not intend to subdivide the Subscriber's purchase of Shares with any person.

(b) The Subscriber has been advised that the Shares have not been registered under the Securities Act of 1933, as amended (the "Act"), or qualified under the California Corporation Securities Law of 1968, as amended (the "Law"), on the ground, among others, that no distribution or public offering of the Shares is to be effected and does not involve any public offering within the meaning of section 4(2) of the Act or section 25102 (f) of the Law, under the respective rules and regulation of the Securities and Exchange Commission and the California Commissioner of Corporations thereunder.  The Subscriber understands that the Company is relying in part on the Subscriber's representations as set forth herein for purposes of claiming such exemptions and that the basis for such exemption may not be presented if, notwithstanding the Subscriber's representation, the Subscriber has in mind merely acquiring Shares for resale on the occurrence or nonoccurrence of some predetermine event.  The Subscriber has no such intention.

(c) (i) The Subscriber has a preexisting personal or business relationship with one or more of the founding shareholders and directors of the Company who control the Company, consisting of personal or business contacts of a nature and duration sufficient to enable the Subscriber, as a reasonably prudent investor, to be aware of the character, business acumen and general business and financial circumstances of the persons with whom such relationships exists; or

(ii) By reason of the Subscriber's business and financial experience or the business or financial experience of the Subscriber's professional advisers who are unaffiliated with and who are not compensated by the Company or any affiliate or selling agent of the

Company, directly or indirectly, the Subscriber has the capacity to protect the Subscriber's own interests in connection with the Subscriber's purchase of Shares; or

(d) If the Subscriber is an individual, the Subscriber is a citizen of the United States over 21 years of age; and if the Subscriber is an unincorporated association, all of its members are such citizens of such age. If the Subscriber is a corporation, partnership, trust or other entity, the Subscriber was not formed for the purpose of investing in Shares and has or will have other substantial business or investments.

(e) The Subscriber, if not an individual, is empowered and duly authorized to enter into this Subscription Agreement under any governing document, partnership agreement, trust instrument, pension plan, charter, certificate of incorporation, bylaw provision or the like; this Subscription Agreement constitutes a valid and binding agreement of the Subscriber enforceable against the Subscriber in accordance with its terms; and the person signing this Subscription Agreement on behalf of the Subscriber is empowered and duly authorized to do so by the governing document or trust instrument, pension plan, charter, certificate of incorporation, bylaw provision, board of directors or stockholders resolution, or the like.

3. <u>AGREEMENT TO REFRAIN FROM RESALES</u>: Without in any way limiting the representation and warranties herein, the Subscriber further agrees that the Subscriber shall in no event pledge, hypothecate, sell, transfer, assign or otherwise dispose of any Shares, nor shall the Subscriber receive any consideration for Shares from any person, unless and until prior to any proposed pledge, hypothecation, sale, transfer, assignment or other disposition:

(a) (i) The Subscriber shall have furnished the Company with a detailed explanation of the proposed disposition; "Notice"),

(ii) The Subscriber shall have furnished the Company with an opinion of the Subscriber's counsel in form and substance and substance satisfactory to the Company to the effect that such disposition will not require registration of such Shares under the Act or qualification of such Shares under the Law or any other securities law,

(iii) Counsel for the Company shall have concurred in such opinion and the Company shall have advised the Subscriber of such concurrence and

(b) For forty-five (45) days following the Notice to the Company, it shall have the option to purchase the shares, or such part of the shares as it may lawfully repurchase, at a price and on the terms stated in the Notice. The Company's right to exercise its option and to purchase the shares is subject to the restrictions imposed on a corporation's repurchase of its own shares imposed by California Corporation's Code Section 500-503 and any other applicable governmental restrictions as are now, or hereafter may become effective.

4. <u>CERTIFICATES REPRESENTING SHARES TO BE LEGENDED</u>: The Subscriber understands and agrees that any certificate representing Shares or relating to Shares may bear such legends as the Company may consider necessary or advisable to facilitate compliance with the Act, the Law and any other securities law, including without limitation legends stating that

the Shares have not been registered under the Act or qualified under the Law and setting forth the limitations on disposition imposed hereby.

5. COMPANY MAY REFUSE TO TRANSFER: Notwithstanding the foregoing, if, in the opinion of counsel for the Company, the Subscriber has acted in a manner inconsistent with the representation and warranties in this Subscription Agreement, the Company may refuse to transfer the Subscriber's Shares until such time as counsel for the Company is of the opinion that such transfer will not require registration of Shares under the Act or qualification of Shares under the Law or any other securities law. The Subscriber understands and agrees that the Company may refuse to acknowledge or permit any disposition of Shares that is not in all respects in compliance with the Subscription Agreement and that the Company intends to make an appropriate notion in its records to that effect.

6. INDEMNIFICATION: The Subscriber hereby agrees to indemnify and defend the Company and its directors and officers and hold them harmless from and against any and all liability, damage, cost or expense incurred on account of or arising out of:

(a) Any breach of or inaccuracy in the Subscriber's representations, warranties or agreement herein;

(b) Any disposition of any Shares contrary to any of the Subscriber's representations, warranties, or agreements herein;

(c) Any action, suit or proceeding based on (i) a claim that any of said representation, warranties or agreements were inaccurate or misleading or otherwise cause for obtaining damages or redress form the Company or any director or officer of the Company under the Act, or (ii) any disposition of any Shares.

7. OTHER:
(a) CWIE will receive a 10% equity interest in the form of the Company's voting common stock in exchange for a capital investment of $50,000.00. The capital investment may include cash and equipment with a fair market value of the equipment applied to the $50,000.00 investment. In the event that at any time the Company issues additional shares of stock to investors other than CWIE, the Company will issue enough additional shares to CWIE to allow CWIE to maintain its 10% interest. CWIE will not be required to invest additional capital or otherwise pay for these additional shares.
(b) As of the date of this Agreement, CWIE has contributed equipment with a fair market value of $25,000.00. If the Company achieves or exceeds the 12 month Total Revenue projection of $1,848,950.00 (as depicted on attached Exhibit "A"), CWIE must tender within 30 days of its receiving the Company's year end unaudited financial statements prepared by an independent Certified Public Accountant, the balance of the initial $50,000.00 ($25,000.00) in (a) cash, (b) equipment with a fair market value of $25,000.00 or (c) any combination thereof in order to retain its 10% equity interest in the Company. In the event that the Company does not achieve or exceed the 12 month total revenue projection of $1,848,950.00 (as depicted in Exhibit "A"), CWIE will not be obligated to tender the remaining $25,000.00 towards its 10% equity interest in the Company. In the event that CWIE fails to comply with the terms of this

3

Agreement, CWIE will: (1) forfeit its entire equity interest in the Company; (2) shall be required to return its stock certificate to the Company and (3) CWIE shall not be entitled to receive any reimbursement, credit or consideration for any cash or equipment contributed to the Company.

(c) The Company shall make a distribution to CWIE within 30 days after the close of each successive calendar month in an amount equal to 10% of it's "Net Profit." For purposes of this Agreement, Net Profit is defined as "Gross Revenue less all Operating and Administrative Expenses" paid or incurred during any given calendar month **BEFORE** any salaries, wages, commissions and/ or bonuses are paid to or incurred on behalf of Ariz Benowitz, Nathan Alexander and Dean Wirtz

(d) CWIE will not participate in the day to day operations of Big Blue Coyote, Inc. ("Company") nor will CWIE have any authority to act on behalf of the Company.

(e) The Company agrees that so long as CWIE retains its equity interest in the Company, the Company must purchase the first 500 Mbs/month of bandwith from CWIE and enter into CWIE's standard Service Agreement for that bandwith. CWIE agrees to sell bandwith to the Company at CWIE's cost from its suppliers. At any time with, and only with CWIE's agreement, the Company may purchase bandwith from suppliers other than CWIE even though the Company has not met the 500 Mbps/month requirement above.

8. SUCCESSORS: The representations, warranties and agreements contained in this Subscription Agreement shall be binding on the Subscriber's successors, assigns, heirs and legal representatives and shall inure to the benefit of the respective successors and assigns of the Company and its directors and officers.

9. GOVERNING LAW: This Agreement shall be governed by and construed in accordance with the internal laws of the State of California.

10. ATTORNEYS' FEES: In the event a dispute arises between Buyer and Seller under this Agreement which results in a final, unappealable judgment as to the merits through arbitration, mediation or court proceedings, the prevailing party shall be entitled to recover court costs incurred and reasonable attorneys' fees and costs from the non-prevailing party.

12. NOTICES: All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given or within 72 hours after mailing, if mailed to the party to whom notice is to be given, by first-class mail, registered or certified mail, postage prepaid and properly addressed to the party at his address set forth on the signature page of this Agreement or any other address that any party may designate by written notice to the others.

13. ENTIRE AGREEMENT: This Agreement contains the entire agreement of the PARTIES hereto with the respect to CWIE's acquisition of a 10% equity interest in the Company and no representations, inducements, promises or agreements, oral or otherwise, between the PARTIES no embodied herein or incorporated herein by reference shall be of any

4

force or effect.

Number of Shares Subscribed: 300; VOTING COMMON STOCK

TYPE OF OWNERSHIP (Check One)

____INDIVIDUAL OWNERSHIP
       (One signature required)

____COMMUNITY PROPERTY
       (One signature required)

____TENANTS-IN-COMMON
       (Both PARTIES must sign

____TRUST
       (Please include name of trust, name of
trustee, and date trust was formed and include
copy of the Trust Agreement or other
authorization)

____PARTNERSHIP
       (Please include a copy of the
Statement of Partnership or Partnership
Agreement authorizing signature)

____CORPORATION
       (Please include Articles of
Incorporation, Certified Corporate Resolution
authorizing signature and Incumbency
Certificate of signing Officer)

X  LIMITED LIABILITY
       COMPANY (Please provide
a copy of the Operating
Agreement)

Dated: March 25th, 2002

_____
By: Ron Cadwell, Operating Manager of CWIE
    1501 W. 17th Street
    Tempe, Arizona 85281

Accepted By:

_____
Ari Benowitz, Director
Dated: March 26 ,2002

_____
Dean Wirtz, Director
Dated: March 25 2002

_____
Nathan Alexander, Director
Dated: March    ,2002

5

# EXHIBIT B

**From:** Ron Cadwell
**Sent:** Friday, January 09, 2009 10:42 AM
**To:** Tom Fisher
**Subject:** FW: AM6 Purchase Agreement

**From:** Mike Flatin [mike@bandcon.com]
**Sent:** Tuesday, June 26, 2007 3:39 PM
**To:** Ron Cadwell
**Cc:** Ari
**Subject:** AM6 Purchase Agreement

Hi Ron..

Ari and I will be calling you shortly to go over these documents as we need to have the board approve this transaction.  You can be represented via con call.

Thanks,
Mike Flatin

# MINUTES OF MEETING

## OF THE BOARD OF DIRECTORS

## OF

## BANDWIDTH CONSULTING, INC.,
### a California Corporation

A meeting of the board of directors of the corporation was held on June ___, 2007 at _____ at the corporation's headquarters in Costa Mesa, California.

Mike Flatin acted as Chairman and the Chairman called the meeting to order, and the following directors being all the directors of the corporation, were present:

Ari Benowitz

Mike Flatin, Chairman

Ron Cadwell, present by conference call

There was presented to the meeting the following documents for consideration by the board:

1. The Stock Purchase Agreement dated June _____, 2007 between the Corporation and AM6 Networks Inc, and the selling stockholders of AM6 Networks Inc., Adam LaFountain and Matthew Kelley, a true and correct copy of which is attached as Exhibit "A" hereto (the "Stock Purchase Agreement"); and

2. The Employment Agreement dated June _____, 2007 between the Corporation and Adam LaFountain, a true and correct copy of which is attached as Exhibit "B" hereto (the "Employment Agreement".

The board reviewed the Stock Purchase Agreement and the Employment Agreement.

The board discussed that the Corporation will receive substantial direct and indirect benefits from entering into the Stock Purchase Agreement and the Employment Agreement.

The board deemed it desirable and in the best interest of the Corporation to authorize the Corporation's execution, delivery and performance of the Stock Purchase Agreement and the Employment Agreement.

Upon motion duly made, seconded and unanimously carried, it was

RESOLVED, that the Stock Purchase Agreement and the Employment Agreement be, and each of them hereby is, authorized and approved, and Ari Benowitz, President and Chief Financial Officer of the Corporation (the "Authorized Officers") be and hereby is, authorized to negotiate, execute, deliver and perform the Stock Purchase Agreement and the Employment Agreement, with such changes therein as the Authorized Officer executing the same may approve, and to negotiate, execute and deliver all certificates, agreements, instruments and other documents required by, or delivered in connection with the Stock Purchase Agreement and the Employment Agreement, or that the Authorized Officer shall deem necessary or desirable in connection with the execution and the delivery of the Stock Purchase Agreement and the Employment Agreement, and the consummation of the transactions contemplated thereby, all upon such terms and conditions as the Authorized Officer or his designees may approve, such actions including the payment of amounts and/or issuance of Class B common stock in the Corporation deemed reasonably necessary to effectuate these resolutions.

RESOLVED FURTHER, that any and all acts taken and any and all agreements, documents, certificates, or other instruments executed and delivered on behalf of the Corporation by the Authorized Officer prior to the date hereof with regard to any of the transactions, agreements, or matters contemplated by or in furtherance of the foregoing Resolutions be, and they hereby are, ratified, confirmed, adopted, and approved.

There being no further business to come before the meeting, upon motion duly made, seconded and unanimously carried, the same was adjourned.

I certify that the foregoing is true and correct as of June ___, 2007.

_____

Mike Flatin, Secretary

# STOCK PURCHASE AGREEMENT

**AGREEMENT** dated as of June __, 2007 (the "Agreement") by and among **BANDWIDTH CONSULTING, INC.**, a California corporation ("BandCon"), **AM6 NETWORKS INC.**, a California corporation ("AM6") and each of the stockholders of AM6 listed on Schedule 3.2 (the "Selling Stockholders").

## W I T N E S S E T H :

**WHEREAS,** the Selling Stockholders are the owners of all of the issued and outstanding shares of capital stock of AM6 (the "AM6 Stock"); and

**WHEREAS,** AM6 is in the business of providing internet infrastructure products and services (the "Business"); and

**WHEREAS,** BandCon, wishes to purchase all of the AM6 Stock from the Selling Stockholders, upon the terms and subject to the conditions set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties hereto do hereby agree as follows:

1.  <u>Purchase and Sale of AM6 Stock</u>.

Subject to the terms and conditions set forth in this Agreement and in reliance upon the representations, warranties, covenants and conditions herein contained, on the Closing Date (as defined in Section 8 hereof), the Selling Stockholders shall sell, convey, assign, transfer and deliver to BandCon, and BandCon shall purchase, all of the AM6 Stock, free and clear of any and all liens, adverse claims, security interests, pledges, mortgages, charges and encumbrances of any nature whatsoever (collectively, "Liens").

2.  <u>Purchase Price</u>.

2.1.  <u>Stock Consideration</u>.  At the Closing, BandCon will issue to the Selling Stockholders One Million Six Hundred Thousand (1,600,000) shares of BandCon's non-voting Class B Common Stock (the "Purchase Price").  The Purchase Price shall be distributed among the Selling Stockholders in accordance with the instructions set forth on **Schedule 2.1** hereof opposite each Selling Stockholders name.

2.2.  <u>Adjustment to Purchase Price</u>.

(a)  At the Closing, BandCon shall hold back from the Purchase Price and not issue or deliver to the Selling Stockholders Four Hundred Eighty Thousand (480,000) shares of the BandCon Class B Common Stock (the "Purchase Price Holdback") for a period of eighteen (18) months after the Closing Date (the "Holdback Period") to ensure compensation for BandCon, if necessary, for any losses, costs, liabilities, damages or expenses suffered by BandCon or AM6 if (i) any of the Selling Stockholder's representations and warranties under Section 3 of this Agreement, including, without

limitation, with respect to AM6's financials provided to BandCon prior to the Closing, turn out to be false or inaccurate, (ii) if any tax issues regarding AM6 for the period prior to Closing arise, and/or (iii) if the Selling Shareholders have an obligation to compensate BandCon under their indemnification obligations to BandCon pursuant to Section 5 of this Agreement and cannot satisfy such obligations (collectively, the "Purchase Price Adjustment Triggering Events"). Such compensation to BandCon from the Purchase Price Holdback as set forth in this Section 2.2 shall be in addition to any other rights and remedies that BandCon has against the Selling Stockholders in the event of the occurrence of a Purchase Price Adjustment Triggering Event.

(b) To the extent that within the Holdback Period BandCon suffers any losses, costs, liabilities, damages or expenses as a result of the occurrence of a Purchase Price Adjustment Triggering Event, in addition to all other rights and remedies that BandCon has, BandCon shall have the option, exercisable in BandCon's sole and absolute discretion, to reduce the Purchase Price in the amount of any such losses, costs, liabilities, damages or expenses or such unfulfilled indemnification obligation of the Selling Stockholders in order to compensate BandCon for such losses, costs, liabilities, damages or expenses or unfulfilled indemnification obligation. In the event BandCon exercises such option, the number of shares in the total Purchase Price shall be reduced by the number of shares the value of which is equal to the amount such losses, costs, liabilities or expenses or such unfulfilled indemnification obligation, based on the value of such shares as of the Closing Date as determined by BandCon's certified pubic accountant, and  such Purchase Price reduction can be effectuated first by BandCon reducing and never issuing or delivering to the Selling Stockholders that same number of shares in the Purchase Price Holdback.

(c) The payment of any adjustment provided for in this Section shall be the joint and several obligation of the Selling Stockholders.  If the number of shares in the Purchase Price Holdback is not sufficient to cover the losses, costs, liabilities, damages or expenses suffered as a result of the occurrence of a Purchase Price Adjustment Event, in addition to all other rights and remedies it has BandCon shall be entitled to proceed against any or all of the Selling Stockholders for any remaining amounts owed.

(d) Upon the earlier to occur of (i) the expiration of the Holdback Period, or (ii) immediately prior to the closing of the sale of all of the outstanding stock or assets of BandCon, if there are any shares remaining in the Purchase Price Holdback, BandCon shall issue and deliver all of such remaining shares to the Selling Stockholders pursuant to Schedule 2.1 hereof.

2.3.   <u>Payment of Taxes Upon Transfer of Stock</u>. All transfer, documentary, sales, use, stamp, registration and other such Taxes (as defined herein) and fees (including any penalties and interest) incurred in connection with this Agreement shall be paid when due by the party that has primary liability for such Tax or fee under the applicable law, and such party shall, at its own expense, file all necessary Tax Returns (as defined herein) and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other taxes and fees, and, if required by applicable law, any other party will join in the execution of any such Tax Returns and other documentation.

3.    Representations and Warranties as to AM6.  Each of the Selling Stockholders, jointly and severally, represents and warrants to BandCon as follows (except that, to the extent the Selling Stockholders are representing or warranting as to their ownership of the AM6 Stock in Section 3.3 or as to their individual relationship to AM6's Business or assets, such representations and warranties shall be several and not joint.

3.1.    Organization, Standing and Power.  AM6 is a corporation duly organized, validly existing and in good standing under the laws of the State of California, with full corporate power and corporate authority to (a) own, lease and operate its properties, (b) carry on the Business as currently conducted by it and (c) execute and deliver, and perform under this Agreement and each other agreement and instrument to be executed and delivered by it pursuant hereto.  There are no states or jurisdictions in which the character and location of any of the properties owned or leased by AM6, or the conduct of the Business makes it necessary for AM6 to qualify to do business as a foreign corporation, except where the failure to so qualify would not have a material adverse effect on the business, operations, properties, financial condition, assets, liabilities or results of operations of AM6 taken as a whole ("Material Adverse Effect"), or the ability of AM6 to consummate the transactions contemplated by this Agreement.  True and complete copies of the Articles of Incorporation of each of AM6 and all amendments thereof, and of the By-Laws of AM6, as amended to date, have heretofore been furnished to BandCon.  AM6's minute book which is available to BandCon to review contains complete and accurate records of all meetings and other corporate actions of AM6's stockholders and Board of Directors (including committees of its Board of Directors).

3.2.    Capitalization.  The authorized capital stock of AM6 consists of: 1,500 shares of common stock, par value of $0.01 (the "AM6 Stock"), all of which shares are issued and outstanding.  All of the AM6 Stock has been duly authorized, validly issued, fully paid and is nonassessable.  **Schedule 3.2** sets forth a true and complete list of the holders of all outstanding shares of AM6 Stock, which shares are held by them in the amounts set forth on **Schedule 3.2.**  Except as contemplated by this Agreement and except as set forth on **Schedule 3.2,** there are no options, warrants or other rights, agreements, arrangements or commitments of any character relating to the issued or unissued capital stock of AM6 or obligating AM6 to issue or sell any shares of capital stock of or other equity interests in AM6.  There is no personal liability, and there are no preemptive rights, with regard to the capital stock of AM6.  Except as set forth on **Schedule 3.2** and except for the transactions contemplated by this Agreement, there are no outstanding contractual obligations or other commitments or arrangements of AM6 to (A) repurchase, redeem or otherwise acquire any shares of AM6 Stock (or any interest therein) or (B) to provide funds to or make any investment (in the form of a loan, capital contribution or otherwise) in any other entity, or (C) issue or distribute to any person any capital stock of AM6, or (D) issue or distribute to holders of any of the capital stock of AM6 any evidences of indebtedness or assets of AM6.  All of the outstanding securities of AM6 have been issued and sold by AM6 in full compliance with applicable federal and state securities laws.

3.3.    Ownership of AM6 Stock.  The Selling Stockholders have good and marketable title to all of the issued and outstanding shares of AM6 Stock, free and clear of any and all Liens, and on the Closing Date will own all of such AM6 Stock, free and clear of any and all Liens, including, but not limited to, any claims by any present or former

-3-

stockholders of AM6.  There are no options, warrants or other rights, agreements, arrangements or commitments of any character obligating any of the Selling Stockholders to sell any shares of capital stock of or other equity interests in AM6 or to repurchase, redeem or otherwise acquire any shares of capital stock of AM6 or any interest therein.

3.4.  Interests in Other Entities.

(a)  Except as set forth in Section 6.1 (e) of this Agreement and  **Schedule 3.4**, none of the Selling Stockholders (individually or jointly) (a) own, directly or indirectly, of record or beneficially, any shares of voting stock or other equity securities of any other corporation engaged in the same or similar business to that business engaged in by AM6 at the Closing Date (other than not more than one percent (1%) of the publicly-traded capital stock of corporations engaged in such business held solely for investment purposes); (b) have any ownership interest, direct or indirect, of record or beneficially, in any unincorporated entity engaged in the same or similar business to that business engaged in by AM6 at the Closing Date; or (c) have any obligation, direct or indirect, present or contingent, (A) to purchase or subscribe for any interest in, advance or loan monies to, or in any way make investments in, any other person or entity engaged in the same or similar business to that business engaged in by AM6 at the Closing Date, or (B) to share any profits or capital investments or both from an entity engaged in the same or similar business to that business engaged in by AM6 at the Closing Date.

3.5.  Authority.  The execution and delivery by AM6 of this Agreement and of all of the agreements to be executed and delivered by AM6 pursuant hereto (collectively, the "AM6 Documents"), the performance by AM6 of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary corporate action on the part of AM6 (including, but not limited to, the unanimous consents of the Board of Directors of AM6 and of the Selling Stockholders) and AM6 has all necessary corporate power and corporate authority with respect thereto.  The Selling Stockholders are individuals or entities having all necessary capacity, power and authority to execute and deliver this Agreement and such other agreements to be executed and delivered by any of them pursuant hereto (collectively, the "Stockholder Documents") and to consummate the transactions contemplated hereby and thereby.  This Agreement is, and when executed and delivered by AM6 and the Selling Stockholders, each of the other agreements to be delivered by any of them pursuant hereto will be, the valid and binding obligations of AM6 and the Selling Stockholders, to the extent they are parties thereto, in accordance with their respective terms, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

3.6.  Noncontravention.  Except as set forth on **Schedule 3.6**, neither the execution and delivery by AM6 or the Selling Stockholders of this Agreement or of any other AM6 Documents or Stockholder Documents to be executed and delivered by either or any of them, nor the consummation of any of the transactions contemplated hereby or thereby, nor the performance by either or any of them of any of their respective obligations hereunder or thereunder, will (nor with the giving of notice or the lapse of time or both would) (a) conflict

with or result in a breach of any provision of the Articles of Incorporation, By-Laws or other constituent documents of AM6, each as amended to date, or (b) give rise to a default, or any right of termination, cancellation or acceleration, or otherwise be in conflict with or result in a loss of contractual benefits to any of them, under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which any of them is a party or by which any of them or any of their respective assets may be bound, or require any consent, approval or notice under the terms of any such document or instrument, or (c) violate any order, writ, injunction, decree, law, statute, rule or regulation of any court or governmental authority which is applicable to any of them or (d) result in the creation or imposition of any Lien upon any of the assets of AM6 (collectively, the "Assets") or the AM6 Common Stock, or (e) interfere with or otherwise adversely affect the ability of BandCon or AM6 to carry on the Business after the Closing Date on substantially the same basis as is now conducted by AM6.

   3.7. <u>AM6 Financial Records</u>.  Adam LaFountain of AM6, on behalf of AM6, delivered to Mike Flatin of BandCon on June 25, 2007 an AM6 Quickbooks file on CD-ROM (signed by Adam LaFountain) of AM6's financial books and records, current as of June 21, 2007, for the period March 2004 through June 21, 2007, which file is called "AM6NetworksCurrent.qbw" (collectively, the "AM6 Financial Records").  The AM6 Financial Records were prepared in accordance with generally accepted accounting principles applied on a consistent basis ("GAAP"), except for any absence of notes and the absence of normal and recurring year-end adjustments, and fairly present the financial position of AM6 as at June 21, 2007 and the results of the operations for the periods indicated.  The AM6 Financial Records are complete and correct, have been maintained in accordance with good business practices, and accurately reflect the financial condition, results of operations and cash flow of AM6 as of June 21, 2007.

   3.8. <u>Absence of Undisclosed Liabilities</u>.  AM6 has not had any liabilities or obligations of any nature whatsoever, whether accrued, matured, unmatured, absolute, contingent, direct or indirect or otherwise, which have not been (a) in the case of liabilities and obligations of a type customarily reflected on a corporate balance sheet,  set forth in the AM6 Financial Records, or (b)  in the case of other types of liabilities and obligations, expressly described in **Schedule 3.8**, or (c) incurred, consistent with past practice, in the ordinary course of business of AM6 (in the case of liabilities and obligations of the type referred to in clause (a) above).

   3.9. <u>Absence of Changes</u>.  Since December 31, 2006 and except as set forth in **Schedule 3.9**, there have not been (a) any material adverse changes (other than as is normal in the ordinary course of business) in the condition (financial or otherwise) of the assets, liabilities, business, results of operations or cash flows of AM6 (including, without limitation, any such adverse change resulting from damage, destruction or other casualty loss, whether or not covered by insurance), (b) any waivers by AM6 of any material right, or cancellations of any debt or claim, of substantial value, (c) any declarations, set asides or payments of any dividend or other distributions or payments in respect of the AM6 Common Stock, (d) any changes in the accounting principles or methods which are utilized by AM6, (e) any amounts borrowed or any liabilities (absolute or contingent) incurred by AM6, other than in the ordinary course of business, (f) any Liens discharged or satisfied or any obligations or liabilities

(absolute or contingent) incurred or paid by AM6, other than in the ordinary course of business, (g) any tangible or intangible Assets of AM6 mortgaged, pledged or subjected to a Lien, (h) any material tangible Assets sold, assigned or transferred other than in the ordinary course of business, (i) any patents, trademarks, trade names, copyrights, trade secrets or other intangible Assets of AM6 sold, assigned or transferred, (j) any material losses of property of AM6, (k) any expenditures by AM6 of any material amount, or any bonuses or extraordinary salary increases, or (l) any agreements or transactions, or amendments or terminations of any agreement, with an affiliate of AM6.

3.10.  Litigation.  Except as set forth in **Schedule 3.10**, there are no claims, suits or actions, or administrative, arbitration or other proceedings or governmental investigations, pending or, to AM6's Knowledge (as hereinafter defined), threatened, against or relating to AM6 or the Selling Stockholders (but only as it relates to AM6, its Business, Assets or any AM6 Stock), the transactions contemplated hereby or any of the Assets.  There are no judgments, orders, stipulations, injunctions, decrees or awards in effect which relate to AM6, this Agreement, the transactions contemplated hereby, the Business or any of the Assets, the effect of which is (a) to limit, restrict, regulate, enjoin or prohibit any business practice of AM6 in any area, or the acquisition by AM6 of any properties, assets or businesses, or (b) otherwise materially adversely affect the Business, any of the Assets or AM6 Common Stock.  To AM6's Knowledge, no basis exists for the commencement of any claims, suits or actions, or administrative, arbitration or other proceedings or governmental investigations.  For purposes of this Agreement, AM6's "Knowledge" shall be the actual knowledge of each of the Selling Stockholders after due inquiry; the Selling Stockholders' "Knowledge" shall be the actual knowledge of the applicable Selling Stockholder on a several basis, after due inquiry, with respect to matters relating to their individual capacities.

3.11.  No Violation of Law.  AM6 is not engaging in any activity or omitting to take any action as a result of which it is in violation of any material law, rule, regulation, zoning or other ordinance, statute, order, injunction or decree, or any other requirement of any court or governmental or administrative body or agency, applicable to AM6, the Business or any of the Assets, including, but not limited to, those relating to: occupational safety and health matters; issues of environmental and ecological protection (e.g., the use, storage, handling, transport or disposal of pollutants, contaminants or hazardous or toxic materials or wastes, and the exposure of persons thereto); business practices and operations; labor practices; employee benefits; and zoning and other land use laws and regulations, except where, in each such case, the failure to be in compliance would not have a Material Adverse Effect.  To AM6's and each Selling Stockholder's Knowledge, neither AM6 nor any of its stockholders, officers, directors, employees, agents or representatives has made, directly or indirectly, with respect to the Assets or the Business, any illegal political contributions or payments from corporate funds, that were falsely recorded on the books and records of AM6, payments from corporate funds to governmental officials in their individual capacities for the purpose of affecting their action or the action of the government they represent to obtain special concessions, illegal payments from corporate funds to obtain or retain business or payments from corporate funds to third parties in their individual capacities for the purpose of affecting their action or the action of the persons or entities that they represent to obtain special concessions.

3.12.  Properties; Assets.  All plants, structures and equipment which are utilized in the Business, or are material to the condition (financial or otherwise) of AM6 are owned or leased by AM6 and are in good operating condition and repair (ordinary wear and tear and obsolescence excepted), and are adequate and suitable for the purposes for which they are used and meet all standards, clearances and ratings in effect on the date hereof in respect of those Laws applicable thereto. **Schedule 3.12** sets forth all (a) real property which is owned, leased (whether as lessor or lessee) or subject to contract or commitment of purchase or sale or lease (whether as lessor or lessee) by AM6, or which is subject to a title retention or conditional sales agreement or other security device, and (b) tangible personal property which is owned, leased (whether as lessor or lessee) or subject to contract or commitment of purchase or sale or lease (whether as lessor or lessee) by AM6. Other than as set forth on **Schedule 3.12,** AM6 has good and marketable title to all of its respective Assets free and clear of all Liens.

3.13.  Intangibles/Inventions.  **Schedule 3.13** identifies (by a summary description) the Intangibles (as defined below), the ownership thereof and, if applicable, AM6's authority for use of the same, which Schedule is complete and correct and encompasses: (A) all United States and foreign patents, trademarks and trade name registrations, trademarks and trade names, brandmarks and brand name registrations, servicemarks and servicemark registrations, assumed names and copyrights and copyright registrations, owned in whole or in part or used by AM6, and all applications therefor (collectively, the "Marks"), (B) domain names, fictitious and d.b.a. names, proprietary 800 and 888 prefix phone numbers, Internet URLs and other similar identifiers and proprietary rights owned or used by AM6or any of its Subsidiaries (collectively, the "Proprietary Identifiers"), (C) all inventions, discoveries, improvements, processes, formulae, technology, know-how, processes and other intellectual property, proprietary rights and trade secrets relating to the Business (collectively, the "Inventions") and (D) all licenses and other agreements to which AM6 is a party or otherwise bound which relate to any of the Intangibles or the Inventions or AM6's use thereof in connection with the Business (collectively, the "Licenses, and together with the Marks Proprietary Identifiers and the Inventions, the "Intangibles"). AM6 does not have, and to AM6's and each Selling Stockholder's Knowledge, no other party has, violated the terms of any of the aforesaid licenses and/or agreements. Except as disclosed on **Schedule 3.13,** (1) AM6 owns or is authorized to use in connection with the Business all of the Intangibles; (2) no proceedings have been instituted, are pending, or to AM6's and each Selling Stockholder's Knowledge, are threatened, which challenge the rights of AM6 with respect to the Intangibles or its use thereof in connection with the Business and/or the Assets or the validity thereof and, to AM6's and each Selling Stockholder's Knowledge, there is no valid basis for any such proceedings; (3) Neither AM6's ownership of the Intangibles nor its use thereof in connection with the Business and/or the Assets violates any laws, statutes, ordinances or regulations, except where such violation would not have a Material Adverse Effect, or has at any time infringed upon or violated any rights of others, or, to AM6's and each Selling Stockholder's Knowledge, is being infringed by others; (4) none of the Intangibles, or AM6's use thereof in connection with the Business and/or the Assets, is subject to any outstanding order, decree, judgment, stipulation or any lien, security interest or other encumbrance; and (5) AM6 has not granted any license to third parties with regard to its Intangibles.

3.14.  Systems and Software.  AM6 owns or has the right to use pursuant to lease, license, sublicense, agreement, or permission all computer hardware, software and

information systems necessary for the operation of the Business (collectively, "Systems"). Each System owned or used by AM6 immediately prior to the Closing Date will be owned or available for use by BandCon on identical terms and conditions immediately subsequent to the Closing Date. With respect to each System owned by a third party and used by AM6 pursuant to lease, license, sublicense, agreement or permission, each of which is set forth on **Schedule 3.14**: (a) the lease, license, sublicense, agreement or permission covering the System is legal, valid, binding, enforceable, and in full force and effect; (b) the lease, license, sublicense, agreement or permission will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the Closing Date; (c) to AM6's and each Selling Stockholder's Knowledge, no party to any such  lease, license, sublicense, agreement or permission is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default, and permit termination, modification or acceleration thereunder; (d) no party to any such lease, license, sublicense, agreement or permission has repudiated any provision thereof; (e) AM6 has not granted any sublicense, sublease or similar right with respect to any such lease, license, sublicense, agreement or permission; (f) AM6's use and continued use of such Systems does not and will not interfere with, infringe upon, misappropriate, or otherwise come into conflict with, any intellectual property rights of third parties as a result of the continued operation of the Business.

3.15. <u>Tax Matters</u>.

(a)     Except as set forth in **Schedule 3.15(a)**, (i) AM6 has filed with the appropriate governmental agencies all Tax Returns and reports required to be filed by it, and has paid in full or contested in good faith or made adequate provision for the payment of, Taxes due and owing (whether or not shown on any Tax Return); and (ii) all such Tax Returns were correct and complete in all material respects and have been prepared in substantial compliance with all applicable laws and regulations. AM6 has duly withheld all payroll Taxes, FICA and other federal, state and local Taxes and other items required to be withheld by it from employer wages or otherwise with respect to any amounts paid to any employee, independent contractor, creditor, stockholder, or other third party, and has duly deposited the same in trust for or paid over to the proper taxing authorities. Except as set forth in **Schedule 3.15(a)**, (1) AM6 has not executed or filed with any taxing authority any agreement extending the periods for the assessment or collection of any Taxes, or is a party to any pending or threatened action or proceeding by any governmental authority for the assessment or collection of Taxes, and (2) within the past three years, the United States federal income tax returns of AM6 have not been audited by the Internal Revenue Service ("the IRS") nor has any state, local or other taxing authority audited any merchandise, personal property, sales or use tax returns of AM6. There is no material tax dispute or claim concerning the Tax liability of AM6 either (x) raised or claimed by any taxing authority in writing, or (y) as to which AM6 or any Selling Stockholder has Knowledge based upon personal contact with any agent of such taxing authority. **Schedule 3.15** lists all federal, state, local, and foreign Tax Returns filed with respect to AM6 for taxable periods ending on or after December 31, 2004, indicates those Tax Returns that have been audited, and indicates those Tax Returns that currently are the subject of an audit. There is no tax Lien, whether imposed by any Federal, state, county, local or foreign taxing authority, outstanding against the Assets, properties or Business of AM6, except for Liens for Taxes not yet due and payable. AM6 has not agreed to make or

is required to make any adjustment under Section 481(a) of the Internal Revenue Code, by reason of a change in accounting method or otherwise.  AM6 is not a party to any tax sharing or allocation agreement.  None of AM6 or any Selling Stockholder has received notice that any claim has been made by any taxing authority in a jurisdiction where AM6 does not file Tax Returns that it is or may be subject to taxation in that jurisdiction.  AM6 has not been a "United States real property holding corporation" within the meaning of Code Section 897(c)(2) during the applicable period specified in Code Section 897(c)(1)(A)(ii).

 (b) AM6 is not an S corporation within the meaning of Sections 1361 and 1362 of the Code (and in all state and local jurisdictions in which it is required to file tax returns) and AM6 will not be an S corporation up to and including the Closing Date.

 (c) As used herein, the term "Taxes" or "Tax" means: (a) any foreign, federal, state or local income, earnings, profits, gross receipts, franchise, capital stock, net worth, sales, use, value added, occupancy, general property, real property, personal property, intangible property, transfer, fuel, excise, parking, payroll, withholding, unemployment compensation, social security, retirement or other tax of any nature; (b) any foreign, federal, state or local organization fee, qualification fee, annual report fee, filing fee, occupation fee, assessment, other fee or charge of any nature imposed by a governmental body; or (c) any deficiency, interest or penalty imposed with respect to any of the foregoing.

 (d) As used herein, "Tax Returns" means all returns and reports, amended returns, information returns, statements, declarations, estimates, schedules, notices, notifications, forms, elections, certificates or other documents required to be filed or submitted to any governmental body with respect to the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement of, or compliance with, any Tax.

 (e) "Code" shall mean the Internal Revenue Code of 1986, as amended.

 3.16. Banks; Powers of Attorney.  **Schedule 3.16** is a complete and correct list showing (a) the names of each bank in which AM6 has an account or safe deposit box and the names of all persons authorized to draw thereon or who have access thereto, and (b) the names of all persons, if any, holding powers of attorney from AM6.

 3.17. Employee Arrangements.  **Schedule 3.17** is a complete and correct list and summary description of all (a) employment, management, termination and consulting agreements to which AM6 is a party or otherwise bound, and (b) compensation plans and arrangements; bonus and incentive plans and arrangements; deferred compensation plans and arrangements; pension and retirement plans and arrangements; profit-sharing and thrift plans and arrangements; stock purchase and stock option plans and arrangements; hospitalization and other life, health or disability insurance or reimbursement programs; holiday, sick leave, severance, vacation, tuition reimbursement, personal loan and product purchase discount

policies and arrangements; and other plans or arrangements providing for benefits for employees of AM6.  Said Schedule also lists the names and compensation of all employees of AM6, including bonuses and other incentive compensation.  AM6 has not received any notice of termination from any of such persons, nor to AM6's Knowledge does any such employee intend to terminate his or her employment

3.18.  <u>ERISA</u>.

(a)      Except as set forth on **Schedule 3.18(a)**, AM6 does not maintain and is not  obligated to contribute to an "employee pension benefit plan", as such term is defined in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or  "welfare benefit plan" as such term is defined in Section 3(1) of ERISA.

(b)      Each employee pension benefit plan set forth on **Schedule 3.18(b)** complies currently and has been maintained in substantial compliance with its terms and, both as to form and in operation, with all material requirements prescribed by any and all material statutes, orders, rules and regulations that are applicable to such plans, including ERISA and the Code.

(c)      Each welfare benefit plan set forth on **Schedule 3.18(c)** complies currently and has been maintained in substantial compliance with its terms and, both as to form and in operation, with all material requirements prescribed by any and all material statutes, orders, rules and regulations that are applicable to such plans, including ERISA and the Code.   AM6 does not sponsor, maintain, or contribute to any welfare benefit plan that provides health or death benefits to former employees of AM6 other than as required by Section 4980B of the Code or other applicable laws.

(d)      With respect to each employee benefit plan of AM6, AM6 will have made, on or before the Closing Date, all payments required to be made by it on or before the Closing Date and will have accrued (in accordance with GAAP) as of the Closing Date all payments due but not yet payable as of the Closing Date, so there will not have been, nor will there be, any Accumulated Funding Deficiencies (as defined in ERISA or the Code) or waivers of such deficiencies.

3.19.  <u>Certain Business Matters</u>.  Except as is set forth in **Schedule 3.19**, (a)  the product and service warranties given by AM6 or by which any of them is bound (complete and correct copies or descriptions of which have heretofore been delivered by AM6 to BandCon) entail no greater obligations than are customary in the Business, (b) none of AM6 or any of the Selling Stockholders is a party to or bound by any agreement which limits its or his, as the case may be, freedom to compete in any line of business or with any person, or which is otherwise materially burdensome to AM6 or any of the Selling Stockholders, and (c) AM6 is not a party to or bound by any agreement in which any officer, director or stockholder of AM6 has, or had when made, a direct or indirect material interest (other than as a stockholder of AM6).

3.20.  Material Contracts.  **Schedule 3.20** is a complete and correct list of all contracts, commitments, obligations and understandings which are not set forth in any other Schedule delivered hereunder and to which AM6 is a party or otherwise bound, including, without limitation, all contracts and agreements with customers and suppliers of AM6, except for each of those which may be anticipated to involve aggregate payments to or by AM6 of $20,000 (or the equivalent) or less calculated over the full term thereof.  Complete and correct copies of all contracts, commitments, obligations and undertakings set forth on any of the Schedules delivered pursuant to this Agreement have been furnished by AM6 to BandCon. Except as expressly stated on any of such Schedules, (1) each of the agreements listed on the Schedules hereto is in full force and effect, no person or entity which is a party thereto or otherwise bound thereby is in material default thereunder, and no event, occurrence, condition or act exists which does (or which with the giving of notice or the lapse of time or both would) give rise to a material default or right of cancellation, acceleration or loss of contractual benefits thereunder and to AM6's and each Selling Stockholder's Knowledge, all the covenants to be performed by any other party under such contract, commitment or agreement have been performed in all material respects; (2) there has been no threatened cancellations thereof, and there are no outstanding disputes thereunder; and (3) each of them is fully assignable without the consent, approval, order or any waiver by, or any other action of or with any individual or individuals, without the payment of any penalty, the incurrence of any additional debt, liability or obligation of any nature whatsoever or the change of any term.

3.21.  Approvals/Consents.  AM6 currently hold all governmental and administrative consents, permits, appointments, approvals, licenses, certificates and franchises which are necessary for the operation of the Business and Assets, all of which are in full force and effect and are unaffected by the transaction contemplated hereby without the payment of any material penalty or the incurrence of any additional debt, liability or obligation of any nature whatsoever or the change of any term.  **Schedule 3.21** is a complete and correct list of all such governmental and administrative consents, permits, appointments, approvals, licenses, certificates and franchises.  No material violations of the terms thereof have heretofore occurred or, to AM6's Knowledge, exist as of the date of this Agreement.

3.22.  Accounts Receivable.  The accounts receivable shown in the AM6 Financial Records arose in the ordinary course of business; were not, as of June 21, 2007, except as set forth on **Schedule 3.22** subject to any discount, contingency, claim of offset or recoupment or counter claim except as reflected on the reserves set forth on the AM6 Financial Records; and represented, as of June 21, 2007, bona fide claims against debtors for sales, leases, licenses and other charges.  Other than those accounts receivable set forth on the AM6 Financial Records, all accounts receivable of AM6 arising after the date of June 21, 2007 through the date of this Agreement arose in the ordinary course of business and, as of the date of this Agreement, and except as set forth on **Schedule 3.22** are not subject to any discount, contingency, claim of off-set or recoupment or counterclaim.  The amount carried for allowances, including, without limitation, markdowns, price protection, bad debt allowance and reserves, disclosed in the AM6 Financial Records is as of the date of this Agreement is sufficient to provide for any losses which may be sustained on realization of the accounts receivable shown in the AM6 Financial Records.  The accounts receivable of AM6 delivered by AM6 to BandCon as part of the AM6 Financial Records on June 21, 2007 is true, complete and accurate in all material respects.

3.23.   Accounts Payable.  All accounts payable of AM6 as and at June 21, 2007 are reflected in the AM6 Financial Records.  **Schedule 3.23** sets forth a true and correct aged list of all of AM6's respective accounts payable as of June 21, 2007 to the date hereof in excess of $3,000 to any one payee.  Except as set forth on **Schedule 3.23**, no account payable of AM6 which has arisen subsequent to June 21, 2007, has exceeded $3,000.  Except as disclosed in **Schedule 3.23**, all accounts payable have arisen in the ordinary course of business and represent valid arms-length accounts payable of AM6.

3.24.   Business Practices and Commitments.

(a)      Set forth on **Schedule 3.24(a)** is a description of AM6's  (1) rebate and volume discount practice, and obligations, (2) allowance and customer refund practice and obligations, (3) advertising and other promotional practices, (4) warranty practices and obligations, (5) cancellation and refund policies and historical cancellation and refund rates, as each of the foregoing relate to AM6's respective customers and suppliers and (6) schedule of recorded and/or committed rebate, volume discount credits, and chargebacks due to customers.  All obligations of AM6 pursuant to such markdowns, allowances, and other chargebacks or other promotional practices obligating AM6 to perform services or supply product at prices below AM6's normal prices or at no cost have been adequately reserved for and disclosed in the AM6 Financial Records.

(b)      Set forth on **Schedule 3.24(b)** is a list of all outstanding purchase orders in excess of $5,000.

(c)      Except for specifically authorized cancellations as set forth on **Schedule 3.24(c)**, there is no general understanding that products or services with any customer would be cancellable.  Set forth on **Schedule 3.24(c)** is a list of the net amount of products or services cancelled by customers in excess of $5,000 per customer during the last two fiscal years ended December 31, 2006.  Except for certain AM6 customers identified on **Schedule 3.24(c)** which have the right to cancel certain products or services in accordance with customary industry standards, neither AM6 nor any of the Selling Stockholders has knowledge of any reason why the future cancellation experience of AM6 would be materially different from AM6's prior experience during the years covered by the AM6 Financial Records.

3.25.   Customers and Suppliers; Loss of Business.

(a)      **Schedule 3.25** accurately identifies, and provides an accurate and complete breakdown of the revenues, amounts paid to or the value of goods/services received from, as applicable (1) each customer or other person of AM6 that individually accounted for more than $10,000 of consolidated gross revenues of AM6 in each of the last two fiscal years ended December 31, 2006, or (2) each supplier of AM6 that received purchase or other orders from AM6 in an amount in excess of $10,000 during each of the last two fiscal years ended December 31, 2006 based on the aggregate value of products or services ordered by AM6.

(b) AM6 and the Selling Stockholders have no Knowledge that the transactions contemplated by this Agreement will result in any loss of business or reduction in volume with any of the present suppliers or customers of AM6. There exists no actual or, to AM6's and each Selling Stockholder's Knowledge, threatened, termination, cancellation or limitation of, or any adverse modification or change in, the business relationship between AM6 and any material supplier or customer of AM6. Each of the Selling Stockholders shall fully cooperate and use best efforts after the Closing Date to maintain the customers and suppliers of AM6 after the Closing Date.

3.26. Insurance. AM6 maintains the policies of insurance (the "Insurance Policies") set forth in **Schedule 3.26**, including all legally required workers' compensation insurance and errors and omissions, casualty, fire and general liability insurance. **Schedule 3.26** sets forth the name of the insurer under each Insurance Policy, the type of policy or bond, the coverage amount and any applicable deductible of the Insurance Policy, and other material provisions, as of the date hereof. All premiums due and payable under all Insurance Policies have been timely paid or are being paid in accordance with agreed-upon payment terms. AM6 is in material compliance with the terms of the Insurance Policies, and all Insurance Policies are in full force and effect. To AM6's and each Selling Stockholder's Knowledge, there is no threatened termination of any Insurance Policy. **Schedule 3.26** sets forth all material claims made under the Insurance Policies at any time. There is no claim pending under any of the Insurance Policies as to which coverage has been questioned, denied or disputed by the underwriters of the Insurance Policies.

3.27. Information as to AM6. None of the representations or warranties made by AM6 or the Selling Stockholders in this Agreement is, or contained in any of the AM6 Documents to be executed and delivered hereto will be, false or misleading with respect to any material fact, or omits to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

3.28. Investment Intent. Each of the Selling Stockholders represents and warrants to BandCon that:

(a) He, she or it understands that the shares of BandCon Class B common stock that comprise the Purchase Price (the "BandCon Shares") are **"restricted securities"** that have not been registered under the Securities Act of 1933, as amended (the "'33 Act"), by reason of a specific exemption from the registration provisions of the '33 Act which depends upon, among other things, the bona fide nature of the investment intent as expressed herein. He, she or it acknowledges that the BandCon Shares may not be transferred unless (a) subsequently registered under the '33 Act and applicable state securities laws or (b) an exemption from such registration is available, as to which no assurance can be given.

(b) He, she or it understands that the certificates representing the BandCon Shares will bear restrictive legends thereon substantially as follows:

-13-

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION.  SUCH SHARES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT THE TRANSFER OF SHARES IS EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OR SUCH OTHER SECURITIES LAWS."

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO LIMITED RIGHTS, PREFERENCES AND PRIVILEGES SET FORTH IN THE AMENDED AND RESTATED ARTICLES OF INCORPORATON FOR THE COMPANY."

(c)     He, she or it acknowledges that the BandCon Shares are non-voting shares that do not entitle the holders thereof to vote on corporate matters of the company, except as may be required by law, or to the distribution of any dividends of the company.

(d)     He, she or it acknowledges and agrees that they have received all the information they consider necessary or appropriate for deciding whether to acquire the BandCon Shares, including, without limitation, historical financial information of BandCon, material contracts to which BandCon is a party and other relevant information.  He, she or it further represents that they have had an opportunity to ask questions and receive answers from BandCon regarding the terms and conditions of the acquisition of the BandCon Shares, the value thereof and the business, properties, prospects and financial condition of BandCon. He acknowledges that no appraisal of BandCon or the BandCon Shares have been performed in connection with this transaction or Agreement.

(e)     He, she or it is a sophisticated investor familiar with the type of risks inherent in the acquisition of securities such as the BandCon Shares and that, by reason of his or her knowledge and experience in financial and business matters in general, and investments of this type in particular, he, she or it is capable of evaluating the merits and risks of an investment in the BandCon Shares.

(f)     He, she or it is able to bear the economic risk of an investment in the BandCon Shares, including, without limiting the generality of the foregoing, the risk of losing part or all of his, her or its investment in the Shares and his, her or its possible inability to sell or transfer the BandCon Shares for an indefinite period of time.

(g)     He, she or it is acquiring the BandCon Shares for his, her or its own account and for the purpose of investment and not with a view to, or for

-14-

resale in connection with, any distribution within the meaning of the Act or any Other Securities Laws, in violation of the Act.

(h)      He, she or it understands that no public market now exists for any of the BandCon Shares and that it is unlikely that a public market will ever exist for the BandCon Shares or any of BandCon's Common Stock or other equity securities.

(i)      He, she or it understands he may never receive a return on his investment, and no such promise of a return has been made.  He, she or it further understands that he may not ever be able to sell the BandCon Shares or liquidate all or any portion thereof, even in the event of a personal emergency.

(j)      He, she or it has reviewed with his own tax and legal advisors the federal, state and local tax consequences of this investment, where applicable, and the legal effect of the transactions contemplated by this Agreement.  He, she or it is relying solely on his advisors and not on any statements or representations of BandCon or any of its agents and understands that he (and not BandCon) shall be responsible for his own tax or legal liability that may arise as a result of this investment or the transactions contemplated by this Agreement.

(k)      He, she or it acknowledges that he has had the opportunity to review this Agreement and the Exhibits attached hereto and the transactions contemplated by this Agreement with his own legal counsel, and that he is relying solely on his legal counsel and not on any statements or representations of the Company or any of the Company's agents, including Barry C. Seaton, P.C., for legal or tax advice with respect to this investment or the transactions contemplated by this Agreement.

(l)      He, she or it acknowledges that BandCon has relied on the representations contained herein and that the statutory basis for exemption from the requirements of Section 5 of the Act may not be present if, notwithstanding such representations, he, she or it is acquiring the BandCon Shares for resale or distribution upon the occurrence or non-occurrence of some predetermined event.

4.      <u>Representations and Warranties as to BandCon</u>.  BandCon represents and warrants to AM6 and the Selling Stockholders, as follows:

4.1.   <u>Organization; Authority</u>.

(a)      The execution and delivery by BandCon of this Agreement and of each agreement to be executed and delivered by it pursuant hereto (collectively, the "Purchase Documents"), the performance by BandCon of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary corporate action on the part of BandCon, and BandCon has all necessary corporate power and corporate authority with respect thereto.  This Agreement is, and when executed and delivered by BandCon and each other Purchase Document will be, the valid and binding obligation of BandCon in accordance with the respective terms thereof, except as the same may be limited by

22

bankruptcy, insolvency, reorganization, moratorium or other laws affecting the rights of creditors generally and subject to the rules of law governing (and all limitations on) specific performance, injunctive relief, and other equitable remedies.

(b)     BandCon is a corporation duly organized, validly existing and in good standing under the laws of the State of California, with full corporate power and corporate authority (a) to own, lease and operate its properties, (b) carry on the business currently carried on by it and (c) execute, deliver and perform under this Agreement and each other agreement and instrument required to be executed and delivered by it pursuant hereto.

4.2.    Noncontravention.  Neither the execution and delivery by BandCon of this Agreement or of any other documents to be executed and delivered by it, nor the consummation of any of the transactions contemplated hereby or thereby, nor the performance by it of any of its respective obligations hereunder or thereunder, will (nor with the giving of notice or the lapse of time or both would) (a) conflict with or result in a breach of any provision of the Certificate of Incorporation, By-Laws or other constituent documents of BandCon, each as amended to date, or (b) give rise to a default, or any right of termination, cancellation or acceleration, or otherwise be in conflict with or result in a loss of contractual benefits to it, under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which it is a party or by which it or any of their respective assets may be bound, or require any consent, approval or notice under the terms of any such document or instrument, or (c) violate any order, writ, injunction, decree, law, statute, rule or regulation of any court or governmental authority which is applicable to it.

4.3.    Issuance of Securities.  The BandCon Shares to be issued at the Closing have been duly authorized by all necessary corporate action and, when issued and paid for in accordance with the terms hereof, shall be validly issued and outstanding, fully paid and non-assessable, free and clear of all liens and encumbrances, and rights of first refusal of any kind (except for any restrictions which may be imposed by state or federal securities laws) and the holders shall be entitled to all rights accorded to holders of BandCon Class B Common Stock.  BandCon has complied, and will comply, with all applicable federal and state securities laws in connection with the issuance of the BandCon Shares.

4.4.    Litigation.  Except as set forth in **Schedule 4.5**, there are no claims, suits or actions, administrative, arbitration or other proceedings or governmental investigations, pending or to BandCon's Knowledge (as hereinafter defined) threatened, against or relating to BandCon, the transactions contemplated hereby or any of BandCon's material assets, properties or business which are required to be disclosed by law.  For purposes of this Agreement, the term "BandCon's Knowledge" shall be the actual knowledge of each of the executive officers of BandCon, after due inquiry.

4.5.    Absence of Changes.  Since the date of BandCon's most recent financial statements and except as set forth in **Schedule 4.6**, there have not been any (a) material adverse changes (other than in the ordinary course of business) in the condition

(financial or otherwise) of the assets, liabilities, business, results of operations or cash flows of BandCon that would require BandCon to amend such financial statements.

    5.    <u>Indemnification.</u>

    5.1.    <u>Indemnification by the Selling Stockholders.</u>  Each of the Selling Stockholders, jointly and severally, hereby indemnifies and agrees to defend and hold harmless BandCon from and against any and all losses, obligations, deficiencies, liabilities, claims (whether actual or threatened), damages, costs and expenses (including, without limitation, the amount of any settlement entered into pursuant hereto, and all reasonable legal fees and other expenses incurred in connection with the investigation, prosecution or defense of any matter indemnified pursuant hereto) ("Losses") which BandCon or any of its affiliates may sustain, suffer or incur and which arise out of, are caused by, relate to, or result or occur from or in connection with any misrepresentation of a fact contained in any representation of AM6 and/or the Selling Stockholders contained in, or the breach by AM6 or the Selling Stockholders of any warranty or covenant made by any one or all of them in, any AM6 Document and/or any Stockholder Document, or if the Accounts Payable is overstated or some issue arises with collection of the Accounts Receivable as reflected in the AM6 Financial Records  provided by AM6 to BandCon June 19, 2007.  The foregoing indemnification shall also apply to direct claims by BandCon against the Selling Stockholders, which shall, together with the Purchase Price Adjustment set forth in this Agreement be BandCon's exclusive form of action against the Selling Stockholders for any such breach.

    5.2.    <u>Indemnification by BandCon.</u>  BandCon hereby indemnifies and agrees to defend and hold harmless each of AM6 (before the Closing Date) and the Selling Stockholders from and against any and all Losses which it or he may sustain, suffer or incur and which arise out of, are caused by, relate to, or result or occur from or in connection with any misrepresentation of a fact contained in any representation of BandCon contained in, or the breach by BandCon of any warranty or covenant made by it in the Purchase Documents.  The foregoing indemnification shall also apply to direct claims by AM6 or the Selling Stockholders against BandCon, which shall be AM6's and the Selling Stockholders' exclusive form of action against BandCon for any such breach.

    5.3.    <u>Third Party Claims.</u>  If a claim by a third party is made against any party or parties hereto and the party or parties against whom said claim is made intends to seek indemnification with respect thereto under Subsections 5.1 or 5.2, the party or parties seeking such indemnification shall promptly notify the indemnifying party or parties, in writing, of such claim; provided, however, that the failure to give such notice shall not affect the rights of the indemnified party or parties hereunder except to the extent that such failure materially and adversely affects the indemnifying party or parties due to the inability to timely defend such action.  The indemnifying party or parties shall have 10 business days after said notice is given to elect, by written notice given to the indemnified party or parties, to undertake, conduct and control, through counsel of their own choosing (subject to the consent of the indemnified party or parties, such consent not to be unreasonably withheld) and at their sole risk and expense, the good faith settlement or defense of such claim, and the indemnified party or parties shall cooperate with the indemnifying parties in connection therewith; provided: (a) all settlements require the prior reasonable consultation with the indemnified party and the prior written

consent of the indemnified party, which consent shall not be unreasonably withheld, and (b) the indemnifying party or parties shall be entitled to participate in such settlement or defense through counsel chosen by the indemnified party or parties, provided that the fees and expenses of such counsel shall be borne by the indemnified party or parties.  So long as the indemnifying party or parties are contesting any such claim in good faith, the indemnified party or parties shall not pay or settle any such claim; provided, however, that notwithstanding the foregoing, the indemnified party or parties shall have the right to pay or settle any such claim at any time, provided that in such event they shall waive any right of indemnification therefor by the indemnifying party or parties.  If the indemnifying party or parties do not make a timely election to undertake the good faith defense or settlement of the claim as aforesaid, or if the indemnifying parties fail to proceed with the good faith defense or settlement of the matter after making such election, then, in either such event, the indemnified party or parties shall have the right to contest, settle or compromise (provided that all settlements or compromises require the prior reasonable consultation with the indemnifying party and the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld) the claim at their exclusive discretion, at the risk and expense of the indemnifying parties.

5.4.   Assistance.  Regardless of which party is controlling the defense of any claim, each party shall act in good faith and shall provide reasonable documents and cooperation to the party handling the defense.

6.   Non-Compete; Certain Covenants

6.1.   Noncompete Covenant

(a)   Subject to subsection (e) below, each of the Selling Stockholders hereby agrees for a period of three (3) years after the Closing Date, not to, directly or indirectly, within any State within the United States or any other geographic area in which BandCon or any of its subsidiaries then conducts business, (A) engage or become interested in any business (whether as owner, manager, operator, licensor, licensee, lender, guarantor, partner, stockholder, joint venturer, employee, consultant or otherwise) or render any services to any business competitive with the Business or any business of BandCon and its subsidiaries, other than as a holder for investment purposes only of not more than two percent (2%) of the publicly-traded capital stock of any corporations engaged in such businesses, or (B) take any other action which constitutes an interference with or a disruption of BandCon's or AM6's operation of the Business or BandCon's or AM6's use, ownership and enjoyment of the Assets after the Closing Date.  At no time during the term of this Agreement or thereafter shall any of the Selling Stockholders, directly or indirectly, disparage the commercial, business or financial reputation of AM6 or BandCon or any of their respective subsidiaries.

(b)   For purposes of clarification, but not of limitation, each Selling Stockholder acknowledges and agrees that the provisions of subsection 6.1 above shall serve as a prohibition against him, during the period described therein, directly or indirectly, hiring, offering to hire, enticing away or in any other manner persuading or attempting to persuade any officer, employee, agent, lessor, lessee, licensor, licensee,

customer, prospective customer or supplier of the Business to discontinue or alter his or its relationship with the Business.

(c)     The parties hereto hereby acknowledge and agree that (i) BandCon and AM6 would be irreparably injured in the event of a breach by any of the Selling Stockholders of any of their obligations under this Section 6.1, (ii) monetary damages would not be an adequate remedy for any such breach, and (iii) BandCon and AM6 shall be entitled to injunctive relief, in addition to any other remedy which it may have, in the event of any such breach.  It is hereby also agreed that the existence of any claims which Selling Stockholders may have against BandCon or AM6, whether under this Agreement or otherwise, shall not be a defense to the enforcement by BandCon or AM6 of any of the rights under this Section 6.1.

(d)     It is the intent of the parties hereto that the covenants contained in this Agreement shall be enforced to the fullest extent permissible under the laws of and public policies of each jurisdiction in which enforcement is sought (the Selling Stockholders hereby acknowledge that said restrictions are reasonably necessary for the protection of BandCon and AM6).  Accordingly, it is hereby agreed that if any one or more of the provisions of Section 6.1 shall be adjudicated to be invalid or unenforceable for any reason whatsoever, said provision shall be (only with respect to the operation thereof in the particular jurisdiction in which such adjudication is made) construed by limiting and reducing it so as to be enforceable to the extent permissible.

(e)     Bandcon acknowledges that Adam LaFountain is the holder of an approximately 30% equity interest in Ronin SDG Corporation, a California corporation, that brokers telecom services (voice data, video) transactions between customers and telecom service vendors such as AM6 and BandCon and receives commissions from the vendors for brokering such transactions.  Matthew Kelley is Chairman of the Board of Ronin SDG Corporation, but has no ownership interest therein.

6.2.   Confidentiality.  On and after the Closing Date, unless otherwise authorized by BandCon, the Selling Stockholders hereby agree not to, at any time, directly or indirectly, use, communicate, disclose or disseminate any Confidential Information.  As used in this paragraph 6.2, the term "Confidential Information" shall mean any and all information (oral and written) relating to the Business or the Assets, other than such information which can be shown by the disclosing party to be in the public domain (such information not being deemed to be in the public domain merely because it is embraced by more general information which is in the public domain) other than as the result of a breach of the provisions of this subsection 6.2 including, but not limited to, information relating to:  identity and description of goods and services used; purchasing; costs; pricing; equipment; technology; research; test procedures and results; customers and prospects; personnel matters, business plans and projections, customer or visitor data, marketing; and selling and servicing.

6.3.   Cooperation/Further Assurances.  On and after the Closing Date, each of the parties hereto hereby agrees (i) to fully cooperate with the other parties hereto in preparing and filing any notices, applications, reports and other instruments and documents and (ii) to execute, acknowledge, deliver, file and/or record, or cause such other parties to the extent

permitted by law to execute, acknowledge, deliver, file and/or record such other documents, which may be required by this Agreement or which are desirable in the reasonable opinion of any of the parties hereto, or their respective legal counsel, in respect of, any statute, rule, regulation or order of any governmental or administrative body in connection with the transactions contemplated by this Agreement.

6.4.   Income Tax Returns.  For income tax purposes, AM6 shall continue to be responsible for filing its income tax returns and for the payment of all income taxes, franchise taxes and all other corporate level taxes which arise in respect of the net income of AM6 during the tax period in which the Closing Date occurs.

6.5.   Other Tax Returns; Taxable Transaction.

(a)   The parties hereto acknowledge that this transaction is intended to be treated for income tax purposes as a taxable transaction.

(b)   AM6 shall file all Tax Returns of AM6 for the taxable period in which the Closing Date occurs,.

(c)   The Selling Stockholders shall be responsible for any personal tax liability they may have resulting from this transaction and shall consult with their independent tax advisors regarding this matter.

6.6.   Cooperation on Tax Matters.

(i) BandCon and Selling Stockholders shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes of AM6. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information reasonably relevant to any such audit, litigation, or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  BandCon (as to itself and on behalf of AM6) and Selling Stockholders agree (A) to retain all books and records in its possession or under its control with respect to Tax matters pertinent to AM6 relating to any taxable period beginning before the Closing Date until expiration of the statute of limitations (and, to the extent notified by BandCon or Selling Stockholders, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (B) to give the other party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other party so requests, BandCon and Selling Stockholders, as the case may be, shall allow the other party to take possession of such books and records.

(ii) BandCon and Selling Stockholders further agree, upon request, to use their best efforts to obtain any certificate or other document from any governmental authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including with respect to the transactions contemplated hereby).

6.7.   Tax Confidentiality Waiver.  Notwithstanding anything contained in this Agreement to the contrary, BandCon and the Selling Stockholders (and each employee,

representative, or other agent of BandCon or the Selling Stockholders) may (i) consult any tax advisor regarding U.S. federal income tax treatment or tax structure of the purchase of the AM6 Stock pursuant to this Agreement, and (ii) disclose to any and all persons, without limitation of any kind, the U.S. federal income tax treatment and tax structure of such purchase and all materials of any kind (including opinions or other tax analysis) that are provided to the taxpayer relating to such tax treatment and tax structure.  For this purpose, "tax structure" is limited to any facts relevant to the U.S. federal income tax treatment of the purchase of the AM6 Stock pursuant to this Agreement and does not include information relating to the identity of the parties hereto.

      6.8.   Investigation.

        (a)      Between the date of this Agreement and the Closing Date, BandCon may, directly and through its representatives, make such investigation of AM6 and its Business and Assets as each deems necessary or advisable, but such investigation shall not affect any of the representations and warranties contained herein or in any instrument or document delivered pursuant hereto.  In furtherance of the foregoing, BandCon and their representatives shall have reasonable access, during normal business hours after the date hereof, to all properties, books, contracts, commitments and records of AM6, all information concerning the names of AM6's principal vendors, the names of AM6's principal customers, and AM6 shall furnish to BandCon and its representatives such financial and operating data and other information as may from time to time be reasonably requested relating to the transactions contemplated by this Agreement (collectively, the "AM6 Information").  AM6 and its management, employees, accountants and attorneys shall cooperate fully with BandCon and its representatives in connection with such investigation.  Unless otherwise designated by AM6, all such financial and operating data and information shall be deemed Confidential Information of AM6, and BandCon's use and possession thereof shall be subject to the restrictions set forth in the Confidentiality Agreement dated June 21, 2007, by and among the parties (the "Confidentiality Restrictions").

        (b)      Promptly after the execution of this Agreement, BandCon shall deliver and/or make available to AM6 and its representatives all properties, books, contracts, commitments and other records of BandCon as reasonably requested by AM6 relating to the names of BandCon's principal vendors and the names of BandCon's principal customers (the "BandCon Information").  AM6 and BandCon shall use and possess the AM6 Information and the BandCon Information, as applicable, in strict compliance with the Confidentiality Restrictions.

      6.9.   Consummation of Transaction.  Each of the parties hereto hereby agrees to use his, her or its best efforts to cause all conditions precedent to his, her or its obligations (and to the obligations of the other parties hereto to consummate the transactions contemplated hereby) to be satisfied, including, but not limited to, using all reasonable efforts to obtain all required (if so required by this Agreement) consents, waivers, amendments, modifications, approvals, authorizations, novations and licenses; provided, however, that nothing herein contained shall be deemed to modify any of the absolute obligations imposed upon any of the parties hereto under this Agreement or any agreement executed and delivered

pursuant hereto.  Each Selling Stockholder hereby agrees that he, she or it shall vote all of his, her or its respective shares of AM6 Stock in favor of consummation of the transactions contemplated in this Agreement.

6.10.  <u>Accuracy of Representations</u>.  Each party hereto agrees that prior to the Closing Date he, she or it will not enter into any transaction and or take any action, and will use his, her or its best efforts to prevent the occurrence of any event (but excluding events which occur in the ordinary course of business and events over which such party has no control), which would result in any of his, her or its representations, warranties or covenants contained in this Agreement or in any agreement, document or instrument executed and delivered by him, her or it pursuant hereto not to be true and correct, or not to be performed as contemplated, at and as of the time immediately after the occurrence of such transaction or event.

6.11.  <u>Conduct of Business; Notification of Certain Matters</u>.  (a) AM6 covenants and agrees, and each of the Selling Stockholders covenants and agrees to cause AM6, to conduct the Business during the period from the date of this Agreement to the Closing Date only in the ordinary course and in a manner consistent with past practice and in compliance with applicable laws, and AM6 and the Selling Stockholders shall preserve intact its business organizations, maintain and preserve the Assets, keep available the services of the respective current officers, employees and consultants of AM6 and preserve the present goodwill of AM6 and its relationships with customers, suppliers and other persons with whom it has business relations.  By way of illustration and not limitation, neither AM6 (as to itself and its Subsidiaries) nor any Selling Stockholder shall between the date hereof and the Closing Date, directly or indirectly do, or prepare to do any of the following without the prior written consent of BandCon:

(i)declare, set aside or pay any dividends on, or make any other distributions in respect of, any of the AM6 Stock; split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for, shares of its capital stock; or purchase, redeem or otherwise acquire any shares of AM6 capital stock or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities; authorize for issuance, issue, deliver, sell or agree to commit to issue, sell or deliver (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise), pledge or otherwise encumber any shares of AM6 Stock, any other voting securities or any securities convertible into, or any rights, warrants or options to acquire, any such shares, voting securities convertible securities or any other securities or equity equivalents;

(ii)increase the compensation or fringe benefits of any of its directors, officers or employees, except for increases in salary or wages of employees of AM6 who are not officers of AM6, in the ordinary course of business, in accordance with past practice; enter into employment arrangements, other than in the ordinary course of business consistent with past practice, with any other employee of AM6 involving annual compensation in excess of $50,000; or establish, adopt, enter into, amend or terminate any written agreement or other plan, agreement, trust, fund, policy or arrangement for the benefit of any directors, officers or employees;

(iii)amend its Articles of Incorporation or Bylaws or alter through merger, liquidation, reorganization, restructuring or in any other fashion the corporate structure or ownership of AM6;

(iv)acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the stock or assets of, or by any other manner, any business or corporation, partnership, joint venture, association or other business organization or division thereof, or any assets that are material, individually or in the aggregate, to AM6 except purchases in the ordinary course of business consistent with past practice;

(v)sell, lease, license, mortgage or otherwise encumber or subject to any Lien or otherwise dispose of any Assets, except sales or dispositions in the ordinary course of business consistent with past practice;

(vi)incur any indebtedness for borrowed money or guarantee any such indebtedness of another person, issue or sell any debt securities or warrants or other rights to acquire any debt securities of AM6, guarantee any debt securities of another person, or enter into any arrangement having the same economic effect of any of the foregoing, except for short-term borrowings incurred in the ordinary course of business consistent with past practice;

(vii)enter into any agreement, contract, commitment involving a commitment on the part of AM6 to purchase, sell, lease or otherwise dispose of Assets or require payment by AM6 in excess of $1,000 other than in the ordinary course of business;

(viii)expend funds for capital expenditures in excess of $2,000, other than in the ordinary course of business;

(ix)adopt a plan of complete or partial liquidation or resolutions providing for or authorizing such a liquidation or dissolution, merger, consolidation, restructuring, recapitalization or reorganization;

(x)except for any matters disclosed in **Schedule 3.15** hereto, make any tax election or settle or compromise any income tax liability or file any federal income tax return prior to the last day (including extensions) prescribed by law, in the case of any of the foregoing, material to the business, financial condition or results of operations of AM6, taken as a whole;

(xi)settle or compromise any litigation in which AM6 is a defendant (whether or not commenced prior to the date of this Agreement) or settle, pay or compromise any claims not required to be paid, which payments are individually in an amount in excess of $1,000 and in the aggregate in an amount in excess of $3,000;

(xii)modify or amend any existing Insurance Policy; or

(xiii)authorize any of, or commit or agree to take any of the foregoing actions.

(b)     AM6 and the Selling Stockholders shall give prompt notice to BandCon, of (a) the occurrence, or nonoccurrence, of any event, the occurrence or

nonoccurrence of which would be likely to cause any representation contained in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date and (b) any material failure of AM6 and/or the Selling Stockholders to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by him or it hereunder; provided, however, if any such notice is given by AM6 or any Selling Stockholder, BandCon's only remedy shall be to terminate this Agreement pursuant to Section 7.1, or consummate the transaction notwithstanding such notice, and in either situation, BandCon shall have no other right or remedy against AM6 or any Selling Stockholder in respect thereof.

6.12.   No Solicitation of Transactions.  Prior to the earlier of the Closing Date or the termination of this Agreement, neither AM6 nor the Selling Stockholders will, directly or indirectly, through any director, officer, employee, investment banker, financial advisor, attorney, accountant or other agent or representative of AM6 or otherwise, solicit, initiate or encourage the submission of proposals or offers from any person relating to any acquisition or purchase of all or (other than in the ordinary course of business) any portion of the AM6 Stock, Assets or Business of, or any equity interest in, AM6, or any business combination with AM6, and, other than with BandCon or any affiliate of BandCon, participate in any negotiations regarding, or furnish to any other person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other person to do or seek to do any of the foregoing.  AM6 and the Selling Stockholders shall immediately cease and cause to be terminated any existing discussions or negotiations with any parties conducted heretofore with respect to any of the foregoing (other than in respect of the transaction contemplated hereby).

6.13.   Stock Options.  Prior to the Closing Date and without any liability to BandCon, AM6 and the Selling Stockholders shall take all action necessary to arrange for (i) all outstanding options, warrants and other rights, contracts or commitments to purchase the capital stock or other equity interests in AM6 (collectively, "Option Rights") to be cancelled, (ii) all stock option plans, equity participation plans and other equity plans of AM6 (collectively, "Option Plans"), to be terminated, and (iii) the receipt of releases from all holders of Option Rights and all participants under any Options Plans releasing AM6 from any and all obligations with respect to all Option Rights and all Option Plans (collectively, "Releases").

7.   Conditions to Obligations of the Parties to Close.

7.1.   Conditions to Obligations of BandCon to Close.  The obligations of BandCon to consummate the transactions contemplated herein shall be subject to the fulfillment or waiver at or prior to the Closing Date of the following conditions:

(a)   Accuracy of Representations and Warranties.  The representations and warranties of each of AM6 and the Selling Stockholders contained in any Stockholder Document or AM6 Document delivered by any of them shall have been true when made, and, in addition, shall be true in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.

(b)   Performance of Agreements.  Each of AM6 and the Selling Stockholders, as the case may be, shall have performed, observed and complied in

all material respects with all of their respective obligations, covenants and agreements, and shall have satisfied or fulfilled in all material respects conditions contained in any Stockholder Document or AM6 Document and required to be performed, observed or complied with, or to be satisfied or fulfilled, by AM6 or the Selling Stockholders at or prior to the Closing Date.

(c)     Due Diligence.  BandCon shall have been satisfied, in its sole discretion, with the results of its "due diligence" investigation of any of AM6's business, liabilities, properties and/or assets.

(d)     Opinion of Counsel for AM6.  BandCon shall have received the Opinion (as defined in Section 8.2(h)).

(e)     Litigation.  No order of any court or administrative agency shall be in effect which restrains or prohibits the transactions contemplated hereby, and no claim, suit, action, inquiry, investigation or proceeding in which it will be, or it is, sought to restrain, prohibit or change the terms of or obtain damages or other relief in connection with this Agreement or any of the transactions contemplated hereby, shall have been instituted or threatened by any person or entity, and which, in the reasonable judgment of BandCon (based on the likelihood of success and material consequences of such claim, suit, action, inquiry or proceeding), makes it inadvisable to proceed with the consummation of such transactions.

(f)     Consents and Approvals.  All consents, waivers, approvals, licenses and authorizations by third parties and governmental and administrative authorities (and all amendments or modifications to existing agreements with third parties) required as a precondition to the performance by AM6 and the Selling Stockholders of their respective obligations hereunder and under any agreement delivered pursuant hereto, or which in BandCon's reasonable judgment are necessary to continue unimpaired, subsequent to the Closing Date, any rights in and to the Assets and/or the Business which could be impaired by the consummation of this transaction, shall have been duly obtained and shall be in full force and effect.

(g)     Date of Consummation.  The transactions contemplated herein shall have been consummated on or prior to July 31, 2007, or such later date as the parties shall agree by a written instrument signed by all of them.

(h)     Validity of Transactions.  The validity of all transactions contemplated hereby, as well as the form and substance of all agreements, instruments, opinions, certificates and other documents delivered by AM6 and the Selling Stockholders pursuant hereto, shall be satisfactory in all material respects to BandCon and its counsel.

(i)     No Material Adverse Change.  Except as otherwise provided by this Agreement, there shall not have occurred after the date hereof, in the reasonable judgment of BandCon, a material adverse change in the financial or business condition of AM6, taken as a whole.

43

(j)        Employment Agreement.  Adam LaFountain  shall have executed and delivered to BandCon the Employment Agreement (as defined in Section 8.1(c) hereof).

(k)        Closing Certificate.  Each of the Selling Stockholders shall have furnished BandCon with a certificate, dated the Closing Date, to the effect that all the representations and warranties of AM6 and the Selling Stockholders are true and complete and all covenants to be performed by AM6 or the Selling Stockholders at or as of the Closing have been performed and conditions to be satisfied at or as of the Closing have been waived or satisfied, and Adam LaFountain will have furnished BandCon a certificate stating that (i) the Accounts Payable and the Accounts Receivable as set forth in the AM6 Financial Records are current and accurate as of June 21, 2007 and (ii) Adam LaFountain will be personally responsible for any costs of AM6 or BandCon for any issues, inaccuracies or problems with the Accounts Receivable or Accounts Payable that come up after the Closing that are not set forth in the AM6 Financial Records dated June 21, 2007.

(l)        Indebtedness.  The indebtedness of AM6 to third parties (the "Indebtedness") shall not exceed $160,000.

7.2.   Conditions to Obligations of AM6 and the Selling Stockholders to Close.  The obligations of AM6 and the Selling Stockholders to consummate the transactions contemplated herein shall be subject to the fulfillment or waiver at or prior to the Closing Date, of the following conditions:

(a)        Accuracy of Representations and Warranties.  The representations and warranties of BandCon contained in any Purchase Documents delivered by BandCon shall have been true when made, and, in addition, shall be true in all material respects, on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.

(b)        Performance of Agreements.  BandCon shall have performed, observed and complied, in all material respects, with all obligations, covenants and agreements, and shall have satisfied or fulfilled in all material respects all conditions contained in any Purchase Document and required to be performed, observed or complied with, or satisfied or fulfilled, by any of them at or prior to the Closing Date.

(c)        Consents and Approvals.  All consents, waivers, approvals, licenses and authorizations by third parties and governmental and administrative authorities (and all amendments and modifications to existing agreements with third parties) required as a precondition to the performance by BandCon or AM6 of any of its respective obligations hereunder and under any agreement delivered pursuant hereto, shall have been duly obtained and shall be in full force and effect.

(d)        Validity of Transactions.  The validity of all transactions contemplated hereby, as well as the form and substance of all agreements,

instruments, certificates and other documents delivered by BandCon pursuant hereto, shall be satisfactory in all material respects to the Selling Stockholders and its counsel.

(e)    <u>Closing Certificate</u>.  BandCon shall have furnished AM6 with a certificate executed by an executive officer, dated the Closing Date, to the effect that all the representations and warranties of BandCon are true and complete in all material respects and all covenants to be performed by BandCon at or as of the Closing have been performed in all material respects and conditions to be satisfied at or as of the Closing have been waived or satisfied in all material respects.

(f)    <u>No Material Adverse Change</u>.  Except as otherwise provided by this Agreement and subject to the provisions of Section 9(g), there shall not have occurred after the date hereof, in the reasonable judgment of AM6 and the Selling Stockholders, any Material Adverse Change in the financial or business condition of BandCon, taken as a whole.

(g)    <u>Litigation</u>.  No order of any court or administrative agency shall be in effect which restrains or prohibits the transactions contemplated hereby, and no claim, suit, action, inquiry, investigation or proceeding in which it will be, or it is, sought to restrain, prohibit or change the terms of or obtain damages or other relief in connection with this Agreement or any of the transactions contemplated hereby, shall have been instituted or threatened by any person or entity, and which, in the reasonable judgment of BandCon (based on the likelihood of success and material consequences of such claim, suit, action, inquiry or proceeding), makes it inadvisable to proceed with the consummation of such transactions.

(h)    <u>Date of Consummation</u>.  The transactions contemplated hereby shall have been consummated on or prior to July 31, 2007, or such later date as the parties shall agree by a written instrument signed by all of them.

8.    <u>The Closing</u>.  The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of BandCon.  The date of Closing shall be referred to herein as the "Closing Date."

8.1.    <u>Deliveries by BandCon at the Closing</u>.  At the Closing, BandCon shall deliver the following:

(a)    the BandCon Class B Common Stock, except for the Purchase Price Holdback;

(b)    Employment Agreement between BandCon and Adam LaFountain, in substantially the form of **Exhibits A**, attached hereto (the "Employment Agreement");

(c)    all third party consents required by BandCon to consummate the transactions contemplated hereby, if any; and

-27-

(d)      certified resolutions of the Board of Directors of BandCon authorizing and approving BandCon's entering into this Agreement and all other Purchase Documents and consummating the transactions contemplated hereby and thereby.

8.2.   Deliveries by AM6 and/or the Selling Stockholders at the Closing. At the Closing, AM6 and/or the Selling Stockholders, as applicable, shall deliver or cause to be delivered to BandCon the following:

(a)      stock certificates representing the AM6 Stock, together with stock powers duly executed by the Selling Stockholders;

(b)      the Employment Agreement;

(c)      all third party consents required by AM6 to consummate the transactions contemplated hereby;

(d)      a copy of the resolutions of the Board of Directors of AM6 authorizing AM6 to execute and deliver the AM6 Documents, to perform its obligations thereunder and to consummate the transaction contemplated in this Agreement, duly certified by the Secretary of AM6;

(e)      the closing certificates set forth in Section 7.1(k).

(f)      the resignations of AM6's officers and directors specified on **Schedule 8.2**;

(g)      an opinion of Patten, Faith & Sandford, counsel to AM6 and the Selling Stockholders in substantially the form of **Exhibit D** attached hereto (the "Opinion"); and

(h)      the Releases, if any.

8.3.   Other Deliveries.  In addition, the parties shall execute and deliver such other documents as may be required by this Agreement and as any of them or their respective counsel may reasonably require in order to document and carry out the transactions contemplated by this Agreement.

9.   Termination.  This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

(a)      By mutual agreement of AM6and BandCon;

(b)      By AM6or BandCon, if the Closing Date has not occurred before the later of August 15, 2007 or the expiration of the notice period provided in Section 9(f) below, if applicable;

(c)      By BandCon, if BandCon is not in material breach of any of its representations, warranties, covenants and agreements under this Agreement

and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of AM6 or the Selling Stockholders and (i) AM6 and the Selling Stockholders have not cured such breach within five (5) business days after receipt of notice of such breach by AM6a nd the Selling Stockholders (*provided, however*, that, no cure period shall be required for a breach which by its nature cannot be cured) and (ii) as a result of such breach any of the conditions set forth in Section 7.1 would not then be satisfied;

(d)     By AM6 and/or the Selling Stockholders, if AM6and the Selling Stockholders are not in material breach of any of their representations, warranties, covenants and agreements under this Agreement and there has been a material breach of any representation, warranty, covenant or agreement contained in this Agreement on the part of BandCon and (i) BandCon has not cured such breach within five (5) business days, after receipt of notice of such breach by BandCon (*provided, however*, that no cure period shall be required for a breach which by its nature cannot be cured), and (ii) as a result of such breach any of the conditions set forth in Section 7.2 would not then be satisfied; or

(e)     By BandCon for any reason (including, without limitation, its disapproval of any of the information or data set forth in any AM6 Information) other than a breach on the part of AM6or the Selling Stockholders pursuant to subsection (c) above; provided that, in the event of any such termination by BandCon pursuant to this Section 9(e), neither BandCon, on the one hand, or AM6 of any Selling Stockholder, on the other, shall have any rights or remedies against the other in respect of BandCon's election to terminate this Agreement and all other Purchase Documents in accordance with this Section 9(e).

(f)     Upon termination of this Agreement pursuant to the provisions of this Section 9, the covenants, agreements, representations and warranties of the parties, except for the obligations of the parties pursuant to Sections 6.2 (confidentiality), and 11.1 (expenses) made in this Agreement, shall terminate, and the parties shall have no continuing obligations or liabilities with respect thereto; provided, however, that if any party terminates this Agreement pursuant to Section 9(c) or 9(d) as a result of the other party's uncured breach of a covenant or agreement, such breaching party shall remain liable for the breach of such covenant or agreement.

10.     Survival of Representations and Warranties.

Each of the parties hereto hereby agrees that representations and warranties made by or on behalf of him or it in this Agreement or in any document or instrument delivered pursuant hereto shall survive the Closing Date for a period of eighteen (18) months, except that a representation or warranty with respect to 3.2 (Capitalization), 3.3 (Ownership of AM6 Stock), 3.5 (Authority), 3.15 (Tax Matters), 3.18 (ERISA) and 3.11 (Violation of Laws, but only as it pertains to environmental violations) shall survive for the maximum duration of the longest statute of limitations applicable with respect to such respective representation or warranty, plus sixty (60) days.

47

11.    General Provisions.

11.1.    Fees and Expenses; Attorneys' Fees.  BandCon, on the one hand, and the Selling Stockholders (on behalf of themselves and on behalf of the AM6), on the other hand, shall bear their own expenses in connection with the transactions contemplated hereby.  If any party hereto shall institute any action or proceeding to enforce or interpret any term or provision hereof or of any other Purchase Document, the party prevailing in such action or proceeding shall be entitled to its reasonable attorneys' fees and out of pocket expenses from the non-prevailing party.

11.2.    Publications.  Each of the parties shall consult with each other prior to issuing any press release or otherwise making any public statement with respect to the contents of this document or the transactions contemplated hereby, and none of the parties hereto shall issue any such press release or make any such public statement prior to such consultation.

11.3.    Notices.  All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made as of the earlier of the date delivered or mailed if delivered personally, by overnight courier or mailed by express, registered or certified mail (postage prepaid, return receipt requested) or by facsimile or electronic transmittal, confirmed by express, certified or registered mail, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice, except that notices of changes of address shall be effective upon receipt):

| | |
|---|---|
| If to BandCon: | Bandwidth Consulting, Inc.<br>151 Kalmus Drive, Suite M-2<br>Costa Mesa, CA  92626<br>Attn:  Ari Benowitz, President |
| with a copy to: | Barry C. Seaton, P.C.<br>18662 MacArthur Blvd, Suite 200<br>Irvine, CA  92612<br>Attn:  Barry C. Seaton, Esq. |
| If to AM6 and/or the Selling Stockholders: | AM6 Networks Inc.<br>617 West 7th Street, Suite 405<br>Los Angeles, CA  90017<br>Attn:  Adam LaFountain |
| with a copy to: | Patten, Faith & Sandford<br>635 West Foothill Blvd.<br>Monrovia, CA  91016<br>Attn:  Kevin R. Welch, Esq. |

11.4.    Amendment.  This Agreement may not be amended except by an instrument in writing signed by each of the parties hereto.

48

11.5.  <u>Waiver</u>.  At any time prior to the Closing Date, any party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions contained herein.  Any such extension or waiver shall be valid if set forth in an instrument in writing signed by the party or parties to be bound thereby.

11.6.  <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the greatest extent possible.

11.7.  <u>Entire Agreement</u>.  This Agreement (together with the Exhibits and Schedules annexed hereto and incorporated herein by this reference) and the agreements referred to herein constitute the entire agreement, and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof.

11.8.  <u>No Assignment</u>.  This Agreement shall not be assigned by operation of law or otherwise, and any assignment shall be null and void.

11.9.  <u>Headings</u>.  Headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

11.10. <u>Schedules</u>.  All references in this Agreement to Schedules shall mean the schedules identified in this Agreement, which are incorporated into this Agreement and shall be deemed a part of the representations and warranties to which they relate.

11.11. <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California without regard to its choice of law principles.

11.12. <u>No Right of Action</u>. The execution of this Agreement and the other agreements, instruments and documents contemplated hereby and the completion of the transactions contemplated hereby and thereby, shall not cause BandCon to be liable for damages to any other person, or give such person any equitable right against BandCon or AM6 or any of their respective assets by reason of any agreement or arrangement to which AM6 is a party.

11.13. <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Telefacsimile transmissions of any executed original document and/or

retransmission of any executed telefacsimile transmission shall be deemed to be the same as the delivery of an executed original.  At the request of any party hereto, the other parties hereto shall confirm telefacsimile transmissions by executing duplicate original documents and delivering the same to the requesting party or parties.

    **IN WITNESS WHEREOF**, each of BandCon and AM6, by their respective officers thereunto duly authorized, and the Selling Stockholders, individually, have caused this Agreement to be executed as of the date first written above.

**Bandwidth Consulting, Inc.**

By:_____
     Name:
     Title:

**AM6 Networks Inc.**

By:_____
     Name:
     Title:

SELLING STOCKHOLDERS

_____
Adam LaFountain

_____
Matthew Kelley

## EMPLOYMENT AGREEMENT

This Agreement is made and entered into effective as of June ___, 2007 (the "Effective Date") by and between BANDWIDTH CONSULTING, INC., a California corporation (the "Company") and Adam LaFountain ("Employee") (collectively, "Parties").

1.    <u>Term of Employment</u>.

    1.1    The Company agrees to employ Employee on the terms and conditions of this Agreement for a period commencing on the Effective Date and continuing for a period of two (2) years (the "Term"), unless terminated earlier as provided in Section 8 below.

    1.2    The Company and Employee acknowledge that Employee's job title and duties may be changed by the Company from time to time as determined by the Company in its sole discretion, provided, however, that during Employee's employment with the Company, Employee shall always hold a title equivalent or superior to Vice President.

2.    <u>Duties of Employee</u>.

    2.1    Employee agrees to accept employment on the terms set forth in this Agreement. Employee shall initially have the duties and responsibilities of Vice President Business Development of the Company, and will perform all services customarily required for such a position. The Employee shall report to the Company's President.

    2.2    The Employee shall devote all of his business time, attention, knowledge and skills faithfully, diligently and to the best of his ability, in furtherance of the business and activities of the Company. The principal place of performance by the Employee of his duties hereunder shall be the Company's executive offices in Costa Mesa, California, although Employee may be required from time to time to temporarily travel outside of the area where the Company's principal executive offices are located in connection with the business of the Company.

    2.3    During the Term, Employee will not render any services, directly or indirectly, as an employee or independent contractor, to any person or entity other than Company.

3.    <u>Compensation</u>.

    3.1    <u>Base Pay</u>. During the Term, Company shall pay to Employee, in full consideration of all services to be rendered by Employee, a salary at a rate of One Hundred Twenty Thousand Dollars ($120,000) per annum, payable in equal bi-weekly installments in accordance with the Company's normal pay practices, and subject to such withholding as may be required by law, prorated for any partial employment period (such salary, as the same may be

increased hereunder (the "Salary")).  During the Term, Employee's Salary will be increased annually a minimum of three percent (3%) as a cost of living adjustment.  Employee's compensation will be reviewed for additional increases annually, but the decision to grant any such additional increases, and the amount of such additional increases, if any, shall remain in the sole and exclusive discretion of Company.

     3.2.   <u>MBO Program</u>.  Throughout the Term, Employee shall be a participant in the Company's Management Bonus Program (the "Program").  Throughout the Term, the Company shall retain sole and exclusive discretion to determine the criteria governing the award of bonuses under the Program, and such criteria may be modified from time to time throughout the Term without advance notice.  The Company and Employee shall establish the Program goals, targets and criteria for Employee during each year of the Term, provided that for the first year of the Term, Employee's maximum bonus under the Program for such year shall be a Company sales MBO of $12,500 per quarter and a Company operations MBO of $12,500 per quarter, with the criteria to be established by the Company in its sole and exclusive discretion.

     4.    <u>Benefits</u>.

     4.1   <u>General</u>.  During the Term, Employee shall have the right to receive or participate in all benefits and plans (including health, dental and 401(k)) which the Company may from time to time institute during such period for its senior-level executives and for which the Employee is eligible.  Nothing paid to the Employee under any plan or arrangement presently in effect or made available in the future shall be deemed to be in lieu of the Salary, the MBO Bonus or any other compensation payable to the Employee pursuant to this Agreement.

     4.2   <u>Vacations and Sick Leave</u>.  During the Term, Employee will be entitled to two (2) weeks of paid vacation.  During the Term, Employee will be entitled to the number of paid sick leave days and paid holidays each year as are generally provided to similarly situated employees of the Company, as may be determined by the Company from time to time.  Vacation may be taken in the Employee's discretion and at such time or times as are not inconsistent with the reasonable business needs of the Company.  Should Employee's employment be terminated by Employee or the Company for any reason, Employee shall receive no compensation for accrued but unused sick leave days.

     5.    <u>Reimbursement of Expenses</u>.  All travel and other expenses incident to the rendering of services reasonably incurred on behalf of the Company by Employee during the Term shall be paid by the Employer, provided that such expenses are incurred in accordance with the Company's policies.  If any such expenses are paid in the first instance by Employee, the Employer shall promptly reimburse him therefor on presentation of appropriate receipts for any such expenses in accordance with the Company's policies.

     6.    <u>Conflict of Interest / Non-Solicitation</u>.

6.1     For purposes of this Agreement, "Related Company" means any then-current parent, subsidiary, or affiliate of Company or any entity owned or controlled, in whole or in part, by Company.

6.2     For purposes of this Agreement, "Competitor" means any person, business or entity that provides any goods or services then being provided by Company or any Related Company, except for Employee's equity interest in Ronin SDG Corporation that brokers telecom services (namely, voice data and video) sales transactions between customers and telecom services vendors such as Company in exchange for a commission paid by such vendors.

6.3     During the Term, Employee shall not, directly or indirectly, become an employee of, consultant to, render any services to, or otherwise assist or become interested in any Competitor (whether as an associate, owner, manager, operator, licensor, licensee, lender, guarantor, partner, joint venturer, employee, employer, consultant, agent, principal, stockholder, corporate officer, director, or in any other individual or representative capacity), other than as a holder, for investment purposes only, of not more than two percent (2%) of the publicly-traded capital stock of any Competitor.

6.4     During the Term, Employee shall not divide his loyalty between Company and any existing or prospective Competitor, and any such instance of divided loyalty shall be deemed a material breach of Employee's duty of loyalty to Company and a material breach of this Agreement.  To avoid such breach, Employee shall not, during the Term, undertake the planning for or the organization of any business activity competitive with the business of the Company or a Related Company, and shall not combine or conspire with other employees or representatives of the Company or any Related Company with the purpose of organizing any such competitive activity.

6.5     Employee agrees that while he is employed by the Company, and for a period of two years after Employee has ceased rendering services to the Company as an employee or consultant, Employee shall not, without express prior written approval from the President, engage in any of the following conduct, directly or indirectly:  (a) solicit or attempt to solicit, on behalf of any person or entity other than Company, business from any client or customer of Company with whom Employee had business contact during Employee's employment with Company; and (b) solicit for employment, on behalf of any person or entity other than Company, any Company employee.  Employee further agrees that at no time, either during or after Employee's employment with Company, will Employee induce or attempt to induce any client, customer, licensee, vendor, supplier, contractor, consultant or other third party to sever any existing business relationship with Company or any Related Company, or to abandon any prospective business relationship with Company or any Related Company.

6.6     At no time, either during or after Employee's employment with Company, shall Employee make any disparaging or defamatory comments to any third party regarding the goods or services provided by, or methods of doing business of, the Company, any Related Company, or the current or former officers, directors, employees or agents of any of them.

6.7     Employee agrees that the provisions of this Section shall survive after Employee has ceased rendering services to Company.

6.8     Nothing herein shall be construed to limit or modify Employee's obligations under the noncompete provisions in Section 6 of the Stock Purchase Agreement dated June ___, 2007 among the Company, AM6 Networks, Inc., Employee and another selling shareholder of AM6, for the sale of stock of AM6 Networks, Inc.

7.     <u>Confidentiality</u>.

7.1     Company and Employee acknowledge that the services to be performed by Employee under this Agreement are unique and extraordinary and, as a result of such employment, Employee has had, and will continue to have access to, become acquainted with, and be in possession of proprietary information (both written and verbal) belonging to Company, Related Companies, and their suppliers and customers, which derives actual or potential economic value from not being known to Company's competitors or the public.  Company and Employee also acknowledge that such information ("Confidential Information") has been and continues to be the subject of efforts that are reasonable under the circumstances  to maintain its secrecy.  Such Confidential Information includes, without limitation, information concerning their organization, business, business practices, activities and affairs, customer lists, member lists, supplier lists, prospect lists, personnel lists, pricing information, product procurement information, product sourcing information, profit margins, referral source lists, vendor services lists, services used, customer and vendor presentations (actual and proposed), research projects, marketing, selling and servicing information, financial information, sales and financing projections, budget information and procedures, profit margins, accounting and financial records, policy and procedure manuals, industry contracts, computer software, computer programs, installation processes and procedures, techniques of operation, employee compensation and financial structure, strategies of any kind or nature, and marketing, promotion, development or acquisition plans (whether past, current, future or potential).  Employee acknowledges that information may be Confidential Information even though not expressly stamped or identified as such, and that Employee shall treat all information in the general categories identified above as Confidential Information.  Employee further acknowledges that Confidential Information is highly confidential, a valuable trade secret, and the sole property of the Company, Related Companies and/or clients, and customers, as the case may be, and that the protection and preservation of Confidential Information by Employee is absolutely vital to the continued success of the distribution business of the Company, and the preservation of the trust of its suppliers, clients and customers.  Accordingly, Employee shall not disclose, reveal, or divulge to any person any trade secrets or other Confidential Information, directly or indirectly, or use them in any way, except as required in the course of Employee's employment under this Agreement.

7.2     Upon the ending of Employee's employment at Company for any reason, or at any other time the Company demands, Employee shall deliver promptly to the Company all property, materials and documentation relating to or belonging to the Company, including without limitation, all forms of magnetic and optical storage, memoranda, documents, notes, notebooks, equipment, price lists, specifications, records, reports, manuals, drawings, blueprints, employee

lists, customer lists, supplier lists, referral source lists, vendor service lists, software programs, Intellectual Property (as defined in Paragraph 9.1), and any other documents, whether or not of a confidential nature, belonging to the Company, including all copies of such materials which Employee may then possess or have under Employee's control (collectively referred to as "Company Property").  Employee further agrees that upon expiration or termination (for any reason) of Employee's employment, Employee shall not retain any document, data or other materials containing or pertaining to the Confidential Information or Intellectual Property.

7.3     Following the ending of Employee's employment at Company for any reason, Employee shall not accept any employment or enter into any other relationship, that will require Employee to disclose or make direct or indirect use of any Confidential Information.  Employee acknowledges the importance of preserving the Company's Confidential Information, especially in the telecom services industry.  Employee therefore agrees that, for a period of twenty-four (24) months following the ending of Employee's employment at Company for any reason, immediately upon accepting any employment or entering into any other business relationship with any entity that provides telecom services, Employee shall:  (a) notify the Company, in writing, of the name and address of such entity and the title Employee shall hold, or the nature of the duties Employee will perform, for such entity; and (b) notify such entity of Employee's obligations of confidentiality with respect to Company.  Employee further understands and agrees that the Company, before or after receiving such notice from Employee, may independently notify such entity of Employee's obligations of confidentiality with respect to Company.

7.4     Employee agrees and acknowledges that a breach of the provisions of Sections 6, 7 or 9 of this Agreement will result in damage or loss to the Company which cannot be reasonably or adequately compensated by an award of money damages and will cause the Company irreparable injury.  Therefore, Employee agrees that, in addition to any other remedies Company may have, Company may seek and obtain injunctive relief restraining Employee from directly or indirectly violating or continuing to violate any of Employee's obligations under Sections 6, 7 or 9 of this Agreement, without the necessity of posting a bond or other financial assurance.  Resort to such equitable relief shall not be construed to be a waiver of any other rights or remedies the Company may have for damages or otherwise.  Employee further agrees that in addition to any other remedies the Company may have under the provisions of this Agreement, the Company shall have the right and remedy to require Employee to account for and pay over to the Company all compensation, profits, monies, accruals, increments or other benefits received by Employee as a result of any transactions constituting a breach of any of the provisions of this Agreement.

7.5     Each of the rights and remedies enumerated in Section 7.4 shall be independent of the other, and shall be severally enforceable, and all of such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or in equity.

7.6     Employee agrees that the provisions of this Section shall survive after Employee has ceased rendering services to Company.

- 5 -

8.      Termination of Agreement.

8.1      Termination by Company for Cause.  The Company, at its option, may terminate this Agreement for Cause by giving written notice to Employee specifying the basis for the Company's determination of Cause.  Upon receipt of such notice, Employee shall be terminated effective immediately unless the termination is pursuant to clauses (a), (d), (e) or (f) below, in which case Employee shall have thirty (30) days to cure any circumstance giving rise to the Company's determination of Cause.  If at the end of such thirty (30) day period uncured circumstances for Cause still exist in the reasonable and good faith determination of the Company, Employee's employment shall be terminated effective immediately.  Upon Employee's termination for Cause, the Company shall have no further obligation or duties to Employee, except for payment of Salary and accrued benefits through the effective date of termination, any reimbursement of expenses incurred by Employee as described in Section 5, and the obligations under Section 11.  The failure or refusal by the Company to exercise its right to terminate Employee's employment as a result of the existence of any Cause shall not constitute or be construed as a waiver of its right to terminate Employee's employment for such Cause or another Cause under this Paragraph at a later time.  For all purposes under this Agreement, "Cause" shall mean:

(a)      the failure by the Employee to substantially perform his duties under this Agreement;

(b)      the engaging by the Employee in willful misconduct (including, without limitation, embezzlement, criminal fraud or inappropriate conduct) which is injurious to the Company, monetarily or otherwise;

(c)      Employee being convicted of or pleading nolo contendere to any felony;

(d)      gross negligence on the part of the Employee;

(e)      the Employee shall otherwise be in breach of any material term or provision hereof;

(f)      the failure of Employee to reasonably cooperate with any lawful investigation undertaken by the Company; or

(g)      Employee's purported resignation of his employment hereunder, without Good Reason (as defined herein) prior to completion of the Term

8.2      Termination in Event of Death or Disability of Employee.  Employee's employment with the Company may be terminated in the event of the death of Employee or Employee's "Disability."  For purposes of this Agreement, Employee shall be deemed to be subject to a "Disability" only if, because of a physical or mental disability, Employee becomes unable to perform the essential functions of his job, even when Company provides such

- 6 -

reasonable accommodations as it can without incurring undue hardship, for a period of ninety (90) consecutive days, during which ninety (90)-day period Salary and any other benefits hereunder shall not be suspended or diminished.  In the event Company terminates Employee's employment by reason of Employee's death or Disability, the Company shall have no further obligation or duties to Employee, except (a) the Company shall pay all Salary and Annual Bonus payments earned, but not yet paid, and all benefits accrued as of the termination date, (b) the Company shall reimburse Employee for all expenses incurred by Employee as described in Section 5, and (c) the obligations under Section 11 shall continue.  Notwithstanding the foregoing, Company may not terminate Employee's employment for Disability if such termination would conflict with the rights of Employee under the Family Medical and Leave Act, the California Family Rights Act or any applicable state or federal law.

        8.3    <u>Termination by Employee for Good Reason</u>.  For purposes of this Agreement, Employee shall have the right to terminate this Agreement for "Good Reason" only as a result of a "Company Breach," which shall include any of the following events or circumstances:  (a) the Company shall be in continuing breach of any material term or provision hereof and shall have failed to cure such breach within thirty (30) days following written notice from Employee specifying the nature of such alleged breach; or (b) there shall occur a substantial diminution in the nature or scope of Employee's responsibilities, authority, powers, functions or duties, without Employee's prior written consent; provided, however, that this subclause (b) shall not apply if Employee continues to hold the title equivalent or superior to Vice President in the area of sales, marketing, acquisitions, business development, purchasing or operations.

        9.    <u>Copyrights; Patents; Trademarks; Works for Hire; Ownership of Intellectual Property</u>.

        9.1    All right, title and interest, of every kind or nature whatsoever, in the United States and throughout the world, in (i) all Works created, made, conceived or disclosed (to the Company) by Employee (whether alone or in conjunction with any other person) at any time during Employee's employment with the Company and all material embodiments of the Works subject to such rights; and (ii) all inventions, ideas, formulas, procedures, processes, concepts, discoveries, designs and improvements, whether the proper subject matter for patent or not, created, made, conceived or disclosed (to the Company) by Employee (whether alone or in conjunction with any other person) at any time during Employee's employment with the Company, shall be and remain the sole and exclusive property of the Company without payment of any further consideration to Employee or any other person.  Employee does hereby assign to the Company all of his right, title and interest in and to all such Works, inventions, ideas, formulas, procedures, processes, concepts, discoveries, designs and improvements, and any copyrights (for the full terms and extensions thereof in every jurisdiction), patents, trademarks, trade secrets and similar rights which may exist or be issued with respect thereto (collectively referred to as "Intellectual Property").  For the purposes of this Section, "Work(s)" shall include, without limitation, all artwork, articles, blueprints, materials, memoranda, reports, research, software, programs, promotions, compilations, designs, drawings, layouts, models, patterns, and any other work, whether in audio, visual, literary or other form, which may be the subject matter of a copyright under the United States Copyright Act created during the term of this Agreement,

whether or not ever used by or submitted to the Company.  For the purposes of United States copyright law, each Work shall be deemed created by Employee pursuant to his or her duties under this Agreement and within the scope of his or her employment, and shall be deemed a "work made for hire."  In addition to its other rights, the Company shall have the exclusive right to register with the United States Copyright Office and similar agencies worldwide the copyright in all such Works in its name in accordance with the requirements of United States copyright law, the Universal Copyright Convention, and any other convention or treaty to which the United States is or may become a party.  Employee agrees that Employee shall not claim to have, any right, title or interest of any kind or nature whatsoever in or to such Intellectual Property and that Employee shall execute any and all documents reasonably required by Company in order to evidence, secure, protect or perfect Company's ownership of such Intellectual Property.

9.2     Employee acknowledges and agrees that the Company has hereby notified Employee that the assignment provided for herein shall not apply to any invention that qualifies fully for exemption from assignment under the provisions of Section 2870 of the California Labor Code, which provides as follows:  "(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (i) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (ii) result from any work performed by the employee for the employer.  (b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

9.3     Employee agrees that the provisions of this Section shall survive after Employee has ceased rendering services to Company.

10.     Notices.  All notices relating to this Agreement shall be in writing and shall be either personally delivered, sent by telecopy (receipt confirmed) or mailed by certified mail, return receipt requested, to be delivered at such address as is indicated below, or at such other address or to the attention of such other person as the recipient has specified by prior written notice to the sending party.  Notice shall be effective when so personally delivered, one business day after being sent by telecopy or five (5) days after being mailed.

To the Employer:

Bandwidth Consulting, Inc.
151 Kalmus Drive, Suite M-2
Costa Mesa, CA  92626
Attention: Ari Benowitz
Fax Number: (714) 641-1670

with a copy to:

      Barry C. Seaton, P.C.
      18662 MacArthur Blvd., Suite 200
      Irvine, CA 92612
      Attn: Barry Seaton
      Fax: 949/440-3218

To the Employee:

      Adam LaFountain
      61 Hidden Valley Road
      Monrovia, CA 91016
      Fax Number: (626) 303-6020

11.    <u>Indemnification</u>.  The Company acknowledges and agrees that Employee shall be entitled to the benefits of all the provisions of the Articles of Incorporation and Bylaws of the Company, as amended, that provide for indemnification of officers and directors of the Company.  In addition, without limiting the indemnification provisions of the Articles of Incorporation or Bylaws, to the fullest extent permitted by law, the Company shall indemnify, save and hold harmless Employee, and his heirs, successors and legal representatives, from and against any and all claims, demands, causes of action, liabilities, costs and expenses, including judgments, fines or amounts paid on account thereof (whether in settlement or otherwise), and reasonable expenses, including attorneys' fees actually and reasonably incurred (except only if and to the extent that such amount shall be finally adjudged to have been caused by Employee's willful misconduct or gross negligence, including the willful breach of the provisions of this Agreement or are otherwise prohibited by applicable law), to the extent that Employee is made a party to or witness in any action, suit or proceeding, or if a claim or liability is asserted against Employee (whether or not in the right of the Company), by reason of the fact that he was or is a director or officer, or acted in such capacity on behalf of the Company, or rendered services pursuant to this Agreement, whether or not the same shall proceed to judgment or be settled or otherwise brought to conclusion.  The Company shall advance to Employee all reasonable expenses incurred by Employee in connection with the defense or settlement of any such claim, action, suit or proceeding, and Employee hereby undertakes to repay such amount if and to the extent that it shall be finally adjudged that Employee is not entitled to be indemnified hereunder.  The rights of Employee under this Section 11 shall survive the termination or expiration of this Agreement and shall be applicable for so long as Employee may be subject to any claim, demand, liability, cost or expense against which this Section 11 is intended to protect and indemnify him.

12.     Parties in Interest.  Employee may not delegate his duties or assign his rights hereunder.  This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, legal representatives, successors and permitted assigns

13.     Entire Agreement.  This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the employment of Employee by the Company, and contains all of the covenants and agreements between the parties with respect to such employment in any manner whatsoever.  Each party to this Agreement acknowledges that no representations, inducements, promises or agreements, oral or otherwise, have been made by any party or anyone acting on behalf of any party which are not expressly contained herein.

14.     Amendments.  This Agreement may not be amended, supplemented, or modified or extended except by a written agreement which expressly refers to this Agreement and which is signed by each of the parties hereto.

15.     Governing Law.  This Agreement is made in and shall be governed by the laws of that State of California.  Neither party will commence or prosecute any suite, proceeding or claim to enforce this Agreement other than in the state and federal courts located in Orange County, California.  The parties irrevocably consent to the exclusive jurisdiction and venue of such courts.

16.     Enforcement.  If any provision contained in this Agreement is found to be unenforceable by reason of the extent, duration or scope thereof, or otherwise, then the court making such determination shall have the right to reduce such extent, duration, scope or other provision and in its reduced form any such restriction shall thereafter be enforceable as contemplated hereby.

17.     Validity.  To the extent that any portion of this Agreement is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited and/or length of time, but could be enforceable by reducing the scope of area, business activity prohibited and/or length of time, Employee and the Company agree that same shall be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction in which enforcement is sought, and that the Company shall have the right, in its sole discretion, to modify such invalid or unenforceable provision to the extent required to be valid and enforceable.  Employee agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking or modifying any of the provisions hereof.

18.     Company Policies.  Employee agrees to abide by the Company policies, procedures and directives.  Employee understands and acknowledges that Company policies, procedures and directives may be amended, supplemented or modified from time to time by the Company, with or without prior notice to the Employee.  In the event of any conflict between the policies, procedures or directives, and the provisions of this Agreement, the provisions of this Agreement shall govern.

19.    <u>Representation and Warranty</u>.  Employee represents and warrants to the Company that there is no restriction or limitation, by reason of any agreement or otherwise, upon Employee's right or ability to enter into this Agreement and fulfill the obligations under this Agreement.

20.    <u>No Reliance</u>.  Employee acknowledges, represents and agrees that Employee is not relying on any inducement, representation, promise, or other statement not expressly set forth herein in entering into this Agreement and accepting employment with the Company, including without limitation any representation regarding the term of employment or any right to continued employment.

21.    <u>Counterparts</u>.  This Agreement may be executed by the parties in one or more counterparts, each of which shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, and shall become effective when one or more counterparts has been signed by each of the parties hereto and delivered to each of the other parties hereto.


DATED: _____        _____
                                     Adam LaFountain
                                     ("Employee")


DATED: _____        BANDWIDTH CONSULTING, INC.
                                     (the "Company")

                                     By:_____

                                     Its:_____


- 11 -

# EXHIBIT C

NOTICE OF SPECIAL MEETING OF SHAREHOLDERS

OF

BANDWIDTH CONSULTING, INC.

Dear Shareholder:

Notice is hereby given that a special meeting of the shareholders of Bandwidth Consulting, Inc., a California corporation (the "Corporation"), will be held at the Corporation's principal executive office at 151 Kalmus Drive, Suite M-2, Costa Mesa, California 92626, on December 19th, 2008 at 3:00P.M. (Pacific Standard Time). A conference call will be scheduled in order that shareholders that do not attend the meeting in person may attend by conference call, and the details for such conference call are below.

> **Phone Number**  **714-727-2975**
> **PIN**  **26769**

The following business will be transacted at the meeting:

1. Removal of Ron Cadwell as member of the board of directors of the Corporation.

2. Election of new member of the board of directors of the Corporation to fill the vacancy on the board of directors created by the removal of Ron Cadwell as director. Scot Ross is nominated for election to the board of directors of the Corporation.

3. To consider and act upon such other matters as may properly come before the meeting.

Michael Flatin, Secretary

**EXHIBIT D**

64

LAW OFFICE OF RICHARD A. LENSE
222 N. SEPULVEDA BLVD. #2000
EL SEGUNDO, CA. 90245
Tel. (310) 662-4750
Fax (310) 662-4751

### FAX COVER SHEET

To:       Ari Benowitz
Fax No.: (310) 943-2574
From:    Richard A. Lense
Date:     June 25th, 2003
Subject:  Amended Subscription Agreement

Number of Pages: 2 (Including cover sheet)



5155 West Rosecrans
ste 213
Hawthorn, CA 90250

Fax Cover Page:

*Mark S. Janssen*
*Chief Financial Officer*
*CWIE Holding Company, Inc.*
*Email: marks@cchill.com*
*Phone: 480-449-7767*
*Fax: 480-449-7758*

September 9, 2003

Mark,

Dean asked me to fax this to you.  Please let me know if there is anything else you need. The paragraph we are further clarifying is number "7C."

The accountant seems to think that looks too much like a dividend and therefore
   1)  needs to be taxed before paid out at corporate tax level and
   2)  Every shareholder needs the same dividend.

Our answer was easy, "clarify" that we are not paying a "dividend" but rather a payment on services from CWIE......

Sincerely,

Ari Benowitz
Bandwidth Consulting, Inc.
Office: 310.491.3485
Ari@Bandcon.com

# EXHIBIT E

AMENDMENT TO THE SUBSCRIPTION AGREEMENT
BETWEEN BANDWIDTH CONSULTING, INC. (FORMERLY BIG BLUE COYOTE,
INC.  CAVE CREEK WHOLESALE INTERNET EXCHANGE, LLC ("CWIE")

On March 25th, 2002, a stock subscription agreement ("Agreement") was executed by and between the principals of Big Blue Coyote, Inc. and CWIE.  The principals have elected to amend the Agreement as follows:

Paragraph 7 of the Agreement ("OTHER"), subsection (c) is deleted in full.  The principals elect to adopt (and hereby incorporate by reference to the Agreement) the following:

"CWIE will perform monthly consulting services for Bandwidth Consulting consistent with the business needs of Bandwidth Consulting.  Further, CWIE will send to Bandwidth Consulting a detailed (monthly) invoice which depicts the services provided and the consulting fees charged."

By: _____
Ron Cadwell, Operating Manger of CWIE

Date: June _30_ ,2003

Accepted By:

_____
Ari Benowitz, Director of Bandwidth Consulting

Date: June _____,2003

_____
Dean Wirtz, Director of Bandwidth Consulting

Date: June _____,2003

# EXHIBIT F

| From: | Mike Flatin [mike@bandcon.com] |
|---|---|
| Sent: | Tuesday, January 02, 2007 10:39 AM |
| To: | Ron Cadwell |
| Cc: | Ari; Mike Flatin |
| Subject: | 10% Share in BandCon |
| Follow Up Flag: | Follow up |
| Flag Status: | Red |
| Attachments: | Ron.xls |

Hi Ron..

I'm not sure who you wanted me to cc on this, so I'm just sending it to you – please pass along to whomever you'll need to see this on the CWIE side.

Your commission for 2006 is **$111,990.69**

The attached excel sheet has 2 tabs.  The first one shows what Ari and I have taken and your associated 10% -- The second tab shows the payment detail for you.

Let me know if you have any questions.

Thanks,
-mike

---

**Michael Flatin | Bandwidth Consulting, Inc. | www.bandcon.com**
2070 Business Center Drive ~ Suite 285 | Irvine, CA 92612
949.468.0631 (office) | **602.697.7998** (cell) | 602.297.6585 (fax) | mike@bandcon.com

| Type | Date | Num | Name | Memo | Amount |
|---|---|---|---|---|---|
| Check | 01/19/2006 | Transfer | Eric N Fox | January | $ (650.00) |
| Check | 02/21/2006 | Transfer | Eric N Fox | February | $ (650.00) |
| Check | 03/15/2006 | 2532 | CWIE | Consulting (RC) Jan06-Feb06 | $ (28,842.59) |
| Check | 03/22/2006 | Transfer | Eric N Fox | March | $ (650.00) |
| Check | 04/21/2006 | Transfer | Eric N Fox | April | $ (650.00) |
| Check | 05/10/2006 | 2631 | CWIE | Consulting (RC) Mar06-Apr06 | $ (13,402.40) |
| Check | 05/25/2006 | Transfer | Eric N Fox | May | $ (650.00) |
| Check | 06/23/2006 | Transfer | Eric N Fox | June | $ (650.00) |
| Check | 07/19/2006 | Transfer | Eric N Fox | July | $ (650.00) |
| Check | 08/22/2006 | Transfer | Eric N Fox | August | $ (650.00) |
| Check | 09/19/2006 | Transfer | Eric N Fox | September | $ (650.00) |
| Check | 10/30/2006 | Transfer | Eric N Fox | October | $ (650.00) |
| Check | 12/01/2006 | Transfer | Eric N Fox | November | $ (650.00) |
| Check | 12/22/2006 | Transfer | Eric N Fox | December | $ (650.00) |
| Check | 12/31/2006 | To Print | CWIE | Consulting (RC) - Final 2006 Payment | $ (61,945.70) |
| | | | | | $ (111,990.69) |

# EXHIBIT G

| **From:** | Ron Cadwell |
|---|---|
| **Sent:** | Monday, April 30, 2007 3:43 PM |
| **To:** | Mike Flatin |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |

Do you know if our Commission checks have gone out on Bandcon for the first part of this year? My accounting department was asking me about it?  Also can you give me some overview details on how the company is doing? Projections how is the backbone doing ect?


Thanks

Ron C

_____

Ron Cadwell
CEO

CCbill.com
Cavecreek.com
Drmnetworks.com

Phone:  480-449-7759
Fax:    480-449-8812
Cell:   602-421-2049
email:  Ron@ccbill.com

CCbill LLC
1501 W 17th St
Tempe, AZ 85281

PROOF OF SERVICE

STATE OF CALIFORNIA    )
                       )  ss
COUNTY OF LOS ANGELES  )

I am employed in Los Angeles County, California, over the age of 18 years, and not a party to this action. My business address is Spillane Weingarten LLP, 1880 Century Park East, Suite 1004, Los Angeles, California 90067. On January 23, 2009, I served the following document(s):

**CADWELL DECLARATION IN SUPPORT OF MOTION OF PLAINTIFF AND SHAREHOLDER CWIE, LLC TO ENJOIN ISSUANCE OF PREFERRED SHARES BY DEFENDANT BANDWIDTH CONSULTING, INC.**

☐ I sent the document (s) from facsimile machine (310) 229-9380 on January 22, 2009. I certify that the transmission was completed and that all pages were received and that a report was generated by facsimile machine (310) 229-9380 that confirms the transmission and receipt. The transmission was reported as complete and without error. Thereafter, I mailed a copy to the interested party(ies) in this action by placing a true copy of it enclosed in sealed envelope(s) addressed to the parties listed below.

☒ by placing the document(s) listed above in a sealed envelope with first class postage on it/them fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed Federal Express envelope with postage paid on account and deposited with Federal Express at Los Angeles, California, addressed as set forth below.

☐ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

**See Attached Service List.**

With respect to documents sent by mail, I readily am familiar with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that practice, in the ordinary course of business correspondence would be deposited with the U.S. Postal Service on that same day with first class postage on it fully prepaid. I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing contained in this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct of my own personal knowledge, and that I am employed in an office of a member of the Bar of the Court at whose direction this service was made.

Executed on January 23, 2009, at Los Angeles, California.

Amy L. Fleschert

---

1

## **SERVICE LIST**

2

3  Kent W. Easter, Esq.
   Stradling Yocca Carlson & Rauth
4  660 Newport Center Drive, Suite 1600
   Newport Beach, CA 92660
5

6  Mr. Ari Benowitz
   Bandwidth Consulting Inc.
7  151 Kalmus Drive, Suite M-2
   Costa Mesa, CA 92626
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2