O

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CWIE, LLC, | CASE NO. SACV08-1423 DOC (RNBx) |
| Plaintiff(s), | |
| v. | **O R D E R DENYING PRELIMINARY INJUNCTION ENJOINING ISSUANCE OF PREFERRED SHARES BY DEFENDANT BANDWIDTH CONSULTING, INC.** |
| BANDWITH CONSULTING, INC., a California corporation; ARI BENOWITZ, an individual; MIKE FLATIN, an individual; SCOT ROSS, an individual; and DOES 1-10, | |
| Defendant(s). | |

_____

Before the Court is Motion of Plaintiff and Shareholder CWIE, LLC ("CWIE") to Enjoin Issuance of Preferred Shares by Defendant Bandwith Consulting, Inc. After considering the moving, opposing, and replying papers, and the oral argument of the parties, the Court hereby DENIES the Motion.[1]

_____

[1] As a preliminary matter, the parties makes a number of objections to evidence submitted in support of and in opposition to the Motion. However, due to the urgency of obtaining preliminary

**I.     BACKGROUND**

This case presents the Court with numerous contested facts and heated accusations between the parties. Plaintiff CWIE operates a wholesale internet access and website hosting business that it began operating in 1996. In early 2002, Defendant Ari Benowitz ("Benowitz") and Dean Wirtz approached CWIE principal Ron Cadwell ("Cadwell") for help in starting up their own internet hosting company originally named Big Blue Coyote, Inc. and ultimately renamed Bandwidth Consulting, Inc., or "BandCon.".[2] CWIE agreed to aid BandCon through the provision of equipment, training, and bandwidth access. CWIE alleges that it provided BandCon with engineering assistance, a high end router, technical assistance, a cash investment, and use of CWIE's own customer call center. CWIE also permitted BandCon to purchase services from Level 3, an internet connection provider, through CWIE's existing contract with Level 3. As a result, BandCon was able to purchase bandwith at a significantly discounted price.

In exchange for CWIE's start-up aid, the parties executed a Subscription Agreement in March 2002 meant to provide CWIE with some return on its investment in BandCon. Two provisions of that agreement are particularly relevant to the instant motion. First, under Section 7(a) of the Agreement, BandCon promised that CWIE would become a 10% shareholder of BandCon and that BandCon would issue additional stock to CWIE, if necessary, in order for CWIE to maintain its 10% equity interest without additional investment or payment by CWIE:

> CWIE will receive a 10% equity interest in the form of the

---

injunctive relief, the Ninth Circuit has held that "[t]he trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984); *see also Rosen Entm't Sys., LP v. Icon Enters., Inc.*, 359 F. Supp. 2d 902, 905 (C.D. Cal. 2005) (noting that "district courts have the discretion 'to consider otherwise inadmissible evidence in ruling on the merits of an application for a preliminary injunction'" (quoting *Rosen Entm't Sys., LP v. Eiger Vision*, 343 F. Supp. 2d 908, 912 (C.D. Cal. 2004)). To the extent the Court relies on such evidence in this Order, the parties' objections are OVERRULED.

[2] Defendants contest the representation that they, too, were entering the internet hosting business. Instead, they claim that they approached CWIE in order to enter the related internet content networking business. BandCon contends that internet content networking involves providing networking services to companies in order to sustain websites rich in audio and visual content, whereas internet hosting more generally involves the provision of hardware and technical support.

> Company's voting common stock in exchange for a capital investment of $50,000.00....In the event that at any time the Company issues additional shares of stock to investors other than CWIE, the Company will issue enough additional shares to CWIE to allow CWIE to maintain its 10% interest. CWIE will not be required to invest additional capital or otherwise pay for these additional shares."

Cadwell Dec. In Sup. of Mot., Exh. A: Subscription Agreement, ¶ 7(a).

Pursuant to Section 7(c) of the Agreement, BandCon also promised to pay CWIE monthly payments of 10% of BandCon's "Net Profit:

> The Company shall make a distribution to CWIE within 30 days after the close of each successive calendar month in an amount equal to 10% of it's [sic] "Net Profit." For purposes of this Agreement, Net Profit is defined as "Gross Revenue less all Operating and Administrative Expenses" paid or incurred during any given calendar month BEFORE any salaries, wages, commissions and/or bonuses are paid to or incurred on behalf of Ariz Benowitz, Nathan Alexander and Dean Wirtz.

*Id*. at ¶7(c).

CWIE claims that it never received any share certificates pursuant to the Agreement, but neither Plaintiff nor Defendants dispute that CWIE owns 300 shares of BandCon pursuant to the March 2002 Agreement, which at that time consisted of 10% of BandCon's equity. Further, after BandCon was formed, Cadwell was named one of the company's board of directors.

Plaintiff bases its request for preliminary relief on two alleged violations of law by BandCon. First, Plaintiff claims BandCon's directors and majority shareholders (the individual named defendants) breached their fiduciary duties to Plaintiff and minority shareholder CWIE by improperly diluting its 10% equity interest. Second, Plaintiff contends that BandCon breached both provisions of the Agreement as cited above. The Court proceeds to address the

3

1  facts relevant to the dilution claim first, and then outlines those allegations relevant to the
2  monthly profit payments.
3  Dilution:
4       Three separate transactions have resulted in CWIE's equity interest in BandCon dropping
5  to around 8%. The first instance occurred on June 26, 2007, regarding BandCon's planned
6  acquisition of AM6, a telecommunications company. The parties present starkly different
7  pictures of this meeting. BandCon contends that the meeting was held on behalf of the
8  shareholders and directors and that all shareholders were present at the meeting as Benowitz
9  owned 45% of BandCon, the other board of director present, Defendant Michael Flatin, also was
10 a 45% shareholder of BandCon, and Cadwell was present as both a director and representative of
11 10% shareholder CWIE. Further, BandCon contends that Cadwell was told that the purchase of
12 AM6 would result in a dilution of CWIE's 10% equity interest in BandCon as the purchase
13 agreement involved the issuance of common stock to AM6 with no additional stock being issued
14 to CWIE. BandCon contends that Cadwell agreed to the dilution of CWIE's 10% stock as long
15 as all shareholders' interests would be diluted equally. BandCon provides a copy of minutes for
16 the June 26, 2007 meeting that were completed on December 19, 2008, which indicate the same.
17      CWIE, on the other hand, contends that the meeting was only between the board of
18 directors, it was not properly noticed as a shareholders' meeting pursuant to BandCon bylaws,
19 Cadwell never agreed to a dilution of CWIE's interest (and could not have since he was only
20 present as a director, rather than as a representative of shareholder CWIE), and also alleges that
21 the record of minutes submitted by BandCon are fabricated. As evidence of the fabrication,
22 CWIE points out that Cadwell was issued draft minutes at or near the time of the actual meeting
23 and indicates that those minutes do not state that the meeting was also a shareholder meeting or
24 that Cadwell agreed to a dilution. CWIE further contends that there is no plausible reason for
25 BandCon to have waited until December 2008 to draft alleged "final" minutes of the 2007
26 meeting unless BandCon was merely fabricating evidence to support its defense.
27      BandCon also points out two other meetings in which Cadwell allegedly agreed to a
28 dilution of CWIE's interest. One meeting took place on August 15, 2007, and involved approval

of a consulting agreement with RFC, LLC for the services of Defendant Scot Ross that included the issuance of shares to Ross.  Further, on November 15, 2007, BandCon alleges that shareholders approved an Equity Participation Plan and Incentive Stock Option Agreement that involved the issuance of stock to BandCon employees with no new stock being issued to CWIE.  CWIE makes the same allegations that the minutes provides by BandCon are fabricated, evidenced by the fact that the final drafts were not written until December 2008 (no drafts were ever issued to Cadwell regarding these meetings), there is no evidence of proper notification of such meetings to include shareholders, and thus Cadwell could not have and did not waive CWIE's anti-dilution rights.

Monthly Profit Payments:

     CWIE also contends that BandCon has breached the Agreement by failing to pay CWIE its agreed 10% share in BandCon's monthly profits.  The parties agree that the provision of the Agreement providing for 10% monthly payments was amended in 2003; however, they dispute the meaning of the change.  In September 2003, BandCon sent CWIE a letter stating that BandCon's accountant "seems to think that [Section 7(c)] looks too much like a dividend" and that the parties needed to revise the section to "'clarify' that [BandCon is] not paying a 'dividend' but rather a payment on services from CWIE...." Cadwell Dec., ¶ 18, Ex. D.  As a result, the parties agreed to delete Section 7(c), as quoted above, and include the following "clarifying" language:

> CWIE will perform monthly consulting services for Bandwidth Consulting consistent with the business needs of Bandwidth Consulting.  Further, CWIE will send to Bandwidth Consulting a detailed (monthly) invoice which depicts the services provided and the consulting fee charged

Cadwell Dec., ¶ 18, Ex. E.

     CWIE alleges that BandCon presented the changed language as for accounting purposes only.  In other words, the language in no way altered the relationship between the parties, and CWIE was still entitled to 10% monthly payments regardless of whether it performed any

1  specific services for CWIE.  In support of its position, CWIE contends that any specific services
2  it performed for BandCon were separately charged to BandCon and were not reflected in the
3  monthly 10% payments.  Further, CWIE points out that BandCon continued to make these
4  monthly payments based on 10% of BandCon's profits up through December 2006, and
5  BandCon often referred to these payments as "commission" or "investment income amounts that
6  have been paid ...to CWIE from BandCon for the 10% equity ownership," rather than indicating
7  they were for any particular service rendered.  Janssen Dec., ¶ 15, Ex. L.  Finally, CWIE points
8  out that it failed to receive any monthly payments for 2007, and that when it indicated as much
9  to BandCon in 2008, rather than state that CWIE no longer had a right to receive such payments,
10  BandCon said that it was in the process of calculating the monthly profits and would provide the
11  numbers to CWIE as soon as possible.  However, in an April 24, 2008 meeting, BandCon
12  allegedly told CWIE that it could no longer receive its monthly payments because BandCon
13  contended that CWIE was improperly competing with BandCon, and BandCon alleged that
14  CWIE had already earned enough from its investment in BandCon.  CWIE maintains its position
15  that the original agreement and modification did not actually require CWIE to perform any
16  services in order to receive its monthly payments.  CWIE also claims that at this meeting,
17  BandCon never argued that CWIE no longer had the right to receive payments because CWIE
18  had failed to perform requisite services.
19       In contrast, BandCon seems to contend that the monthly payments were always meant to
20  be paid in consideration of CWIE performing services for BandCon, both pre- and post-
21  amendment.  The initial start-up services were the consideration for the monthly payments, and
22  BandCon alleges that the 2003 Amendment was meant to clarify that the Agreement required
23  continuing services by CWIE in order to receive the monthly payments.  Further, BandCon
24  contends that in late 2006, Cadwell indicated that CWIE  would no longer perform any services
25  for BandCon due to the expense.  As a result, Benowitz contends that BandCon held a
26  shareholder and director meeting in which Cadwell again indicated that CWIE could no longer
27  provide certain services to BandCon pursuant to the Subscription Agreement, and as a result, the
28  shareholders and board of directors agreed that BandCon no longer needed to pay CWIE 10% of

BandCon's monthly profits.

Preferred Shares:

On January 9, 2009, after this litigation was already pending, BandCon held a duly-noticed shareholders' meeting in which the shareholders present voted to remove Cadwell as a board of director. The shareholders also approved an amendment to the articles of incorporation authorizing, but not yet issuing, up to five-million shares of preferred stock of BandCon. *See* Benowitz Dec., ¶51, Ex. 3. ("RESOLVED, that the corporation's articles of incorporation be amended and restated to authorize the issuance of up to 5 million shares of a new class of shares to be designated as Preferred Shares, with the board of the directors of the company to determine the issuance of those shares and the rights, preferences and privileges associated with those shares"). CWIE's attorney, Jay M. Spillane, attempted to participate in the meeting, but he alleges that he was effectively prevented from doing so. In his declaration, he indicates that he asked for BandCon to move the start-time back because he had to drop his son off at school, and BandCon refused. He then was able to participate by phone, but when he refused to waive any objections to voting over the phone, his call was terminated. BandCon later informed Spillane of the results of the meeting. In the email, BandCon states "a motion was made to increase the number of preferred shares to be authorized under an amendment to the articles of incorporation to 5 million shares and that motion was seconded and was approved. Again no preferred shares are being issued; there has just been approval to amend the articles of incorporation to authorize up to 5 million preferred shares." Spillane Dec. ¶ 12, Ex. U. Further, in response to Spillane's questions regarding the preferred shares, BandCon represented the following:

> Also, in response to your diligence questions below:
>
> 1. There are no terms for the proposed class of Preferred Shares to describe as of yet. Nor is there a proposed amendment been drafted yet.
>
> 2. ...
>
> 3. There is no offering that has been concluded nor is any offering underway.

          4. Any description or response on this [i.e. a description of the plan of offering and sale of such Preferred Shares] would be completely premature as there is simply nothing underway at present.

As a result of the breach of fiduciary duty and breach of contract claims, Plaintiff requests that the Court enter a preliminary injunction enjoining BandCon from issuing any of the preferred "blank check"[3] shares. Plaintiff claims that the issuance of such shares pending trial will further dilute CWIE's equity interest in BandCon and will also frustrate CWIE's rights under the Agreement to receive its promised monthly payments of BandCon's net income, payments that have not been made to CWIE since December 2006. CWIE further contends that such injuries are imminent and irreparable.

## II.     LEGAL STANDARD

Generally, courts grant equitable relief in the event of irreparable injury and the inadequacy of legal remedies. *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994); *see also Weinberer v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S. Ct. 1798 (1982) ("[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies."). Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court may grant preliminary injunctive relief in order to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b). Plaintiffs must satisfy additional requirements in order to be granted preliminary relief. Plaintiffs have the burden of showing that they are entitled to preliminary relief. The "traditional test" requires that Plaintiffs demonstrate (1) a strong likelihood of success on the merits; (2) a significant threat of irreparable injury; (3) greater hardship to Plaintiffs than Defendants; and (4) that the public interest favors granting the injunction. *See American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir. 1983).

The "alternative test" permits the plaintiff to meet its burden by showing either "(1) a likelihood of success on the merits and the possibility of irreparable injury or (2) the existence of

---

[3]"Blank check" shares refers to "stock whose powers, designation, preferences and other rights are not described in the certificate of incorporation" but whose terms can be fixed by the board of directors. *Robert M. Bass Group., Inc. v. Evans*, 552 A.2d 1227, 1233 n.16 (Del. Ch. 1998).

8

serious questions going to the merits and the balance of hardships tipping in [the plaintiff's] favor." *Nike, Inc. v. McCarthy*, 379 F.3d 576, 580 (9th Cir. 2004) (internal quotation marks omitted). "'[S]erious questions' refers to the questions which cannot be resolved one way or the other at the hearing on the injunction...Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.' Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (citations omitted). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *U.S. v. Nutri-cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992) (citations omitted). "The critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *State of Alaska v. Native Vill. of Venetie*, 856 F.2d 1384, 1389 (9th Cir. 1988) (citations omitted).

**III.    DISCUSSION**

While the Court considers that there may at least be serious questions going to the merits of the case, the Court denies preliminary injunctive relief as Plaintiff has not made an adequate showing of immediate, irreparable injury or inadequate legal remedies to warrant such pre-trial relief.

**A.    The Merits**

While Plaintiff includes additional claims for relief in its complaint, it bases the instant Motion on BandCon's alleged breach of fiduciary duties and breach of contract to CWIE.

**1.    Fiduciary Duty**

Under California law, corporate directors owe fiduciary duties to shareholders. *Schwab v. Schwab-Wilson Mach. Corp.*, 13 Cal. App. 2d 1, 3 (1936). Further, controlling or majority shareholders also owe fiduciary duties to minority shareholders "to use there ability to control the corporation in a fair, just and equitable manner." *Jones v. H.F. Ahmanson & Co.*, 1 Cal. 3d

9

93, 108 (1969); *Lynch v. Cook*, 148 Cal. App. 3d 1072, 1079-80 (1983).

The parties dispute whether dilution of a shareholder's shares, alone, constitutes breach of fiduciary duties. BandCon contends that something more, such as a disclosure violation, is necessary. However, even under BandCon's formulation, CWIE's version of the facts would likely constitute a breach of fiduciary duty. CWIE contends that in the three alleged transactions that led to a dilution of its equity interest, it was never told that BandCon would not hold to the terms of the Subscription Agreement, and Cadwell did not verbally consent to a dilution of its interest. And CWIE presents compelling evidence that the minutes of the meetings in question may be fabricated, that the meetings were not properly noticed shareholder meetings (thus Cadwell could not have waived CWIE's equity rights under the contract), and that the parties never discussed the possibility of dilution at those meetings.

BandCon, on the other hand, contends that Cadwell, on behalf of CWIE, consented every time to the dilution of CWIE's interest. BandCon is likely right that if CWIE consented to the dilution of its equity interest, the directors and majority shareholders could not be acting in an unfair manner towards CWIE. And while CWIE presents evidence suggesting that BandCon's version of the facts should not be believed, BandCon also identifies numerous instances in which it contends that Cadwell and CWIE have siphoned competition and business opportunities away from BandCon. For example, one of CWIE's subsidiaries, allegedly at the direction of Cadwell, took over one of BandCon's major customers, Virtual Web Holding, Inc., and may have directed Virtual Web to cease making payments to BandCon. BandCon alleges a similar situation regarding another major customer, Alpha Red, Inc. This evidence, too, undermines the credibility of CWIE's version of the facts.

Finally, if BandCon further diluted minority shareholder CWIE's equity interest through the issuance of preferred shares without CWIE's consent and in contravention of the Agreement between the parties, the named defendants likely would not be acting in a "fair, just and equitable manner" pursuant to their fiduciary capacity as directors and majority shareholders. However, the Court cannot say that the *authorization* of preferred share, in and of itself, has led to a breach of fiduciary duty because, as of yet, there is no indication of how those shares will be

1  issued, to whom, and on what terms.

2  With such contested facts, it is unclear if CWIE will prevail at trial on its fiduciary duty
3  claim but, at a minimum, CWIE has raised serious questions going to the merits of the case.

### 2. Breach of Contract

5  To establish a claim for breach of contract, Plaintiff must show that: (1) it entered into a
6  contract with BandCon; (2) Plaintiff performed all its obligations; (3) all conditions to
7  BandCon's performance were satisfied; (4) BandCon failed to perform; and (5) resulting
8  damages. *Acoustics, Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d 881, 913 (1971).

9  Plaintiff alleges that BandCon breached the Subscription Agreement in two respects.
10  First, CWIE alleges that BandCon breached the anti-dilution provision of the Agreement,
11  forming the basis for the breach of fiduciary duties claim as well. Second, CWIE claims that
12  BandCon breached Section 7(c) of the Agreement when BandCon ceased making monthly profit
13  payments to CWIE.

14  The parties provide the Court with minimal legal authority regarding their contract
15  claims. Instead, they primarily dispute the facts. For example, as to the anti-dilution claim,
16  BandCon raises the same argument as in the fiduciary duty claim, alleging that CWIE waived its
17  right to receive an increase in shares. Rather than provide any legal argument against waiver,
18  CWIE instead claims that it never waived such rights. The Court notes that waiver of a
19  condition is not always legally cognizable. "There can be no waiver of 'a material part of the
20  agreed exchange'; i.e. the party entitled to performance cannot by a mere declaration of other
21  acts, unsupported by consideration, give up the entire benefit of the contract. Thus a buyer may
22  waive conditions relating to time and place of delivery, but not the right to receive the goods." 1
23  Witkin, *Summary of California Law* § 823 (10th ed. 2005). Under Section 7(a), CWIE received
24  a 10% equity interest in BandCon (at that time, 300 shares of common stock) in exchange for
25  CWIE's capital investment of $50,000, as well as the right to receive additional shares of
26  BandCon in order to maintain its 10% equity with no requirement that CWIE pay for the
27  additional shares or contribute more capital to BandCon. CWIE may argue that the right to
28  maintain the 10% equity interest is nonwaivable. However, BandCon might argue that the

11

1  waiver was supported by consideration, as CWIE allegedly said that it did not need to receive
2  the additional shares to maintain its equity interest as long as all other current shareholders
3  would be diluted equally.  Thus, CWIE bargained for equal dilution among the existing
4  shareholders, and this equal dilution may constitute consideration.  BandCon will also likely
5  contend that the right to maintain the 10% equity interest is waivable more generally.  As to this
6  contract claim, the parties have at least raised serious questions going to the merits.  However,
7  with these contested facts and minimal legal arguments, the Court cannot say CWIE will likely
8  prevail on this claim but can only find that serious questions have been raised.
9        As to the monthly profit payments, the parties dispute the intent of both the original
10 provision Section 7(c) as well as the "clarifying" amendment.  Under California law, "[a]
11 contract must be so interpreted as to give effect to the mutual intention of the parties as it existed
12 at the time of contracting, so far as the same is ascertainable and lawful."  Cal. Civ. Code §
13 1636.  CWIE argues that the original language of Section 7(c) no where states that CWIE had to
14 perform certain services in order to receive net-profit monthly payments under the Agreement.
15 Further, CWIE presents evidence that the payments it received pursuant to the original Section
16 7(c) and post-amendment were always calculated based on BandCon's monthly profits and  were
17 often referred to as CWIE's "commission" or "10% equity interest."  CWIE also claims that
18 BandCon never required an invoice for certain services rendered in order to make the payments
19 and that CWIE separately billed any rendered services to BandCon.  Thus, CWIE argues that the
20 amendment indicating that BandCon's monthly payments to CWIE were for services rendered
21 was only for accounting purposes and did no actually change the relationship between the
22 parties.  As a result, BandCon breached the Agreement when it ceased making the monthly
23 payments after 2006.  CWIE also provides the declaration of Dean Wirtz, a former principal of
24 BandCon, to support its argument that the amended language did not mean to alter the parties'
25 obligations.
26       BandCon, on the other hand, argues that the parties always intended CWIE's monthly
27 payments to be in consideration for CWIE's services.  This is why the amendment was referred
28 to as a "clarification" of the parties' rights under Section 7(c).  And BandCon argues that the

1 plain language of the amendment makes it clear that CWIE was only entitled to the payments if
2 it performed services. Further, BandCon contends that in 2006 Cadwell, on behalf of CWIE,
3 indicated that CWIE would no longer perform services for BandCon and that at a shareholders'
4 meeting in which Cadwell was present, the shareholders agreed that BandCon no longer had to
5 make monthly payments to CWIE, facts that CWIE claims are fabricated. Thus, BandCon is not
6 in breach of the Agreement. The Court notes that the parties do not address whether the
7 amendment was a modification of the contract pursuant to Cal. Civ. Code § 1698 or a
8 reformation of the contract pursuant to Cal. Civ. Code § 3399. Such a distinction may effect the
9 validity of the amendment as well as a determination by the Court regarding the parties' original
10 mutual intention. However, with such disputed facts, the Court at most finds that the parties
11 have raised serious questions going to the merits of the breach of contract claim that cannot
12 legitimately be resolved one way or the other.

And again, Plaintiff argues that the issuance of preferred shares will result in a continued breach of both provisions of the Agreement. However, the Court cannot clearly evaluate this charge as no plan of issuance implicating the rights of CWIE under the Agreement is yet underway or even on the table.

With such contested facts and minimal legal authority cited by the parties regarding the contract claims, the Court at most finds that CWIE has raised serious questions regarding the merits of its breach of contract claims.

**B.     Balance of Hardships**

Despite raising serious questions going to the merits of its claims for breach of contract and breach of fiduciary duties, CWIE has not made the requisite showing of immediate, irreparable harm or inadequate legal remedies. Thus, the balance of hardships does not tip decidedly toward Plaintiff.

In reference to CWIE's breach of contract claim, CWIE has made virtually no argument regarding why compensatory damages would be inadequate regarding BandCon's alleged failure to make 10% monthly payments pursuant to Section 7(c) of the Agreement, a claim for money damages. CWIE argues that if BandCon is allowed to issue preferred shares, then CWIE's right

13

to receive such monthly payments will likely continue to be frustrated. However, CWIE is not currently receiving such payments. So, enjoining the issuance of shares will have no effect on the status quo in this respect. Further, if compensatory damages will be available in the ordinary course of litigation, then the moving party is not faced with the threat of irreparable injury which is required to obtain preliminary injunctive relief. *Sampson v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 937 (1974). Plaintiff makes no allegation that it will not be able to collect money due under Section 7(c) at the close of trial. For example, there is no allegation that an asset freeze is necessary in order to ensure the payment of a judgment post-trial related to an equitable claim or any allegations that CWIE is facing insolvency. And the preliminary injunction sought here is not even directly related to the Section 7(c) breach of contract claim. Indeed, CWIE is not seeking an injunction that will require BandCon to reinstate performance under Section 7(c). As a result, with regard to CWIE's Section 7(c) breach of contract claim, CWIE has not made an adequate showing of inadequacy of legal remedies.

With regard to its equity interest, CWIE has not made a sufficient showing that injury is imminent or irreparable . Instead, the Court agrees with BandCon, that at this point the alleged injury to CWIE is too speculative. Further, CWIE has not shown that monetary damages are inadequate or that equitable relief would be unavailable post-trial.

To begin, in CWIE's moving and replying papers, it concedes that the requested injunction will not prevent BandCon from issuing common shares in order to raise capital. *See* Pl.'s Mot., 22 ("BandCon will no doubt claim that the requested relief will supposedly block further investment in Bandcon. However, BandCon has identified no party willing to invest money prior to the trial of this action. Further, nothing in the relief requested would prevent BandCon from obtaining debt financing or to solicit investment through the sale or issuance of common shares."); Pl.'s Repy, 18 ("Here, if the injunction is granted, the status quo will be preserved. Further, dilution and impairment of CWIE's rights would be averted. BandCon has not shown that the injunction sought by CWIE would prevent BandCon from raising capital. BandCon has not shown that it cannot raise capital through debt or through the issuance of common shares.") If CWIE wants to claim that continued dilution of its equity interest

constitutes irreparable harm, the Court has a hard time seeing why CWIE would be okay with such a dilution if more common shares are issued.

At oral argument, CWIE argued that it did not mean to imply in its briefing that it would be amenable to the issuance of common shares during trial if issuance of those shares also resulted in further dilution of its equity interest. However, as the premise for its motion to enjoin the issuance of preferred shares, CWIE contends that BandCon will necessarily issue those shares without honoring CWIE's 10% equity interest in the company. If CWIE is concerned that BandCon will not abide by the Subscription Agreement as to the preferred shares, the Court is unclear why CWIE seems to think that BandCon will abide by the agreement as to common shares, and thus does not need the protection of a preliminary injunction as to the issuance of common shares. Instead, the Court finds this inconsistent argumentation as further evidence of the lack of need for a preliminary injunction at this point.

CWIE seems to imply that dilution by preferred shares constitutes more of a worry because preferred shares will likely have priority rights to dividends and superior voting rights that would render CWIE's common shares even more worthless than through dilution by additionally issued common shares. However, as CWIE concedes, BandCon has not even set the terms of the preferred shares. The Court is hard-pressed to determine that the issuance of preferred shares will render CWIE's ownership interest valueless when the terms of such preferred shares are up for conjecture; the Court has no evidence regarding how such preferred shares will effect the voting rights of CWIE or that CWIE will not be issued such shares pursuant to an issuance plan. Further, BandCon has no current plans to issue such shares and, as CWIE points out, "has identified no party willing to invest money prior to the trial of this action" in such preferred shares. Pl.'s Mot., 22. With virtually no issuance plans on the table, the Court finds that any injury is too speculative at this point. Speculative injury cannot constitute irreparable injury. *Goldie's Bookstore, Inc. v. Superior Court of State of Cal.,* 739 F.2d 466, 472 (9th Cir. 1984). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until

1 the end of trial to resolve the harm.'" *Freedom Holding, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d
2 Cir. 2005) (*quoting Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1999). However,
3 difficulty in quantifying an injury does not make it speculative; if "the threat of injury is
4 imminent and the measure of that injury defies calculation, damages will not provide a remedy at
5 law." *Gilder v. PGA Tour, Inc.*, 936 F.3d 417, 423 (9th Cir. 1991).

6 Here, there is virtually no imminence. While CWIE is right that it should not have to
7 wait until such preferred shares are issued to seek relief from the Court, the cases it relies on to
8 argue irreparable harm are clearly distinguishable because they involved specific, contemplated
9 transactions with defined terms. For example, in *Asarco*, heavily relied on by Plaintiff and a
10 case in which the court entered a preliminary injunction, the preferred shares at issue violated
11 New Jersey Corporations law because they allowed for stock within the same class to have
12 different voting rights. *Asarco Inc. v. MRH Holmes A Court*, 611 F. Supp. 468, 477-78 (D.N.J.
13 1985). Thus, the court there held issuance of the shares would result in illegal dilution of
14 plaintiff's voting rights, an irreparable injury. Here, there is no evidence that the issuance of
15 preferred shares that do not yet have set voting terms will "illegally" dilute CWIE's voting
16 rights. Two other cases primarily relied on by Plaintiff's suffer from the same issue. *See Robert*
17 *M. Bass Group, Inc. V. Evans*, 552 A.2d 1227, 1246-47 (Del. Ch. 1988) (enjoining
18 implementation of publicly-announced corporate restructuring plan and finding irreparable
19 injury where plan would permanently divide company into two separate entities, management
20 would gain voting control, and corporation would incur bank debt of 1.7 billion dollars);
21 *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 734 (9th Cir. 1999) (injunction issued to prevent
22 the consummation of a stock swap and the liquidation of a corporation).

23 Without a clear transaction pending or any indication of the terms of preferred shares, the
24 Court cannot make an adequate finding that CWIE is facing new, impending irreparable injury.
25 And the past dilution of its equity interest cannot form the basis for injunctive relief now. *See*
26 *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S. Ct. 1660 (1983) ("Past exposure to illegal
27 conduct does not in itself show a present case or controversy regarding injunctive relief.")
28 Further, there is no showing that equitable relief will not be possible post-trial or that damages

are inadequate. Plaintiff claims that it has a right to 10% equity interest in BandCon. However, it makes no strong argument regarding why a cash value of that 10% equity interest cannot be calculated in order to award compensatory damages if its approximate 8% interest is further diluted pending trial due to the issuance of preferred shares. Ownership of shares of a company is not so unique that a court may not place a dollar value upon the shares to compensate a plaintiff for its loss. Thus, because CWIE has failed to demonstrate irreparable harm or the inadequacy of legal remedies, the Court cannot issue an injunction.

## IV.   DISPOSITION

For the foregoing reasons, the Court hereby DENIES Plaintiff's Motion to Enjoin the Issuance of Preferred Shares by Defendant Bandwidth Consulting, Inc. At oral argument, the parties stipulated that Defendant BandCon will provide Plaintiff CWIE with reasonable notice once an issuance plan regarding preferred shares is formulated.

IT IS SO ORDERED.

DATED: April 20, 2009

_____
DAVID O. CARTER
United States District Judge